UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
                                           :

IN RE BARRICK GOLD SECURITIES LITIGATION     :      13 Civ. 3851 (RPP)

                                           :
------------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Colby A. Smith                      Bruce E. Yannett
Jonathan R. Tuttle                 Elliot Greenfield
Ada Fernandez Johnson          Anna A. Moody
DEBEVOISE & PLIMPTON LLP    DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.              919 Third Avenue
Washington, D.C. 20004          New York, New York 10022
(202) 383-8000                    (212) 909-6000

*Attorneys for Defendants Barrick Gold Corporation, Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George Potter, and Sybil E. Veenman*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

THE UNDERLYING FACTS ............................................................................. 3

PLAINTIFFS' CLAIMS .................................................................................... 11

ARGUMENT ..................................................................................................... 12

I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) .......................... 12

      A.      The Section 10(b) Claim Should Be Dismissed for Failure to Allege an Actionable Misrepresentation. ......................................................... 13

           1.      Cost and Schedule Estimates Are Not Actionable .................................... 13

           2.      Statements Regarding Environmental Approvals  Were Not False When Made. ............................................................... 17

           3.      Statements Regarding Internal Controls and Accounting for Capital Costs Are Not Actionable ............................................ 19

           4.      Statements of Corporate Optimism and Puffery Are Not Actionable. ............................................................................... 22

           5.      Individual Defendants Are Not Liable For Statements They Did Not Make. ..................................................................... 23

      B.      The Section 10(b) Claim Should Be Dismissed for Failure to Allege Particularized Facts Giving Rise to a Strong Inference of Scienter ..................... 23

           1.      The Opposing Inference of Non-Fraudulent Intent  Is Far More Compelling. ................................................................... 24

           2.      Plaintiffs Do Not Adequately Plead Motive. ........................................... 25

           3.      Plaintiffs Do Not Adequately Plead Actual Knowledge of Falsity as to Cost and Schedule Estimates .......................................... 26

           4.      Plaintiffs Do Not Adequately Plead Conscious Misbehavior or Recklessness as to Statements Regarding Environmental Approvals. ..................................................................... 31

           5.      Plaintiffs' Allegations of GAAP Violations and Purported Internal Control Weaknesses Are Inadequate ........................................ 34

i

6. Plaintiffs Fail to Adequately Allege Scienter as to  Each Individual Defendant.................................................................35

7. Plaintiffs Fail to Adequately Allege Corporate Scienter. ...........................36

C. The Section 10(b) Claim Should Be Dismissed for  Failure to Plead Loss Causation.................................................................37

1. None of the Identified Statements or Events Constitute "Corrective Disclosures" or the "Materialization of a Concealed Risk."......................38

2. Plaintiffs Fail to Allege Loss Causation as to Internal Controls...............41

3. Plaintiffs Fail to Disaggregate from Losses Caused  by Other Events Affecting Barrick's Stock Price. ......................................41

II. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(a). ..........................................................44

III. PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS TO ANY  NON-DOMESTIC TRANSACTIONS..........................................................45

CONCLUSION..........................................................45

24059889v02

# TABLE OF AUTHORITIES

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)..................................................................................45

*Ashland Inc. v. Morgan Stanley & Co.*,
   700 F. Supp. 2d 453 (S.D.N.Y. 2010).................................................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)................................................................... 23-24, 31

*Campo v. Sears Holdings Corp.*,
   371 Fed. App'x 212 (2d Cir. 2010)....................................................................30

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)...............................................................................31

*City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*,
   No. 10 Civ. 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011).....................14, 22

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   928 F. Supp. 2d 705 (S.D.N.Y. 2013)...............................................................42, 44

*Coronel v. Quanta Capital Holdings Ltd.*,
   No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)........................14, 44

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................................................44

*Delshah Group LLC v. Javeri*,
   No. 09 Civ. 6909, 2013 WL 2322488 (S.D.N.Y. May 28, 2013).......................40

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................37, 38, 41

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...............................................................................22

*Fait v. Regions Financial Corp.*,
   655 F.3d 105 (2d Cir. 2011)...............................................................13, 16, 21

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994).................................................................................42

*Frederick v. Mechel OAO*,
   475 Fed. App'x 353 (2d Cir. 2012).....................................................................36

24059889v02

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ........................................................35

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010).............................................13

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004)..............................................................25

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)..............................................................16

*Higginbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................28, 30

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
    No. 11 Civ. 7968, 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013)............28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................45

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................3

*In re Buca Inc. Secs. Litig.*,
    No. 05-1762, 2006 WL 3030886 (D. Minn. Oct. 16, 2006) ................21

*In re Carter-Wallace, Inc., Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000).................................................................18

*In re Citigroup*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)..............................................35

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)..............................................33

*In re Emex Corp. Sec. Litig.*,
    No. 01 Civ. 4886, 2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002)........26

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*, 525 Fed. App'x 16 (2d Cir. 2013)..................23

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)..............................................34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)..........................................................41, 44

iv

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)..................................................................39

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011)............................................................................45

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)..............................................................38

*In re MF Global Holdings Ltd. Sec. Litig.*,
    No. 11 Civ. 7866, 2013 WL 5996426 (S.D.N.Y. Nov. 12, 2013) ..........................44

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)......................................................................37, 38

*In re SAIC, Inc. Sec. Litig.*,
    No. 12 Civ. 1353, 2013 WL 5462289 (S.D.N.Y. Sept. 30, 2013) ........................21

*In re Salomon Analyst Winstar Litig.*,
    No. 02 Civ. 6171, 2006 WL 510526 (S.D.N.Y. Feb. 28, 2006) ..........................14

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)............................................................................33

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................................22

*In re Security Capital Assurance Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)..............................................................43

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................35

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)..........................................................38, 39

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. 2010)............................................................................15

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011)..................................................................................23

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................31

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)..............................................................................3

24059889v02

*Kuriakose v. Federal Home Loan Mortg. Corp.*,
 No. 08 Civ. 7281, 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011),
 *aff'd*, No. 12-4353-cv, 2013 WL 5911476 (2d Cir. Nov. 5, 2013)........................................41

*Lattanzio v. Deloitte & Touche LLP*,
 476 F.3d 147 (2d Cir. 2007)........................................42

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005)........................................37, 39, 42

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp.
 2d 447 (S.D.N.Y. 2010)........................................33

*Matrixx Initiatives, Inc. v. Siracusano*,
 131 S. Ct. 1309 (2011)........................................27

*Mills v. Polar Molecular Corp.*,
 12 F.3d 1170 (2d Cir. 1993)........................................35

*Morrison v. Nat'l Austl. Bank Ltd.*,
 130 S. Ct. 2869 (2010)........................................45

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
 693 F.3d 145 (2d Cir. 2012)........................................3

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
 455 Fed. App'x 10 (2d Cir. 2011)........................................36

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)........................................25, 26, 30, 31, 34

*Olkey v. Hyperion 1999 Term Trust*,
 98 F.3d 2 (2d Cir. 1996)........................................16

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
 Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010)........................................26

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000)........................................3, 25

*Russo v. Bruce*,
 777 F. Supp. 2d 505 (S.D.N.Y. 2011)........................................26

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
 75 F.3d 801 (2d Cir. 1996)........................................3, 17

*Shapiro v. UJB Fin. Corp.*,
 964 F.2d 272 (3d Cir. 1992)........................................35

vi

*Shemian v. Research In Motion Ltd.*,
No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ..............................34, 36, 37

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................13, 18, 27, 29, 32

*South Cherry St., LLC v. Hennessee Grp., LLC*,
573 F.3d 98 (2d Cir. 2009)...............................................................................26, 31

*Steinberg v. Ericsson LM Tel. Co.*,
No. 07 Civ. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)....................................22, 31

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
552 U.S. 148 (2008).................................................................................................12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..........................................................................24, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................2, 23, 24, 29, 30

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)....................................................................36

*Wallace v. IntraLinks*,
No. 11 Civ. 8861, 2013 WL 1907685 (S.D.N.Y. May 8, 2013)......................................38

*Wilson v. Merrill Lynch & Co., Inc.*,
671 F.3d 120 (2d Cir. 2011).................................................................................44

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007)................................................................................27

STATUTES

Private Securities Litigation Reform Act of 1995,
15 U.S.C. § 78u-4 .........................................1, 2, 3, 13, 15, 23, 24, 27, 35, 36, 45

Securities Exchange Act, Section 10(b),
15 U.S.C. § 78j(b)...................................................................12, 23, 25, 37, 41, 44

Securities Exchange Act, Section 20(a),
15 U.S.C. § 78t(a) ................................................................................12, 44

OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)........................................................................1, 35

Federal Rule of Civil Procedure 12(b)(6) ...................................................................1

Defendants Barrick Gold Corporation ("Barrick" or the "Company"), Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, and George Potter (the "Individual Defendants"), and Sybil E. Veenman (collectively, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the amended complaint ("Amended Complaint" or "AC") filed by plaintiffs Union Asset Management Holding AG and LRI Invest S.A. ("Plaintiffs"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA").

## PRELIMINARY STATEMENT

Despite the length and repetition of the 198-page, 548-paragraph Amended Complaint, the facts underlying Plaintiffs' claims are straightforward.  Barrick, the world's largest gold producer, announced on May 7, 2009 that it would begin construction of what it hoped would become a substantial, low-cost gold mine.  The project, known as Pascua-Lama (the "Project"), was unprecedented in its scope, size, and – because it straddled the high-altitude border between Argentina and Chile in the Andes Mountains – complexity.  Barrick expressed confidence that the Project could be accomplished, but also warned throughout the putative class period that the Project was complex, difficult, and faced a range of risks and uncertainties.  In October 2013, Barrick suspended the Project as a result of unexpected cost increases, regulatory issues and, perhaps most important, the sharply declining price of gold, which had changed the Project's economics.  Each of these risks had been fully disclosed to investors from the outset.

Relying on the false clarity of hindsight, Plaintiffs now claim that the Project was doomed to fail from the beginning and that Barrick knew and concealed that fact from the day it first announced the commencement of construction.  The AC should be dismissed because it provides no support for the claim that Defendants made any actionable misrepresentations, let alone that they did so with an intent to defraud, or that the purported misrepresentations caused

the identified declines in Barrick's stock price.

*First*, Plaintiffs fail to allege any actionable misrepresentations, primarily because Barrick's statements regarding projected costs and timing are forward-looking statements protected by the safe harbor provisions of the PSLRA and the bespeaks caution doctrine.  Other alleged misrepresentations, including those related to the Project's environmental approvals, also are not actionable, either because Plaintiffs fail to allege any facts showing that the statements were inaccurate when made or because the statements were opinion, optimism, or puffery that cannot give rise to a securities fraud claim.

*Second*, Plaintiffs fail to allege facts giving rise to a strong inference of scienter. Plaintiffs' key factual predicate – that Barrick undertook a multi-billion dollar mine construction project that it knew from the outset was not technically or economically feasible – simply makes no sense.  For this reason alone, under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), this case should be dismissed.  Plaintiffs allege no facts in support of this nonsensical theory, relying instead on (*i*) an alleged unsuccessful bid by a construction contractor that pre-dates the first alleged misstatement by at least two years; (*ii*) a small set of mischaracterized internal documents that actually demonstrate Barrick's good faith efforts to address the Project's risks and challenges; and (*iii*) the uninformed speculation and opinions of four anonymous former low-level employees who were not even present at the outset of the Project.  None of these allegations are sufficient under the PSLRA's heightened pleading standard.

*Third*, Plaintiffs fail to plead loss causation because (*i*) none of the eight statements or events alleged by Plaintiffs to have caused declines in Barrick's stock price constitute "corrective disclosures" or the "materialization of a concealed risk," and (*ii*) Plaintiffs make no attempt to disaggregate the losses allegedly caused by those statements from those caused by other

industry-wide factors, such as the plummeting price of gold, or other company-specific news disclosed by Barrick in the same public filings.  That Plaintiffs ignore significant announcements that first revealed cost pressures and revised estimates, but were unaccompanied by negative investor reaction, further undermines Plaintiffs' loss causation assertions.

When Plaintiffs' overwrought allegations are scrutinized as the PSLRA requires, when the repetition and mischaracterization of the AC are stripped away, what remains is a story of ongoing good faith efforts by Barrick to manage and complete a massive and complex project in a changing economic environment, and to disclose those developments to the public once the facts were known.  The AC ignores this cogent explanation of events and instead promotes an implausible alternative that cannot support a securities fraud claim.

### THE UNDERLYING FACTS[1]

Founded in 1983 and headquartered in Toronto, Canada, Barrick is one of the world's largest gold mining companies.  (AC ¶ 21)  In 1994, Barrick acquired Pascua-Lama, considered one of the world's largest untapped gold mines, but also "one of the biggest and most difficult industrial ventures."  (AC ¶¶ 1, 34, 36)  Pascua-Lama's location spanning Chile and Argentina in the Andes Mountains presented "significant and unique challenges for exploration and the ultimate production of gold."  (*Id.*  ¶ 2, 35)  To access the ore, Barrick planned to dig an open-pit mine 15,000 feet above sea level, in conditions that created significant "logistical, operational, and environmental challenges."  (*Id.*  ¶ 36)

---

[1]   The factual allegations in the AC are taken as true solely for purposes of this motion, except where those allegations contradict the contents of SEC filings and other documents cited in the AC.  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012) (court need not accept as true allegations contradicted by cited documents); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) (same).  On a motion to dismiss, the Court may take notice of the full content of documents cited in the complaint.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996).  The Court may also consider materials integral to the complaint even if they are not explicitly incorporated by reference therein.  *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).  Copies of such documents are attached as exhibits to the accompanying Declaration of Elliot Greenfield, cited as "Ex. _."

Barrick regularly disclosed the risks of this complex mining venture to investors. Barrick's comprehensive cautionary language warned specifically about the risks associated with changes in metal prices, price volatility and decreased availability of commodities, the failure to achieve production or cost estimates, the failure to comply with applicable environmental laws and regulations, and the inherent unpredictability of project success.  (Ex. 1 at 78-88; Ex. 2 at 83-93; Ex. 3 at 99-109; Ex. 4 at 112-124; Ex. 5 at 103-117)  Barrick emphasized at the outset – and repeated throughout the putative class period – that "it is possible that *actual costs may increase significantly and economic returns may differ materially from Barrick's estimates* or that *metal prices may decrease significantly* or that Barrick could fail to obtain . . . *the governmental approvals necessary* for the operation of a project . . ., in which case, *the project may not proceed either on its original timing or at all*."  (Ex. 1 at 79 (emphasis added); s*ee also* Ex. 2 at 85; Ex. 3 at 100; Ex. 4 at 114; Ex. 5 at 107)

On May 7, 2009, Barrick announced that it was proceeding with construction of the Project.  (AC ¶¶ 57)  In its press release, the Company said that "considerable progress" had been made on the issues of "cross border permitting," "capital and operating costs and project economics" and "project financing," which culminated in a "go-ahead decision" on the Project. (*Id.*; Ex. 6 at 1)  Barrick also stated that the Project's "pre-production construction *estimate* is $2.8-$3.0 billion" and that production was "*expected*" to begin in "early 2013."  (AC ¶ 241 (emphasis added))  The Company also explained that the Project's environmental impact assessments ("EIAs") had received approval from the regulatory authorities in Chile and Argentina after "extensive community and environmental review over several years."  (Ex. 6 at 4)  In particular, as relevant here, Barrick agreed to implement certain measures to protect nearby glaciers and the local water supply, including construction of a water management system to

divert run-off from the glaciers around the mine.  (AC ¶¶ 45-47)

Barrick's May 7, 2009 announcement contained extensive cautionary language warning investors that the Company's forward-looking statements – including its cost and schedule estimates – represented expectations and were subject to inherent risks and uncertainties:

- Forward-looking statements about such projects "are necessarily based upon a number of *estimates and assumptions* that, while considered reasonable by management, are inherently subject to significant *business, economic and competitive uncertainties* and contingencies."  (Ex. 6 at 5 (emphasis added))  "Such *forward-looking statements include* . . . expectations regarding the *start-up time*, design, mine life, *production*, reserves, *total cash costs* and exploration potential of the Pascua-Lama project."  (*Id.*)

- Those statements "involve known and *unknown risks, uncertainties and other factors* that may cause the actual financial results, performance or achievements of Barrick to be *materially different* from the Company's estimated future results, performance or achievements  . . . ."  (*Id.*)  These risks include "*changes in the worldwide price of gold*," "*operating or technical difficulties* in connection with mining or development activities," "*availability and costs associated with mining inputs and labor*," and "the *speculative nature* of exploration and development."  (*Id.*)

This cautionary language, together with additional risk disclosures discussed below, highlighted for investors the range of uncertainties associated with the Project.  From May 7, 2009 until February 17, 2011, Barrick's cost and schedule estimates remained virtually unchanged – the Project was "in line with" its forecast pre-production budget of $2.8-$3.0 billion and "on schedule" to begin production during the first quarter of 2013.  (*See* AC ¶¶ 250-308)

On February 17, 2011, however, Barrick announced that, as a result of a "line-by-line review" of expected capital costs for the Project, "[p]re-production capital budgets are expected to be higher" by 10-20% to $3.3-$3.6 billion.  (AC ¶ 309-310)  Barrick said this change was primarily "a result of a stronger Chilean peso, labor, commodity and other input cost increases in both countries and higher inflation particularly in Argentina."  (Ex. 7 at 3)  Labor cost pressures were reported to be especially pronounced in Chile, which suffered a severe earthquake in October 2010 and was in the midst of rebuilding projects that sapped locally available resources.

5

(Ex. 8 at 4)  First gold production, the announcement said, was now expected to occur in the "first half of 2013."  (Ex. 7 at 3)  Once again, this disclosure was accompanied by extensive warnings and cautionary language.  (*Id.* at 9-10)

On July 28, 2011, Barrick announced another upward revision of the anticipated pre-production capital costs of the Project, raising the estimate to $4.7-$5.0 billion.  (AC ¶ 344)  Barrick explained that the Project had been affected by "global cost trends which are a product of a higher commodity price environment, stronger local currencies, tighter labor markets and higher inflation."  (Ex. 9 at 1)  In particular, since Barrick's initial estimate in 2009, costs for key consumables at Pascua-Lama had increased dramatically:  steel prices were up about 100%, oil about 120%, and copper prices more than 200%.  (*Id.* at 5)  Additionally, inflation rates of over 25% in Argentina, as well as the earthquake in Chile, resulted in significantly higher labor costs and a tighter labor market.  (*Id.* at 6)[2]

Barrick further disclosed that it had conducted a detailed review of "the underlying assumptions and trending analysis" for the Project, which found that "certain earlier estimates and assumptions [were] not achievable, including those for productivity rates and inflationary effects on costs, as well as for required quantities of certain construction materials such as steel and cement."  (*Id.* at 5)  The Company also said it had "engaged an independent, globally recognized engineering consulting firm" – Turner & Townsend – to review the "robustness of our processes and methodology in deriving this updated capital estimate."  (Ex. 10 at 3)

Throughout the remainder of 2011 and early 2012, Barrick maintained its pre-production

---

[2]    Barrick disclosed that the increased cost of key consumables such as steel, oil and copper, as well as high inflation rates in Argentina and the effects of the earthquake in Chile accounted for approximately 50% of the cost increases.  Another 35% of the increase resulted from construction experience at the Project, which led to a re-estimate of the amount of materials required.  The final 15% of the increase resulted from additional expenditures required to maintain the schedule for the Project, despite lower productivity levels arising from higher costs associated with winter construction and housing of employees.  (Ex. 9 at 6)

24059889v02

cost and project completion estimates.  (AC ¶¶ 354-64)  In response to a specific question on a February 16, 2012 earnings call asking whether capital costs for the Project would be higher than predicted, Barrick CEO Aaron Regent said "we're still tracking within the range," but he cautioned that "I think it's too early to say" whether Barrick would go above that range.  (AC ¶ 365)  On May 2, 2012, Barrick again warned investors that the Project continued to be "impacted by labor and commodity cost pressures, primarily as a result of:  high inflation in Argentina, and to a lesser extent, Chile, competition for skilled labor and lower than expected labor productivity in underground development."  (Ex. 11 at 5)  To assess these cost pressures, the Company announced that it intended to complete "a detailed capital cost and schedule review in the second quarter of 2012."  (*Id.*)  On a call that day, Mr. Regent explained that "we are just highlighting that we are working in an environment where it is challenging and there are pressures from a cost perspective."  (AC ¶ 381)

On July 26, 2012, Barrick disclosed the preliminary results of its cost and schedule review, raising its estimate of pre-production costs to $7.5-$8.0 billion and delaying the estimated first production date to mid-2014.  (AC ¶ 117; Ex. 12 at 1, 5)  Barrick stated that it would provide "a further progress update" with its third quarter financial results.  (Ex. 12 at 5)  Barrick subsequently reported that the key factors contributing to the capital cost increase were lower than expected contractor productivity, engineering and planning gaps, cost escalation, and schedule delays in completing the camps, tunnel and process plant.  (*Id.*)  Jamie Sokalsky, who had succeeded Regent as CEO on June 2, 2012, said that Barrick's review of the Project was continuing, but that "[i]n retrospect, the challenges that come with a project of this size and unique complexity were greater than anticipated."  (Ex. 13 at 4)  To meet those challenges, Barrick said that Flour Corporation would take over management of the Project.  (*Id*. at 4-5)

In October 2012, after observing "unusually high wind and dust," Barrick voluntarily suspended pre-stripping on the Chilean side of Pascua Lama.  (AC ¶¶ 127, 404; Ex. 14 at 1)  Chilean regulatory authorities subsequently issued an order maintaining the suspension of pre-stripping until the dust-related concerns were addressed.  (Ex. 14 at 1)  Barrick stated that it "immediately formulated an action plan to address the regulator's specific concerns while further strengthening dust control measures at the project generally."  (*Id.*)

Barrick's next earnings announcement on November 1, 2012 disclosed that the previously-announced review of capital costs and schedule would be "complete by our 2012 year-end results release," and that "work to date suggests capital costs will be closer to $8.0-$8.5 billion, with first production in the second half of 2014."  (AC ¶ 397)  Barrick attributed the adjustment to "the impact of the delay of first gold to the second half of 2014," "increased labor hours and installation rates," and "incremental payments to Fluor."  (AC ¶ 219)  Barrick also informed investors that two lawsuits had been filed in Chile "seeking the suspension of construction" of the Chilean portion of the Project, due to "alleged non-compliance with" environmental approvals.  (Ex. 15 at 14)  Barrick said that the Court had "declined to issue an immediate injunction suspending pre-stripping activities, but both cases have been admitted for review by the Court."  (*Id.* at 14-15)  On February 14, 2013, Barrick reported that it had completed its review of Project costs and production schedule, with no further changes to the estimates announced the previous November.  (AC ¶ 402(b))

Barrick's Annual Report for 2012, filed on March 28, 2013, contained extensive additional disclosure about developing environmental issues in Chile and the potential impact on the Project.  Barrick disclosed that in December 2012 and January 2013, a portion of the "non-contact water diversion system" was damaged, and that "measures to repair and improve the

non-contact water management system are expected to be completed by mid-year." (Ex. 5 at 80)

Barrick reported that it was also evaluating upgrades to the water treatment plant, which it

expected would be completed by the end of the first quarter of 2014. (*Id.*) Barrick expressly

warned investors that "[p]re-stripping of the pit in Chile is unlikely to recommence until matters

related to dust and water management are resolved." (*Id.*) Barrick added that, in March 2013,

"the environmental authority in Chile issued a resolution alleging certain non-compliances

related to the acid rock drainage water management system in Chile." (*Id.* at 83) Barrick stated

that it would evaluate the resolution and "respond to the allegations as required, including by

presenting a plan to bring the system into compliance with the project's environmental permit."

(*Id.*) The Company cautioned that, "[a]lthough in the fourth quarter of 2012, the cost and

schedule estimate was finalized, it is possible that unanticipated events, or the outcome of the

current constitutional challenges and regulatory actions in Chile could result in further changes."

(*Id.* at 107)

  Barrick also disclosed that, in light of new developments, it had evaluated whether the

asset value of Pascua-Lama might be impaired. It reported that the value of the Project, at that

time, exceeded Barrick's investment by $1.5 billion, but that a "decrease of about 7% in long-

term gold prices, a decrease of about 12% in silver prices, an increase of about 10% in operating

costs or an increase of about 15% in the total [life-of-mine] capital expenditures, would in

isolation, cause the estimated recoverable amount to be equal to the carrying value" – which

would require an impairment charge. (Ex. 16 at 112)

  On April 10, 2013, Barrick announced that a local court in one of the previously

disclosed Chilean lawsuits had issued a preliminary injunction suspending all work on the

Chilean side of the Project pending a full hearing. Barrick said it would "address environmental

and other regulatory requirements" in response to the order and told investors "[i]t is too early to assess the impact, if any, on the overall capital budget and schedule of the project."  (AC ¶ 131; Ex. 17 at 1)  Two weeks later, Barrick cautioned that "if resumption of construction activities in Chile, including the pre-stripping, is delayed beyond late 2013 . . . there could be a significant change to the mine plan and an impact on the capital cost and production schedule of the project."  (Ex. 18 at 4)  On May 24, 2013, Barrick received a resolution from the Chilean environmental authority, which required the Company to complete the water management system at Pascua-Lama before construction could resume and imposed a fine of $16 million related to the same issue.  (AC ¶ 137; 228)

While these events were taking place at Pascua-Lama, in early 2013 the price of gold began to decline precipitously, reversing a long-term upward trend that had been followed by a period of stable prices.  In the first six months of 2013, the price of gold plummeted more than 25%.  In light of the regulatory and litigation developments at Pascua-Lama, and sharply declining gold prices, the Company announced on June 28, 2013, that it would re-sequence the construction plan for the Project, reducing capital costs in the near term and delaying gold production until mid-2016.  (Ex. 19 at 1) The Company also disclosed that in light of the decline in gold prices and developments at the Project, it had undertaken impairment testing to evaluate the carrying value of the Project and preliminarily determined that the Project likely was impaired by $4.5 to $5.5 billion.  (*Id.* at 1-2)  A *Wall Street Journal* article cited by Plaintiffs noted: "Like all gold miners, Barrick has also been hit hard as the price of its main commodity falls and its costs rise . . . .  Miners across the board have been writing down the value of projects."  (Ex. 20)  On August 1, 2013, the Company confirmed the Pascua-Lama impairment charge of $5.1 billion and also announced $3.6 billion of impairment charges at other projects,

10

all associated with the significant decline in gold prices.  (Ex. 21 at 1, 41-43)

On October 31, 2013, Barrick announced it was "temporarily suspending" construction activity at Pascua-Lama, except for construction necessary for environmental and regulatory compliance.  (Ex. 22 at 1)  Sokalsky explained that the decision was based on a number of factors, including that gold and silver prices "have continued to remain at lower levels for a longer period of time" and that "capital cost estimates for the project have continued to come under pressure."  (Ex. 23 at 2)  The decision to re-start the Project would "depend on improved project economics such as go-forward costs, the outlook for metal prices, and reduced uncertainty associated with legal and other regulatory requirements."  (Ex. 22 at 1)

## PLAINTIFFS' CLAIMS

Based on these facts, Plaintiffs allege a highly implausible story of securities fraud that spans nearly four-and-one-half years, beginning at the very outset of the Project and continuing until five months after this case was initially filed.  In support of their theory, Plaintiffs rely on a key assertion – which they repeat verbatim 35 times in the AC:

> Defendants concealed that Project personnel, the Bechtel Report, and the environmental and logistical challenges of the Project made clear before 2009 that the Company would not be able to deliver [the Pascua-Lama Project] (i) within the timeframe or budget disclosed to shareholders; or (ii) in compliance with the terms of the environmental impact assessment that the Chilean regulators approved . . . .

(*See*, *e.g.*, AC ¶¶ 246, 249)

With respect to the Project's "timeframe and budget," the so-called "Bechtel Report" plays a central role in Plaintiffs' theory:  it is the only alleged document that pre-dates the commencement of the Project and therefore the sole basis for Plaintiffs' claim that Defendants knew from the outset that the Project was never "technically or economically feasible."  (AC ¶ 85)  Although Plaintiffs contend that the alleged "Bechtel Report" demonstrates that the Project

would cost $5 billion – and thus "eviscerate[s]" Barrick's $2.8-$3.0 billion initial cost estimate – by Plaintiffs' own description, the "Report" is actually nothing more than an unsuccessful bid submitted by a third-party contractor years before the Project was announced.  (AC ¶¶ 52-53, 56)

Plaintiffs' allegations regarding the Project's compliance with its Chilean EIA rely on the purported statements of anonymous sources and a handful of internal documents from the Project – none of which contradict or undermine Barrick's public statements about the Project's environmental approvals.  (AC ¶¶ 63-108)

Based largely on the same underlying allegations, Plaintiffs also assert claims with respect to statements by Barrick regarding the capitalization of costs associated with the Project (AC ¶¶ 174-92), and the adequacy of Barrick's internal controls, as certified by Barrick's CEO and CFO (AC ¶¶ 152-73).

Plaintiffs claim that these four categories of alleged misstatements give rise to a claim for securities fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (the "Exchange Act") and, with respect to the Individual Defendants and Veenman, to control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  As explained in the pages that follow, Plaintiffs' allegations are a self-serving and facially inaccurate caricature of the underlying facts, and Plaintiffs' claims should be dismissed with prejudice.

## **ARGUMENT**

## I.   **PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b).**

Plaintiffs' Section 10(b) claim fails because the AC does not adequately allege that any Defendant made an actionable misrepresentation, that any Defendant acted with scienter, or that the alleged misrepresentations caused investor losses.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

### A.    The Section 10(b) Claim Should Be Dismissed for Failure to Allege an Actionable Misrepresentation.

Under well-settled Second Circuit law, none of Plaintiffs' four categories of alleged

misrepresentations – about cost and schedule, environmental approvals, capitalization of costs,

and internal controls – are actionable.

### 1.    Cost and Schedule Estimates Are Not Actionable.

The core allegation underlying the AC is that Barrick's cost and schedule estimates for

Pascua-Lama were false.  Plaintiffs assert that every statement made by Barrick about the

schedule for the Project and its costs – from the initial estimate in 2009 to the last estimate in

2013 – was untrue.  (*See*, *e.g.*, AC¶¶ 148, 240, 321)  Each estimate, however, constituted a

forward-looking statement, and each was accompanied by meaningful cautionary language that

rendered it immune under the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5(c), and the

"bespeaks caution" doctrine.  In addition, under the Second Circuit's ruling in *Fait v. Regions

Financial Corp.*, 655 F.3d 105, 110 (2d Cir. 2011), such estimates, which are indisputably

statements of opinion, are not actionable because Plaintiffs allege no facts indicating that they

were both objectively false and not honestly believed when made.

### a.    Estimates Are Protected Forward-Looking Statements.

Under the PSLRA's "safe harbor" provision, Defendants are not liable for forward-

looking statements that are identified as such and "accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially."  15

U.S.C. § 78u-5(c).  Forward-looking statements include statements that "speak predictively

about the future," including statements "of the plans and objectives of management for future

operations."  *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010).  To be "meaningful,"

cautionary language need only set out the "major factors that the defendants faced at the time the

statement was made." *Slayton v. Am. Express Co.*, 604 F.3d 758, 771 (2d Cir. 2010).  Likewise, the "bespeaks caution" doctrine "precludes fraud liability for positive forward-looking statements that are accompanied by sufficient cautionary language or risk disclosures which, taken in context, 'bespeak caution' to the reader."  *In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526, at *11 (S.D.N.Y. Feb. 28, 2006) (internal quotations omitted).

The language of Barrick's statements about the Project's estimated costs and schedule made clear that the announcements reflected forecasts and anticipated outcomes, and were not statements of existing fact.  In the May 7, 2009 press release announcing that construction of Pascua-Lama was commencing, in which Barrick stated that "Pascua-Lama's pre-production construction *estimate* is $2.8-$3.0 billion" and that its "[c]ommissioning [was] *expected* in late 2012 and production in 2013," and in each of Barrick's later revisions to those estimates, the Company consistently used the word "*estimate*" when referring to pre-production capital costs and the word "*expected*" when referring to the timetable, or their equivalents.  (*See*, *e.g.*, Ex. 6 at 1-2; Ex. 7 at 1, Ex. 9 at 1, Ex. 12 at 1, Ex. 15 at 1-2; Ex. 19 at 1)  In fact, Barrick expressly stated in conjunction with each of its announcements that its cost and schedule estimates constituted "forward-looking statements" and, as such, "are necessarily based upon a number of estimates and assumptions that, while considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies."  (*See*, *e.g.*, Ex. 6 at 5)  *See City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10 Civ 00967, 2011 WL 7158548, at *4–5 (S.D.N.Y. Sept. 6, 2011) (statements disclosing "projected outlook – including expected financial results . . . and future new product releases – are not actionable pursuant to the forward-looking statement safe harbor"); *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *17  (S.D.N.Y. Jan. 26, 2009) (granting motion to dismiss where

defendant warned that its "estimates" were "'inherently difficult to predict,'" "subject to a 'high level of uncertainty,'" and "might prove to be materially incorrect").

Barrick accompanied its forward-looking statements with cautionary language setting forth a number of important factors that could cause actual performance to differ materially from Barrick's expectations.  Although not necessary to secure the protection of the PSLRA's safe harbor, Barrick in fact warned of precisely the risks that ultimately caused the Company to revise its estimates and to suspend the project, including:  "changes in the worldwide price of gold," "availability and costs associated with mining inputs and labor," "operating or technical difficulties in connection with mining or development activities," and "the risks of obtaining necessary licenses and permits."  (*See, e.g.*, Ex. 6 at 5)  Moreover, as the risks and challenges to the Project changed over time, Barrick enhanced this cautionary language with even more specific disclosures.  For example:

- In February 2011, when Barrick announced for the first time that it had revised its Pascua-Lama pre-production capital estimate by 10-20%, the Company warned of additional risks resulting from the "strong commodity price environment," which impacted the "demand and cost profile of inputs into capital projects," and increasing costs of "labor, freight, commodities [and] contractor services."  (Ex. 8 at 4)

- In May 2012, Barrick disclosed that the Project was undergoing a "detailed capital cost and schedule review" that would be completed in the second quarter of 2012.  (Ex. 11 at 5)  Barrick announced that the Project was being impacted by labor and commodity cost pressures, primarily resulting from high inflation, competition for skilled labor, and lower than expected labor productivity.  (*Id.*)

- In November 2012, when Barrick reported that it was further adjusting its cost estimate for the Project, the Company also disclosed that a "top-to-bottom" review was on-going and reiterated the cost pressures affecting the Project.  (AC ¶¶ 218-19)

(*See also* Ex. 24 at 5; Ex. 25 at 42; Ex. 12 at 1)

As a result of these and other disclosures about Project contingencies, "no reasonable investor could have found the statement[s] materially misleading" because, "[i]n such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or

unattended by contingency." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002) ("The cautionary language addresses the relevant risk directly, and therefore neither offering memorandum was misleading."); *Olkey v. Hyperion 1999 Term Trust,* 98 F.3d 2, 5 (2d Cir. 1996) (finding no liability where prospectus gave "prominent and specific" warnings of "exactly the risk the plaintiffs claim was not disclosed").

#### b.    Estimates Are Not Actionable Under the Second Circuit's Ruling in *Fait.*

In addition to being forward-looking statements, Barrick's costs and schedule estimates for the Project are statements of opinion, reflecting the judgment of the Company or the speakers.  Under the Second Circuit's ruling in *Fait*, such estimates are not actionable because Plaintiffs allege no facts indicating that they were both objectively false and not honestly believed when made.  655 F.3d at 110.

Nothing in the AC comes close to this demanding standard.  In particular, the so-called "Bechtel Report," on which Plaintiffs rest so heavily, does not render Barrick's cost and schedule estimates "objectively false."  (AC ¶¶ 52-56)  As noted above, the Bechtel document is simply an unsuccessful third-party bid to become the lead contractor for the Project that was submitted years before the Project even commenced construction (Plaintiffs are not sure of the year); as such, it hardly justifies a conclusion that Barrick's estimates in 2009 through 2013 were "objectively false."  (*Id.*)  Indeed, if that were true, every company would be required to accept the highest bid for projects in order to guard against potential securities fraud claims arising from the mere possibility that cost estimates might increase.  In addition, the AC is devoid of any factual allegation that any of the Defendants saw or knew about the Bechtel proposal, let alone that any of them gave it sufficient credence so that it deprived them of an honest belief in the

veracity of their statements.  Plaintiffs' allegations based on the mischaracterization of internal documents and on anonymous sources, described in Section I.B.3. below, are similarly insufficient.[3]

### 2. Statements Regarding Environmental Approvals Were Not False When Made.

Plaintiffs' second core allegation is that certain of Barrick's statements were false or misleading because Pascua-Lama allegedly was not in compliance with its Chilean EIA, but this allegation fails because Plaintiffs allege no facts indicating that the identified statements were false when made.  *See San Leandro*, 75 F.3d at 812-13 (dismissing claim where plaintiffs "made no showing that defendants' [statements] were not based on the facts available to the company at the time the statements were made").

Plaintiffs' allegations in this regard again go back to the very beginning of the Project, with Barrick's May 2009 statement that it "had incorporated all of the conditions of the environmental approval" into the Project plans.  (AC ¶ 244)  However, Plaintiffs identify no reason why this statement was false or misleading when made (AC ¶¶ 246-47), and Plaintiffs' allegations of non-compliance with the Chilean EIA address events that occurred years later.

Plaintiffs also emphasize Barrick's statements, repeated from October 2010 to November 2012, that the Project had been "undertaken pursuant to existing environmental approvals" and that the Company had a "comprehensive range of measures in place to protect [sensitive environmental] areas and resources."  (AC ¶¶ 307, 313, 318, 324, 326, 335, 353, 360, 373, 393, 397; *see also* AC ¶¶ 329, 362)  But Plaintiffs allege no facts indicating that the Project was not

---

[3] Plaintiffs also allege that Barrick stated that the Project was 75% or 95% "engineered," when according to Plaintiffs' anonymous sources, it was only 10% "engineered."  (AC ¶ 64)  Plaintiffs offer no corroboration for this vague and facially implausible allegation; nor do they allege any facts indicating that the anonymous sources were in a position to know that information, that any of the Individual Defendants were aware of it, or that it caused any decline in Barrick's stock price.

undertaken pursuant to existing approvals or that Barrick did not have a range of measures in place to protect the environment.  To the contrary, Plaintiffs acknowledge that environmental authorities approved Barrick's plan for Pascua-Lama.  (AC ¶¶ 43, 44)  Likewise, Plaintiffs allege no facts indicating that Barrick's October 28, 2010 statement the Project was not impacting surrounding glaciers, and that Barrick was "compliant with the provincial legislation" in Argentina, was false when made.  (AC ¶¶ 303, 304)

Plaintiffs' allegations of purported non-compliance with the Chilean EIA are based on (*i*) events that occurred later in time and (*ii*) internal documents that they mischaracterize.  (*See*, *e.g.*, AC ¶¶ 306, 314 (citing AC ¶¶ 95, 127-28, 137-39))  *First*, Barrick's voluntary suspension of pre-stripping in Chile in October 2012 in response to unusually high winds that contributed to increased dust at the Project does not indicate that any of the alleged misrepresentations were false.  (AC ¶¶ 127-28)  Nor does Chile's imposition of a fine in May 2013 related to the water management system – an event that occurred well after all of the alleged misrepresentations – undermine the truth of Barrick's statements when made.  (AC ¶¶ 137-39)  *See Slayton*, 604 F.3d at 776; *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 42 (2d Cir. 2000).

*Second*, Plaintiffs cite certain internal Barrick documents and misleadingly claim they indicate that the water management system at the Project was not in compliance with its environmental commitments.  (AC ¶¶ 94-96)  In fact, those documents expressly state just the opposite.  Plaintiffs selectively quote a July 2011 monthly report but fail to note the report's conclusion that "to date there are ***no non-compliance commitments*** which hinder the development of the project."  (AC ¶ 94; Ex. 27 at 80 (emphasis added))  The report, in fact, highlights the importance of complying with water management commitments and states that "hav[ing] the water management system fully operational before the start of pre-stripping" is a

"key commitment."  (Ex. 27 at 80)  Barrick later reported that it had delayed pre-stripping until the second quarter of 2012 because of its need to comply with that commitment.  (Ex. 12 at 6)

This allegation also fails for the fundamental reason that the alleged misstatements – that Pascua-Lama had been "undertaken pursuant to existing environmental approvals" and that Barrick had a "comprehensive range of measures in place to protect [sensitive environmental] areas and resources" – did not even address compliance with the Chilean EIA.  Plaintiffs fail to acknowledge that Barrick made those statements in response to Argentina's passage in 2010 of a federal law restricting mining near glaciers and addressed only the Company's activities in Argentina.  (Ex. 26 at 14)  The AC includes no allegations of non-compliance with the Argentine EIA or Argentine law.  Indeed, Barrick reported in January 2013 that Argentina's environmental authority concluded an audit, pursuant to the new federal glacier protection law, and determined that Pascua-Lama had not impacted the surrounding glaciers.  (Ex. 5 at 83)

### 3.   Statements Regarding Internal Controls and Accounting for Capital Costs Are Not Actionable.

Plaintiffs allege that Barrick did not disclose the inadequacies of its internal controls (AC ¶¶ 152-159) and failed to properly account for its expenditures on the Project (AC ¶¶ 189-192), but these allegations are just variations of Plaintiffs' core assertions that the Project was doomed from the start, was bound to cost more than disclosed and could not be completed on time, if at all.  As such, these claims also must be dismissed.

**Internal Controls.**  Plaintiffs' internal controls allegations rest on the bald assertion that Barrick "concealed that [its] internal controls suffered from a material weakness."  (AC ¶ 422) Here, again, Plaintiffs try to bolster their claim by mischaracterizing monthly reports and misleadingly asserting that those reports identified certain control deficiencies at Pascua-Lama that created the reasonable probability of a material misstatement.  (AC ¶¶ 80, 169, 422, 438,

19

440)  Nothing in those reports indicates that any issue at Pascua-Lama amounted to a "material weakness" in internal controls at the Company level.  Moreover, whenever those reports identified issues at the Project, they also set out the action plans that the Company had undertaken to remedy the issues.  (Ex. 27 at 17-19; Ex. 28 at 21-23; Ex. 29 at 31-32)[4]

Barrick routinely disclosed Project control issues to investors, along with the steps being taken to address them.  For example, in July 2011, Barrick stated that it was "in the process of assessing the impact on, and, as required, redesigning, the internal control over financial reporting and disclosure frameworks to reflect" organizational changes at the Project.  (Ex. 9 at 52)  A few months later, Barrick reported that "work continues to enhance and standardize the project controls, finance and supply chain business processes and systems."  (Ex. 30 at 52)  In July 2012, Barrick disclosed that, as part of its comprehensive review and changes to the management team, it was assessing "the impact on internal control over financial reporting and disclosure."  (Ex. 12 at 43; Ex. 15 at 42)  These are the statements of a Company that is committed to both disclosing and addressing issues related to internal controls as they arise.

**Accounting for Costs.**  Plaintiffs' allegation that Barrick should not have calculated the Project as an asset on its balance sheet rests on the unsupported assertion that Barrick knew, from the start, that the Project would never generate a net positive cash flow.  (AC ¶¶ 190-92)[5] As already discussed, Plaintiffs' allegations do not provide a basis for concluding that Defendants' judgment that Pascua-Lama would "generate future economic benefits in excess of

---

[4]   Contrary to Plaintiffs' suggestion, the fact that the January 2012 monthly report provided updates on the issues identified in the July and September 2011 monthly reports does not indicate that those issues had resurfaced or "continued to plague reporting, cost management, and risk management at Pascua-Lama."  (AC ¶ 422(d))

[5]   To qualify as an asset under GAAP, the Project must have "a probable future benefit that involves a capacity, singularly or in combination with other assets, to contribute directly or indirectly to future net cash inflows." (AC ¶ 190)  Under IFRS, an asset must have "the potential to contribute, directly or indirectly, to the flow of cash and cash equivalents to the entity," and to recognize an asset on an entity's balance sheet under IFRS, it must be "probable that the future economic benefits will flow to the entity and the asset has a cost or value that can be measured reliably."  (*Id.*)

the costs of the Project" was both objectively false and not honestly believed when made.  *See*

*Fait*, 655 F.3d at 110.  Indeed, it would have been absurd for Barrick to undertake the Project in

the first place had it believed there was no possibility of success, and Plaintiffs offer no plausible

reason why it would do so.  *See In re Buca Inc. Secs. Litig.*, No. 05-1762,  2006 WL 3030886, at

*12-13  (D. Minn. Oct. 16, 2006) (rejecting allegation of improper capitalization of expenses

because plaintiffs "fail[ed] to plead any fact demonstrating that [defendants] knew or believed

the capitalization was improper at the time the original financial results were announced").

Plaintiffs also assert that Barrick improperly accounted for the Project because it did not

determine that Pascua-Lama was an impaired asset earlier in the putative class period.  (AC ¶¶

175, 177, 181)  Here, Plaintiffs allege that weak internal controls at the Project prevented Barrick

from appropriately identifying an impairment until April 2013.  (AC ¶ 181)  As a result,

Plaintiffs' impairment analysis allegations are wholly dependent on their allegations of deficient

internal controls claims, and should likewise fail.  More importantly, Plaintiffs fail to allege

particularized facts suggesting that the asset impairment analyses about Pascua-Lama reported to

investors on July 27, 2012, March 28, 2013, June 28, 2013 and August 1, 2013 were performed

inadequately or were based upon incomplete or inaccurate information.  (Ex. 12 at 42-43; Ex. 16

at 112; Ex. 19 at 1-2; Ex. 21 at 3-4)  Likewise, Plaintiffs assert that Barrick was obliged to test

Pascua-Lama for impairment annually, but do not actually allege that Barrick failed to conduct

such impairment analyses.  (AC ¶ 178)

**Certifications of Controls and Financial Statements.**  Plaintiffs' claims against Regent,

Sokalsky and Al-Joundi related to their certifications of internal controls and financial statements

must fail.  A certification statement can give rise to a securities fraud claim only where

defendants were "cognizant of its falsity at the time it was made."  *In re SAIC, Inc. Sec. Litig.*,

No. 12 Civ. 1353, 2013 WL 5462289, at *11 n.6 (S.D.N.Y. Sept. 30, 2013).  Here, the control

certifications state that "based on [the certifying Defendant's] knowledge," each filing contained

no material misstatements.  (AC ¶¶ 420-421, 423-424)  "Thus, for these certifications to be

materially false, it is insufficient for the financial statements themselves to have been false –

defendants must also have had knowledge of that falsity."  *In re Scottish Re Group Sec. Litig.*,

524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007).  Plaintiffs fail to identify particularized facts that

Defendants knew that Barrick's internal controls were insufficient.  Nor do Plaintiffs allege any

facts to support their conclusory assertion that Defendants did not actually evaluate the

Company's internal controls and determine them to be effective.  (AC ¶ 419)

### 4.      Statements of Corporate Optimism and Puffery Are Not Actionable.

A number of the alleged misrepresentations amount to nothing more than inactionable

statements of corporate optimism or puffery.  Statements of puffery do not support a claim for

securities fraud because they are "too general to cause a reasonable investor to rely on them."

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187,

206 (2d Cir. 2009).  Statements of corporate optimism are not actionable "regardless of whether

that optimism was, by hindsight, unwarranted."  *City of Roseville*, 2011 WL 7158548, at *6.

Barrick's statements that Pascua-Lama was a "world-class" resource (AC ¶¶ 8, 40, 58,

62, 197, 345, 351), had "[a]ttractive economics" (AC ¶¶ 57, 242, 247, 250, 252), and had "a

strong environmental team" (AC ¶¶ 59, 245) are examples of puffery.  That Pascua-Lama "is

expected to become one of the gold industry's largest and lowest cost mines" (AC ¶ 257) is an

inactionable statement of corporate optimism.  *See Steinberg v. Ericsson LM Tel. Co.*, No. 07

Civ. 9615, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (statements as to expectations of

future company performance were "simply expressions of confidence in the viability of

[defendant's] future business which do not give rise to a securities violation.") (citing cases).

### 5.    Individual Defendants Are Not Liable For Statements They Did Not Make.

Defendants Kinver, Potter, and Gonzales are not alleged to have signed any of the Company's SEC filings or exercised ultimate authority over them, and therefore each of them is potentially liable only for statements he is alleged to have made personally.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 525 Fed. App'x 16 (2d Cir. 2013) ("In the post- *Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive.").  Kinver is alleged to have made statements to investors on only two occasions (AC ¶¶ 245, 248, 371), Gonzales on one occasion (AC ¶ 354), and Potter on one occasion (AC ¶ 244).  For the reasons set forth above, none of these statements are actionable under the securities laws.

### B.    The Section 10(b) Claim Should Be Dismissed for Failure to Allege Particularized Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs do not state a claim under Section 10(b) because Plaintiffs do not satisfy the PSLRA's requirement that they allege with particularity facts giving rise to a strong inference of scienter – "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (internal quotations omitted); 15 U.S.C. § 78u-4(b)(2).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

To plead scienter adequately, Plaintiffs must allege *facts* "(1) showing that [Defendants] had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial

evidence of conscious misbehavior or recklessness." *Id.*  With respect to the forward-looking statements, such as cost and schedule estimates, even recklessness is insufficient, and the PSLRA requires Plaintiffs to demonstrate that Defendants had "actual knowledge" that the specific statements were false when made.  15 U.S.C. §§ 78u-5(c)(1)(B)(i).

Unable to allege any plausible motive, Plaintiffs' scienter allegations rely entirely on the mischaracterization of certain internal Company documents and on the statements of anonymous sources who had no insight into the knowledge or intent of the Individual Defendants or senior management.  As discussed below, Plaintiffs fail to allege any facts that, taken together or alone, would support any inference – much less the required strong inference – of scienter.

### 1. The Opposing Inference of Non-Fraudulent Intent Is Far More Compelling.

In *Tellabs*, the Supreme Court clarified that a reviewing court must "engage in a comparative evaluation," considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  551 U.S. at 314.  "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*; *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (affirming dismissal where opposing inference of non-fraudulent intent was more compelling).  The facts alleged in the AC provide no support for the inference that Defendants acted with an intent to deceive Barrick's investors, and the opposing inference of non-fraudulent intent is far more compelling.

Plaintiffs' entire case rests on the nonsensical and wholly unsupported assertion that Barrick purposefully pursued a massive, multi-billion dollar mining project at Pascua-Lama despite knowing – from the outset – that the Project was not economically or environmentally

feasible.  Plaintiffs provide no explanation as to why Defendants would embark on such a

"suicide mission," pointlessly throwing billions of dollars into a project that they purportedly

"knew" had no chance of success.  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 244

(3d Cir. 2004) (rejecting theory that management would have undertaken acquisition had it

known that its due diligence was materially obstructed); *see also Ashland Inc. v. Morgan Stanley

& Co.*, 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) (finding no inference of scienter where

claimed motive for purported fraud would be "economically irrational").

A far more cogent and compelling inference – indeed, the only plausible inference – is

that Barrick took on a mining development project that it believed could prove highly productive

and profitable, but which was subject to numerous risks and contingencies, as Barrick repeatedly

cautioned investors.  Over time, Barrick was forced to revise its cost and schedule estimates as a

result of adverse developments, including increased commodity costs, labor shortages, currency

inflation, and environmental challenges – precisely the risks about which Barrick had warned

investors.  Ultimately, as those developments continued to increase the Project's costs and as the

price of gold fell precipitously, the Project's economics changed fundamentally and the

Company decided to suspend construction.  Plaintiffs may take issue with Barrick management's

decision to take on the Project, but such allegations do not amount to securities fraud.  *See

Rothman*, 220 F.3d at 90 ("poor business judgment," "misplaced optimism" or even "sloppy

management" are not a basis for securities fraud claims under Section 10(b)).

### 2.      Plaintiffs Do Not Adequately Plead Motive.

Plaintiffs do not plead scienter based on motive because the AC includes no factual

allegations of "concrete benefits that could be realized by one or more of the false statements and

wrongful nondisclosures alleged."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  The

"desire to . . . sustain the appearance of corporate profitability or the success of an investment" is

an insufficient basis to establish motive. *South Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009). The requirement of alleging "concrete benefits" is "'generally met when corporate insiders [a]re alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit.'" *Id.* at 108 (*quoting Novak*, 216 F.3d at 308). Plaintiffs do not allege that any of the Individual Defendants sold stock prior to any price drop – "a fact suggesting the absence of any nefarious motives." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

Plaintiffs also attempt to plead motive based on Barrick's 2009 financing agreement with Silver Wheaton (one of the world's largest silver mining companies), but the terms of that agreement provided that, if Barrick failed to meet specific production timelines, Silver Wheaton could terminate the agreement and force Barrick to return its investment. (AC ¶¶ 194, 195, 257-262) Plaintiffs do not, and cannot, explain why Barrick would be motivated to misstate pre-production capital cost and production schedule estimates in order to secure financing that ultimately depended on actual production output. If anything, the Silver Wheaton deal is further evidence that Barrick had confidence in its ability to bring the Project into production. In any event, a purported need to raise funds "comfortably fits within the set of universal corporate motivations that are inadequate to sustain a securities fraud complaint." *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011); *see also In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002) ("[A] desire to raise much needed capital is an insufficient generalized motive to support an inference of scienter.").

### 3.     Plaintiffs Do Not Adequately Plead Actual Knowledge of Falsity as to Cost and Schedule Estimates.

"Under the PSLRA, if the alleged misstatement or omission is a 'forward-looking

statement,' the required level of scienter is 'actual knowledge.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 n.14 (2011); *Slayton*, 604 F.3d at 773 ("Whereas liability for [statements of current fact] requires a showing of either knowing falsity or recklessness, liability for [forward-looking statements] attaches only upon proof of knowing falsity.").  Plaintiffs' allegations as to Barrick's cost and schedule estimates do not support a strong inference that Defendants announced those estimates with actual knowledge of their falsity.

> ### a.     Plaintiffs' Allegations Based on Internal Documents Are Insufficient.

Plaintiffs rely most heavily on a bid they allege was submitted by Bechtel in 2006 or 2007, in which Bechtel allegedly proposed to manage the engineering, procurement, and construction for Pascua-Lama with a development cost of $5 billion.  (AC ¶¶ 52-53)  Although Plaintiffs misleadingly call the alleged proposal a "report," as a third-party bid it cannot be considered an objective measure of the cost of the Project, particularly where the AC provides no information on its content (other than apparently second-hand information on its total budget and timeframe) or whether it differed from the Project plan that was actually launched in 2009. Certainly there is no basis to infer that anyone who read Bechtel's proposal would "know" – as a fact – that the Project could not be completed at a lower cost or on a shorter timeframe.  If anything, that Barrick rejected the Bechtel proposal suggests that the Company believed it could develop the Project at a lower cost.  *See Winer Family Trust v. Queen*, 503 F.3d 319, 332 (3d Cir. 2007) (allegation that defendant had seen higher cost estimate prior to making its own estimate failed to give rise to a strong inference of scienter).

The Bechtel proposal is the only scienter allegation predating May 7, 2009, the beginning of the purported class period, and thus it is the only allegation on which Plaintiffs base their core theory of fraud:  that Barrick decided to go forward with the development of Pascua-Lama

despite knowing – from the outset – that the Project was not economically feasible.  Absent this single misleading allegation, Plaintiffs' entire theory of the case falls apart.[6]

Aside from the Bechtel proposal, to argue scienter, Plaintiffs point to two internal Barrick documents from later in the purported class period that allegedly suggested that the Project's costs might be greater than estimated.  (AC ¶¶ 67-69, 82-83)  Those documents, however, appear to have been part of, or prompted by, the Company's publicly disclosed internal reviews, which led to increases in the Company's cost estimates shortly thereafter:

- An October 2010 "Project Plan Report" allegedly concluded that the current estimate of $2.8 billion was infeasible within the Company's 36-month timeframe for construction. (AC ¶¶ 67-69)  By February 17, 2011, Barrick announced that it had conducted a "line-by-line review" of expected capital costs and that, as a result, "[p]re-production capital budgets are expected to be higher" by 10-20% to $3.3-$3.6 billion.  (AC ¶ 309-310)

- A January 2012 "Lama Master FCST," which looked primarily at costs on the Lama side of the mine in Argentina, allegedly concluded that "total costs" for Pascua-Lama would exceed $6.1 billion.  (AC ¶¶ 82-83)[7]  By May 2012, Barrick announced that it was conducting "a detailed cost and schedule review," which it intended to complete in the second quarter.  (Ex. 31 at 3)  In July 2012, as a result of that detailed review, Barrick increased its cost estimate for Pascua-Lama to $7.5-$8.0 billion.  (AC ¶ 117)

Barrick's estimates were not rendered "false" the minute that any preliminary analysis suggested that they were coming under pressure.  "Taking the time necessary to get things right is both proper and lawful," and managers "are entitled to investigate for a reasonable time, until they have a full story to reveal."  *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 Civ. 7968, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) (quoting *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007)), *aff'd*, 533 Fed. App'x 38 (2d Cir. 2013).  Barrick's decision to

---

[6]   At a minimum, without this allegation, there is no basis to begin the class period in May 2009.  Conversely, to the extent that one were to credit the Bechtel proposal's estimate of $5 billion as "fact," that "fact" would have been fully revealed in July 2011, when the Company raised its estimate to $4.7-$5.0 billion.  (AC ¶ 344)  In either case, Plaintiffs' purported four-and-a-half year class period is undermined by their own allegations.

[7]   Plaintiffs also confuse the Lama Master FCST estimates as to "total capital costs" with the Company's publicly disclosed estimates of "pre-production capital" costs.  (AC ¶ 84; Ex. 24 at 5)

24059889v02

conduct thorough (and publically disclosed) reviews of its cost and schedule estimates in response to increasing cost pressures and other developments represents a "prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton*, 604 F.3d at 777.[8]

Likewise, Plaintiffs point to a July 2011 report from consulting firm Turner & Townsend (the "T&T Report"), but that report was part of a publicly disclosed review process voluntarily undertaken by the Company to evaluate the methodology underlying its cost estimates – indicating a good faith effort wholly inconsistent with an intent to defraud.  (AC ¶¶ 75-77; Ex. 12 at 1, 5)  Although the T&T Report questioned certain aspects of Barrick's methodology in developing a forecast in the month before Barrick made a public disclosure, it goes on to state that the adjustments "will be implemented by the Pascua-Lama Project team and will be documented over the next 4-6 weeks" (Ex. 32 at 1), and there is no allegation that the implementation of the suggested changes in methodology resulted in a higher cost estimate.  Significantly, the T&T Report also confirmed that Barrick's original 2009 cost estimate of $2.8-$3.0 billion was based on sound methodology – yet another fact undercutting any inference that Defendants knew that its original estimate was false when made.  (*Id.*)

### b.   Plaintiffs' Allegations Based On Anonymous Sources Are Insufficient.

Plaintiffs' allegations based on anonymous sources also fail to raise a strong inference of scienter.  Since the Supreme Court's decision in *Tellabs*, courts are increasingly skeptical of such allegations, and the Second Circuit has stated that "[t]he anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a

---

[8]   Plaintiffs similarly allege that, in forecasts dated December 2012, March 2013, and July 2013, Fluor allegedly estimated total costs for the completion of Pascua-Lama at $8.96 billion, $8.8 billion, and "about $10 billion," respectively.  (AC ¶¶ 86-88)  At the time of those forecasts, the Company had already announced the suspension of work in Chile, and in June 2013 (prior to the third Fluor estimate), the Company had announced that it was re-sequencing construction to target production in 2016.  (AC ¶¶ 131, 141)

court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 216 n.4 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 314); *see also Higginbotham*, 495 F.3d at 757 ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

Plaintiffs' allegations based on the purported statements of anonymous sources are insufficient under Second Circuit law because they are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.  The only anonymous source alleged to have had any contact with the Individual Defendants or other senior management is the "Project Manager" – an employee who did not report to any of the Individual Defendants and whose responsibilities at Pascua-Lama allegedly were limited to "oversight" of the construction of "camps and infrastructure."  (AC ¶¶ 32, 63, 66)  There is no basis to infer that the Project Manager had any understanding of the budget or schedule of a multi-billion dollar mining operation, or that his alleged opinion was based on any analysis of Pascua-Lama.  Indeed, according to the AC, when he joined Barrick in 2010, he "immediately knew" that "cost would be at least $4.5-$5 billion."  (AC ¶ 63)  Such uninformed speculation utterly fails to meet the Second Circuit's exacting standard for allegations based on anonymous sources.

As to communications with the Individual Defendants, Plaintiffs allege only that the Project Manager requested additional funds from Kinver and Potter in 2010 to "maintain compliance" with the schedule but was told to "make do with the existing budget."  (AC ¶¶ 63,

66)  Those vague allegations of the Project Manager's dissatisfaction do not support a strong

inference that Kinver or Potter had actual knowledge that Barrick's overall capital cost estimates

were false.  That the Project Manager allegedly told unidentified "senior management" in 2010

that the Company's estimated schedule was "unrealistic" fails for the same reasons.  (AC ¶ 63)

*See Steinberg*, 2008 WL 5170640, at *13 (rejecting scienter allegations based on anonymous

"mid-level managers in the United States who claim no contacts or communications with

Defendants, or even with [defendant's] European corporate headquarters").

> **4.      Plaintiffs Do Not Adequately Plead Conscious Misbehavior or
> Recklessness as to Statements Regarding Environmental Approvals.**

As to Barrick's statements regarding environmental approvals, Plaintiffs fail to allege

facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."

*ATSI*, 493 F.3d at 99.  In this context, "recklessness" means "'conscious recklessness – *i.e.*, a

state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'"

*South Cherry*, 573 F.3d at 109 (quoting *Novak*, 216 F.3d at 312) (emphasis in original).  To

qualify as reckless disregard for the truth, the alleged conduct must "represent[] an extreme

departure from the standards of ordinary care to the extent that *the danger was either known to

the defendant or so obvious that the defendant must have been aware of it*."  *South Cherry*, 573

F.3d at 109 (quotation omitted) (emphasis in original).  The Second Circuit has emphasized the

"significant burden on the plaintiff in stating a fraud claim based on recklessness."  *Chill v. Gen.

Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).  Where, as here, motive "is not apparent," the

strength of the allegations of conscious misbehavior or recklessness "must be correspondingly

greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

> **a.      Plaintiffs' Allegations Based on Internal Documents
> Are Insufficient.**

Plaintiffs' allegations regarding certain environmental information in internal Barrick

documents do not constitute strong circumstantial evidence of recklessness.  Neither the monthly reports nor the presentation at the March 7, 2012 meeting in La Serena, Chile would have indicated to the Individual Defendants, had they reviewed them, that Barrick's public statements were false or misleading, or that Pascua-Lama was not in compliance with its environmental commitments.  (AC ¶¶ 79-81, 92-96, 102-08)  Instead, the documents demonstrate that the Project team was appropriately identifying, monitoring and, when necessary, remediating issues when they arose, including issues related to environmental compliance.  *See Slayton*, 604 F.3d at 777 ("Rather than suggesting an intent to deceive investors, the facts . . . exhibit the defendants engaging in a good-faith process to inform themselves and the public of the risks.").

The monthly reports emphasize the importance that the Company placed on meeting its commitments, set forth the "risks" of non-compliance, and expressly state that "to date there are ***no non-compliance commitments*** which hinder the development of the project."  (Ex. 27 at 80 (emphasis added))  The monthly reports state that "hav[ing] the water management system fully operational before the start of pre-stripping" was a "key commitment."  (*Id.*; Ex. 28 at 93; Ex. 29 at 93; AC ¶ 94)  The September monthly report did not, as Plaintiffs suggest, "document[]" that Barrick was in violation of its water management system commitments.  (AC ¶ 96)  On the contrary, the report describes a transparent and open working relationship with government authorities to address the 24 water stations, noting that although the agreements had not been finalized, discussions with the Chilean authorities had "evolved significantly and positively," and that they were "reviewing a draft agreement that ha[d] been developed jointly."  (Ex. 28 at 94)  The January 2012 monthly report provided an update:  "Chilean authorities [] have been engaged and visited the site to review the [water management] system and scope pending for completion.  Initial visit in January was very positive."  (Ex. 29 at 7)

Likewise, a presentation at the March 2012 meeting in La Serena addressed the "concern" that the water management system then under construction differed from the design that had been approved by regulators.  (AC ¶ 104)  Noting that an approved water management system would be required prior to pre-stripping, the presentation emphasized that delays in approval could lead to delays in the Project schedule.  (AC ¶ 105; Ex. 33 at 3)  The presentation suggested that Barrick "[c]larify [the] current design" and "approach [] the authorities to obtain partial approval for the system."  (AC ¶ 106; Ex. 33 at 6)

Allegations of scienter based on these documents also fail because the Plaintiffs do not allege who prepared them or that any of the Individual Defendants reviewed the monthly reports or attended the meeting in La Serena.  The allegation that the monthly reports were "circulated internally" in Chile and to Barrick's "Toronto office, including Defendants Kinver and Gonzales" is too general to support a strong inference of scienter.  (AC ¶ 79)  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (plaintiff must "specify the internal reports, who prepared them and when, and how firm the numbers were or which company officers reviewed them"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (finding plaintiffs' failure to "allege with specificity that any of the confidential witnesses . . . presented information to the individual defendants" to be "fatal" to their claims).[9]

### b.    Plaintiffs' Allegations Based On Anonymous Sources Are Insufficient.

As with Barrick's cost and schedule estimates, the anonymous sources relied on by

---

[9]    Plaintiffs' allegation that the Operations Manager, who is not alleged to have had responsibility for environmental compliance, drafted reports stating his concerns with alleged changes to the water management system does not actually identify any of those concerns.  (AC ¶¶ 98-99)  Nor is the allegation that the reports "would have [been] forwarded . . . to Defendant Gonzales" sufficient to raise an inference that Gonzales received or reviewed the reports.  (AC ¶ 99)  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (finding allegation that information "would have been reported to the Company's CFO" insufficient to raise a strong inference that individual defendants "had specific information contradicting their public statements").

Plaintiffs with respect to environmental compliance are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. In particular, none of the anonymous sources are alleged to have had responsibility for environmental compliance at Pascua-Lama, or are alleged to have reported to any of the Individual Defendants. (AC ¶ 32)

The allegations attributed to Plaintiffs' anonymous sources do not undermine any of Defendants' alleged statements, much less support a strong inference of scienter. According to the "Project Manager," in April 2010 Pascua-Lama violated its commitment to contain dust from its roads, but Plaintiffs allege no public statement to the contrary and, in any case, do not allege any facts showing that the Individual Defendants were aware of the alleged issue. (AC ¶ 90) Likewise, the "Field Engineering Manager" allegedly stated that Barrick missed a deadline for completing part of the water management system, and the "Operations Manager" allegedly stated that Barrick changed the design of another aspect of the water management system. (AC ¶¶ 97-98) There is no allegation that these concerns were conveyed to the Individual Defendants, and, in any case, neither of these allegations would have indicated to them that Barrick's public statements were false or misleading. The allegations attributed to the anonymous sources amount to nothing more than a litany of "non-actionable grievances." *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013).

### 5. Plaintiffs' Allegations of GAAP Violations and Purported Internal Control Weaknesses Are Inadequate

Plaintiffs cannot rely upon vague and conclusory allegations of purported GAAP or other accounting irregularities to plead scienter. Instead, Plaintiffs must allege particularized facts demonstrating that Defendants had contemporaneous knowledge of the undisclosed "material weaknesses" when certifying the Company's internal controls. *See In re FBR Inc. Sec. Litig.*,

544 F. Supp. 2d 346, 359 -60 (S.D.N.Y. 2008) ("[I]t is not a violation of the securities laws to

simply fail to . . . provide sufficient internal controls[.]") (quoting *Shapiro v. UJB Fin. Corp.*,

964 F.2d 272, 283 (3d Cir. 1992)).  Plaintiffs fail to meet this standard.

Plaintiffs also cannot rely upon the fact that some of the Individual Defendants signed

certifications – as required by law – as a means of pleading scienter.  *See In re Take-Two*

*Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) ("[A] Sarbanes-Oxley

certification is probative of scienter only if the complaint alleges specific contrary information,

such as 'glaring accounting irregularities or other red flags' of which the certifying officer had

'reason to know.'") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir.

2006)).  Plaintiffs' allegations are not coupled with any *specific* factual allegations relating to

what the Individual Defendants purportedly knew that contradicted their statements regarding

Barrick's internal controls or their Sarbanes-Oxley certifications.  *See In re Take-Two*, 551 F.

Supp. 2d at 305 (plaintiffs failed to show that the named officers "possessed, or had access to,

any specific, contemporaneous information that contradicted the company's public statements.")

As discussed above, the reliance upon the monthly reports to establish alleged knowledge of

internal control weakness is based on a gross mischaracterization of those documents.

### 6.    Plaintiffs Fail to Adequately Allege Scienter as to Each Individual Defendant.

Under the PSLRA and Rule 9(b), Plaintiffs must plead particularized facts with regard to

each Individual Defendant that give rise to a strong inference of fraudulent intent.  *See In re*

*Citigroup*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("A plaintiff must allege that an officer or

director '***personally*** knew of, or participated in, the fraud.'") (emphasis in original) (*quoting*

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  The AC, for the most part,

simply lumps all of the Individual Defendants together.

35

With respect to Defendants Regent, Al-Joundi and Sokalsky, there are no allegations that these individuals attended meetings, received documents, or otherwise learned information about Pascua-Lama that contradicted their public statements.  The scienter allegations as to Defendants Potter, Kinver, and Gonzales are also woefully deficient.  As discussed above, one of the anonymous sources is alleged to have complained to Defendants Potter and Kinver in May or June 2010 that the budget and schedule for the Project were "unrealistic" – an alleged interaction that is not only insufficient but also took place a year after their alleged May 2009 statements. (AC ¶¶ 63, 66)  Similarly, the assertion that certain monthly reports in 2011 were "circulated internally . . . including [to] Defendants Kinver and Gonzales" does not indicate that they actually reviewed those documents, and, in any case, the monthly reports did not reflect any information that would have caused Kinver or Gonzales to question the truthfulness of their public statements regarding the Project.  (AC ¶¶ 79-80)

### 7. Plaintiffs Fail to Adequately Allege Corporate Scienter.

Plaintiffs do not adequately allege scienter against Barrick because they fail to allege scienter against anyone whose intent could be imputed to the Company.  *See Teamsters Local 445*, 531 F.3d at 195 (to plead corporate scienter, allegations "must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter").

Nor can Plaintiffs salvage their claims by relying on the so-called "core operations" doctrine.  (AC ¶¶ 198-99)  *See Shemian*, 2013 WL 1285779 at *17-*18.  The Second Circuit has not decided "whether, and in what form," that doctrine survived the enactment of the PSLRA, *Frederick v. Mechel OAO*, 475 Fed. App'x 353, 356 (2d Cir. 2012), but it has suggested that, at best, allegations of a company's core operations may "provide supplemental support for allegations of scienter" but "cannot establish scienter independently."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14 n.3 (2d Cir. 2011); *see also Tyler v. Liz Claiborne*,

*Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (allegation of core operations may "bolster[] the strength of the inference of scienter when plaintiff has already adequately alleged facts indicating that defendants might have known their statements were false").

Plaintiffs do not allege facts otherwise supporting an inference of scienter, and, in any case, Pascua-Lama is not alleged to have been sufficiently significant to the Company to be considered a "core operation." To qualify as "core," the operation must be "essential to the survival" of a company's business, such that it "constitute[s] nearly all of a company's business." *Id.* Plaintiffs acknowledge that the Project, when completed, was projected to account for less than 10% of Barrick's gold production and less than 15% of its gold reserves, far short of the required significance. (AC ¶ 199) Statements of corporate puffery, describing Pascua-Lama as a "key priority" or a "flagship" project, simply do not support an inference of scienter. (AC ¶ 200) *See Shemian*, 2013 WL 1285779, at *23.

### C. The Section 10(b) Claim Should Be Dismissed for Failure to Plead Loss Causation.

Plaintiffs' Section 10(b) claims also should be dismissed because Plaintiffs do not adequately plead loss causation – *i.e.*, the causal connection between the alleged misrepresentation and the alleged economic loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-2 (2005); *Lentell v. Merrill Lynch & Co*, 396 F.3d 161, 172 (2d Cir. 2005). Establishing this causal link requires allegations "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. This requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura*, 544 U.S. at 345).

Plaintiffs fail to plead loss causation for two independent reasons. *First*, none of the eight statements or events identified by Plaintiffs as allegedly causing declines in Barrick's stock price constitute "corrective disclosures" or a "materialization of a concealed risk." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (citing *In re Omnicom*, 597 F.3d at 511). (AC ¶¶ 207-239) *Second*, Plaintiffs fail to disaggregate losses allegedly caused by the identified statements or events from those caused by "the tangle of factors affecting price," including other statements Barrick made in the same public filing and industry-wide forces, such as the plummeting price of gold. *Dura*, 544 U.S. at 343.

### 1.    None of the Identified Statements or Events Constitute "Corrective Disclosures" or the "Materialization of a Concealed Risk."

To constitute a corrective disclosure, a statement must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom*, 597 F.3d at 511. Likewise, for an event to be the "materialization of a concealed risk," it must "reveal new information previously concealed and fall within the 'zone of risk' concealed so that the events were foreseeable consequences of the fraud." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011).

**Regent Resignation.** Barrick's announcement on June 6, 2012 that Sokalsky would succeed Regent as CEO did not reveal any facts underlying Regent's departure, much less any facts that underlie the alleged misrepresentations. (AC ¶ 210) *See In re Omnicom*, 597 F.3d at 511 (resignation of chairman of audit committee due to concerns about accounting strategy was not a corrective disclosure of accounting fraud).[10]

**Updated Cost and Time Estimates.** The updated cost and time estimates disclosed by

---

[10]    That certain reporters or analysts may have suggested a link between Regent's resignation and Pascua-Lama is also insufficient. (AC ¶¶ 210, 211) *See Wallace v. IntraLinks*, No. 11 Civ. 8861, 2013 WL 1907685, at *10 (S.D.N.Y. May 8, 2013) ("Even the alleged speculation of some analysts as to the reasons behind the SEC subpoena is insufficient to constitute a disclosure of the truth.").

Barrick on July 26, 2012 and November 1, 2012 were not corrective disclosures because they did not "reveal to the market the falsity" of the earlier estimates. *Lentell*, 396 F.3d at 175 n.4; *see also In re Vivendi*, 765 F. Supp. 2d at 555 (corrective disclosure must "identify prior company statements as misleading"); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (finding alleged "downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts" insufficient to plead loss causation). In fact, Plaintiffs allege that the July 26, 2012 statement did not "disclose the real cause of the cost overruns and delays" and that Barrick's "fraudulent reassurances continued to mislead the market." (AC ¶¶ 214, 216) Likewise, Plaintiffs allege that the November 1, 2012 statement "continued to conceal the fundamental fact that the mine had never been technically or economically feasible under any of the Company's public cost estimates." (AC ¶ 85, 219) Furthermore, as discussed above in detail, Barrick had regularly cautioned investors regarding the risk that its cost estimates could be revised, and, in fact, had already substantially increased its cost estimates for Pascua-Lama on two occasions: on February 18, 2011, from $2.8-$3.0 billion to $3.3-$3.6 billion, and on July 28, 2011, to $4.7-$5.0 billion.

**Actions of Chilean Authorities.** The April 10, 2013 and May 24, 2013 actions by the Chilean court and Chilean regulatory authority, both of which sought to halt further construction in Chile until Barrick's water management system was in compliance with the existing environmental approvals, were not the materialization of a "concealed risk." (AC ¶¶ 222, 227)[11]

Prior to these events, Barrick had specifically disclosed the risks associated with the Chilean litigation, warning that the "relief sought in the actions is the suspension of the

---

[11] Importantly, Plaintiffs have not alleged loss causation as to any alleged misrepresentation regarding alleged *dust mitigation issues* (AC ¶¶ 46, 90, 91, 93, 108, 111) because Plaintiffs do not allege that the April 10, 2013 and May 24, 2013 actions related to anything other than Pascua-Lama's *water management system*. (AC ¶¶ 222, 227-28; Ex. 21 at 6-7)

construction of the Project in Chile until all environmental obligations are fulfilled." (Ex. 15 at 71; *see also* Ex. 5 at 103) Barrick had also disclosed that, in March 2013, "the environmental authority in Chile issued a resolution alleging certain non-compliances related to the acid rock drainage water management system in Chile." (Ex. 5 at 83)

In light of these detailed disclosures, the actions by the Chilean authorities cannot represent the materialization of a ***concealed*** risk. "To state the obvious, the risk which materialized must have been concealed; the specific materialization of those particular concealed risks must be demonstrated to be proximately connected to plaintiff's loss." *Delshah Group LLC v. Javeri*, No. 09 Civ. 6909, 2013 WL 2322488, at *26 (S.D.N.Y. May 28, 2013).

**Impairment**. Barrick's June 28, 2013 statement that, as a result of "recent and continued significant declines in gold and silver prices, and the delay in first gold production," it expected to take an asset impairment charge did not disclose any facts indicating that Barrick's prior statements regarding impairment analysis were false, or that impairment indicators existed prior to its April 25, 2013 announcement. (AC ¶¶ 141, 230, 500; Ex. 18 at 30; Ex. 19 at 1-2)

**Suspension**. Likewise, Barrick's announcement on October 31, 2013 that it would temporarily suspend most construction activities at Pascua-Lama did not reveal the falsity of any prior statements. (AC ¶¶ 233-35) Barrick stated that the suspension was the result of several recent developments, including the sustained decline in gold prices and continued cost pressures – risks that that the Company expressly warned could cause the Project "not [to] proceed either on its original timing or at all." (AC ¶ 235; Ex. 1 at 79; Ex. 2 at 85; Ex. 5 at 107) Indeed, in an April 24, 2013 press release, Barrick cautioned that it would "continue to evaluate all alternatives, in light of the uncertainties associated with [ongoing] legal and regulatory actions, and the current commodity price environment, ***including the possibility of suspending the***

*project*." (Ex. 18 at 4 (emphasis added))

**Equity Offering**.  Barrick's announcement on October 31, 2013 of a $3 billion equity offering made no mention of Pascua-Lama, and there is no basis whatsoever to conclude it revealed any facts regarding the Project.  (AC ¶ 237; Ex. 34 at 1-2)

### 2.    Plaintiffs Fail to Allege Loss Causation as to Internal Controls.

Plaintiffs fail to allege loss causation as to the alleged misrepresentations regarding Barrick's internal controls because none of the statements or events alleged to have caused a decline in stock price revealed any concealed information on that topic.  *See Kuriakose v. Federal Home Loan Mortg. Corp.*, No. 08 Civ. 7281, 2011 WL 1158028, at *14 (S.D.N.Y. Mar. 30, 2011) (Plaintiffs failed to plead loss causation because they "make no specific factual allegations about the disclosure of concealed information relating to [defendant's] internal controls."), *aff'd*, No. 12-4353-cv, 2013 WL 5911476, at *2 (2d Cir. Nov. 5, 2013).

### 3.    Plaintiffs Fail to Disaggregate from Losses Caused by Other Events Affecting Barrick's Stock Price.

Plaintiffs also fail to adequately allege loss causation because they do not disaggregate losses purportedly due to the identified statements and events, as opposed to other industry-wide factors or company-specific news.  The Supreme Court's decision in *Dura* "requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura*, 544 U.S. at 342).

Furthermore, it is well-settled law in the Second Circuit that "'when the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails

when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" *Lentell*, 396 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (holding that plaintiffs failed to plead loss causation because they did not allege facts to show that defendant's misstatements, "among others … that were much more consequential and numerous, were the proximate cause of plaintiffs' loss," nor any "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements").

Plaintiffs do not even mention the steep decline in the price of gold that occurred during the second half of the putative class period and caused comparable losses to investors in other large gold mining companies, much less allege any facts showing that the decline in Barrick's stock price was caused by the identified disclosures as opposed to the plummeting price of gold. Plaintiffs ignore the fact that Barrick's stock traded in tandem with the price of gold, both of which peaked in early September 2011, remained relative flat though 2012, and dropped precipitously in 2013. (Ex. 35; Ex. 36)  From its peak on September 8, 2011 to November 1, 2013, Barrick stock fell 67%.  (AC ¶ 208 n.3; Ex. 37)  The stock of other large gold mining companies suffered similar declines over this period:  Newmont Mining Corp fell 60%, AngloGold Ashanti Ltd fell 68%, Goldcorp Inc. fell 56%, and Kinross Gold Corporation fell 73%.  (Ex. 37)  *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (dismissing claims for failure to plead loss causation where plaintiff "fail[ed] even to acknowledge the U.S. credit downgrade" that caused comparable losses to competitors and instead "misleadingly attempt[ed] to attribute the entire drop in stock value to the alleged corrective disclosure").

Notably, the bulk of the losses that Plaintiffs attribute to fraud occurred in the second quarter of 2013, during which the price of gold fell 23% – *its steepest quarterly decline since modern trading began in the mid-1970s*.  (Ex. 20)  During that quarter, Barrick's stock fell 46%.  (Ex. 37)  Although Plaintiffs point to the 8.4% decline of Barrick's stock on April 10, 2013, they neglect to mention that it had already fallen nearly 24% so far that year, and that it declined 20% between April 10, 2013 and May 24, 2013, during which time Plaintiffs identify no disclosures related to Pascua-Lama.  (*Id.*)  *See In re Security Capital Assurance Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 602 (S.D.N.Y. 2010) (finding loss causation allegations implausible where plaintiffs "leave wide periods unaccounted for," suggesting that they "may be cherrypicking dates that suit their argument").  Plaintiffs' cherry-picking also ignores earlier upward revisions of cost estimates that did not result in losses:  the February 18, 2011 increase in cost estimate from $2.8-$3.0 billion to $3.3-$3.6 billion (after which the stock *rose* 1.5%) and a further increase to $4.7-$5.0 billion on July 28, 2011 (after which the stock fell only 0.8%).  (Ex. 37)

Wholly apart from Plaintiffs' failure to address the impact of declining gold prices on Barrick's stock, Plaintiffs also make no attempt to disaggregate losses caused by other company-specific disclosures made by Barrick in the same public filings.  On July 26, 2012, Barrick provided a weaker outlook for 2012, raising its cost of gold production from $460-$500 per ounce to $550-$575 per ounce and reducing its growth target from 9 million ounces per year to 8 million ounces per year.  (Ex. 12 at 1)  On November 1, 2012, Barrick reported a 55% drop in third quarter profit, substantially below analysts' expectations, and again raised its cost of gold production to $575-$585 per ounce.  (Ex. 15 at 1; Ex. 38 at 1)  And on October 31, 2013, Barrick reported a 74% drop in third quarter profit, reflecting lower gold prices.  (Ex. 22 at 3)  Plaintiffs' failure even to mention these disclosures, much less to allege facts sufficient to disaggregate

losses allegedly caused by the purported misrepresentations from those caused by these additional disclosures, is inconsistent with the requirements for pleading loss causation.  *In re Flag Telecom*, 574 F.3d at 36.  Plaintiffs' attempt to attribute the entire loss to statements regarding Pascua-Lama is simply implausible.  *See City of Westland*, 928 F. Supp. 2d at 715.[12]

## II.    PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(a).

To state a claim for control person liability under Section 20(a), Plaintiffs must allege (*i*) a primary violation by a controlled person; (*ii*) actual control by each Defendant; and (*iii*) particularized facts as to the Defendant's culpable participation in the fraud.  *See Coronel*, 2009 WL 174656, at *24.  Plaintiffs fail to meet any of these requirements.  *First*, Plaintiffs fail to allege a primary violation of Section 10(b) and the Section 20(a) claims should be dismissed on this basis alone.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011) (affirming dismissal of Section 20(a) claim for failure to plead a primary violation).  *Second*, Plaintiffs fail to adequately plead that Kinver, Potter, and Gonzales – who are not alleged to have signed any of Barrick's SEC filings – had "[a]ctual control over the wrongdoer and the transactions in question is necessary for control person liability," and "officer or director status alone does not constitute control."  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001).  *Third*, Plaintiffs fail to allege particularized facts showing culpable participation by the Individual Defendants sufficient for Section 20(a) liability.  Courts have held that culpable participation is essentially the same as scienter, and that allegations of culpable participation are subject to the same heightened pleading standards of the PSLRA.  *See In re MF Global Holdings Ltd. Sec. Litig.*, No. 11 Civ. 7866, 2013 WL 5996426, at *20 (S.D.N.Y. Nov.

---

[12]    For example, there is no reasonable basis to conclude that the 9.4% decline in Barrick's stock on November 1, 2012 resulted from the relatively minor change in cost and schedule estimate (from $7.5-$8.0 billion to $8.0-$8.5 billion and from mid-2014 to the second half of 2014), where Barrick also announced sharply disappointing financial results in the same quarterly report.

24059889v02

12, 2013).  Plaintiffs' allegations of culpable participation by the Individual Defendants suffer from the same shortcomings as their allegations of scienter, and must likewise fail.

Defendant Veenman, Barrick's General Counsel, is not alleged to have participated in the alleged fraud in any way.  Plaintiffs' sole allegation with respect to Veenman is that she signed SEC filings.  (AC ¶ 29)  This is plainly insufficient to allege culpable participation, which requires facts showing that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 499 (S.D.N.Y. 2004) (allegation that defendant signed SEC filing insufficient to allege culpable participation).

## III.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS TO ANY NON-DOMESTIC TRANSACTIONS.

Supreme Court and Second Circuit authority require that any claims based on transactions conducted on the Toronto Stock Exchange, where Barrick stock is also traded, must be dismissed.  *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2888 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

<u>CONCLUSION</u>

For the foregoing reasons, the AC should be dismissed with prejudice.

Dated:   New York, New York
         February 11, 2014          DEBEVOISE & PLIMPTON LLP

                                    By : /s/ Bruce E. Yannett
                                    Bruce E. Yannett (*beyannett@debevoise.com*)
                                    Elliot Greenfield (*egreenfield@debevoise.com*)
                                    Anna A. Moody (*amoody@debevoise.com*)
                                    919 Third Avenue
                                    New York, New York  10022
                                    Tel: (212) 909-6000
                                    Fax: (212) 909-6836

24059889v02

Colby A. Smith (*casmith@debevoise.com*)
Jonathan R. Tuttle (*jrtuttle@debevoise.com*)
Ada Fernandez Johnson (*afjohnso@debevoise.com*)
555 13th Street, N.W.
Washington, D.C.  20004
Tel: (202) 383-8000
Fax: (202) 383-8118

*Attorneys for Defendants Barrick Gold Corporation, Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George Potter, and Sybil E. Veenman*

24059889v02