# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Barrick Gold Securities Litigation | Case No.  1:13-CV-03851 |
| | Hon. Robert P. Patterson |
| | ECF Case |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

James M. Hughes (*pro hac vice*)
David P. Abel (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, South Carolina 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

*Lead Counsel for Lead Plaintiffs and the Putative Class*

Jonathan M. Plasse (JP-7515)
Joseph A. Fonti (JF-3201)
Serena P. Hallowell (SH-1120)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Liaison Counsel for Lead Plaintiffs and the Putative Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................. 15

I.      PLAINTIFFS STATE A CLAIM UNDER §10(b) ......................................... 15

A.      The Complaint Adequately Alleges Material Misrepresentations. .................... 15

      1.      Defendants' Statements That Pascua-Lama Was A Low-Cost Project Are Actionable. ................................................................................................ 16

            (a)      Defendants' Statements Are Not Protected As Forward-Looking Statements Or By The "Bespeaks Caution" Doctrine ............................... 17

            (b)      *Fait* Is Irrelevant; In Any Event, The Complaint's Allegations Surpass The *Fait* Requirement .................................................................. 20

      2.      Defendants' Statements Regarding Compliance With Environmental Regulations Were False When Made ......................................................... 20

      3.      Statements Regarding Internal Controls And Accounting For Capital Costs Are Actionable. ....................................................................................... 24

      4.      Defendants' Misstatements Concerning Accounting For The Project Are Actionable. ................................................................................................ 26

      5.      Defendants' Misstatements Are Not Corporate Optimism And Puffery. ............. 28

      6.      The Individual Defendants Are Liable For Statements They Did Not Make. ...................................................................................................... 29

B.      The Complaint Alleges Particularized Facts That Give Rise To A Strong Inference Of Scienter. .................................................................................... 30

      1.      Legal Standard .......................................................................................... 30

      2.      Plaintiffs Adequately Allege Scienter Against Barrick (Count I) ...................... 31

      3.      The Complaint Alleges Particularized Facts That Raise A Strong Inference Of The Individual Defendants' Scienter (Count II) ............................. 32

      4.      Internal Documents And Witness Accounts Support Scienter ............................ 33

5.      The Project Was A "Core Operation," Further Supporting Scienter. ...................36

6.      Plaintiffs Allegations Of Internal Control Weaknesses And Accounting Violations Further Support Scienter ...........................................................37

7.      The Complaint Alleges Specific Facts As To Each Individual Defendants' Scienter ...................................................................................................38

8.      Plaintiffs Are Not Required To Plead Motive, But Have Done So Nonetheless. .......................................................................................39

C.      Plaintiffs Adequately Plead Loss Causation. ..................................................40

1.      Loss Causation Allegations Are Subject To Rule 8(a). ........................41

2.      The Disclosures Caused Plaintiffs' Losses. ........................................42

3.      Defendants' Loss Causation Arguments Concerning Disaggregation Are Unavailing.......................................................................................45

II.     PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON LIABILITY. ................47

III.    SECTION 10(b) APPLIES TO ALL TRANSACTIONS IN BARRICK STOCK, WHICH IS REGISTERED AND LISTED ON THE NYSE...........................................49

CONCLUSION.............................................................................................................50

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)......................................................................49

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)......................................................................47

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)........................................47

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................................................35

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................36

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................................................46

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................29

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).....................................................................33

*Caiola v. Citibank, N.A., N.Y.*,
  295 F.3d 312 (2d Cir. 2002)....................................................................18

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ............................................................35

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997)...................................................................46

*Carlson v. Xerox Corp.*,
  392 F. Supp. 2d 267 (D. Conn. 2005)......................................................32

*Chill v. GE Co.*,
  101 F.3d 263 (2d Cir. 1996)....................................................................31

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................19, 34, 46

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................29

*CLAL Fin. Batucha Inv. Mgmt. Ltd. v. Perrigo Co.*,
    2010 WL 4177103 (S.D.N.Y. Oct. 7, 2010) ........................................................46

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006)..................................................................47

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .....................................................................38

*In re Crude Oil Commodity Futures Litig.*,
    2012 WL 6645728 (S.D.N.Y. Dec. 21, 2012) ................................................7, 47

*Cruz v. TD Bank, N.A.*,
    742 F.3d 520 (2d Cir. 2013)................................................................................50

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..................................................................................... *passim*

*In re Dynex Capital, Inc. Sec. Litig.*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ......................................................36

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
    2010 WL 1983375 (S.D.N.Y. May 17, 2010) ......................................................18

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)..........................................................................45, 47

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)..........................................................................17, 20

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................... *passim*

*In re GE Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................45

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)..................................................................37

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .......................................................37

*Hunt v. Enzo Biochem, Inc.*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008)..................................................................41

*In re IBM Corporate Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)................................................................................18

*Jacobs v. Coopers & Lybrand, L.L.P.*,
   1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ........................................................48

*Janus Capital Group., Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011)..............................................................................27, 29

*King County, Washington v. IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010)...............................................................45

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)...............................................................28

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007).............................................................................40

*In re Lehman Bros. Sec. & ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)...........................................................46, 48

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).........................................................................40, 45

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   2011 U.S. Dist. LEXIS 93873 (N.D. Ala. Aug. 23, 2011) .................................29

*Makor Issues & Rights. Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..........................................................................31

*In re Marsh & McLennan Co., Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006).................................................................32

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013).............................................................41, 43, 45

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)...............................................................45

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................40

*In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..........................................................29

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)...........................................................31, 32

*Morrison v. National Australia Bank*,
    561 U.S. 247 (2010)...............................................................................................49

*The New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................... *passim*

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003).....................................................................30

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)............................................................. *passim*

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................ *passim*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    719 F.3d 498 (6th Cir. 2013) *cert. granted*, 82 U.S.L.W. 3242 (U.S. Mar. 3, 2014)..............20

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)....................................................................................43

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)......................................................................................17

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005).....................................................................41

*Patriot Exploration, LLC v. Sandridge Energy, Inc.*,
    951 F. Supp. 2d 331 (D. Conn. 2013)......................................................................48

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
    792 F. Supp. 2d 328 (D. Conn. 2011)......................................................................48

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996).............................................................................19

*Reese v Malone*,
    2014 WL 555911 (9th Cir. Feb. 13, 2014) ........................................35, 37, 38, 39

*Robbins v. Moore Med. Corp.*,
    788 F. Supp. 179 (S.D.N.Y. 1992)...........................................................................40

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).......................................................................................30

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................24, 37, 40

*SEC v. Tecumseh Holdings Corp.*,
    765 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................................ 30

*In re Solucorp Indus., Ltd. Sec. Litig.*,
    2000 WL 1708186 (S.D.N.Y. Nov. 15, 2000) ........................................................... 48

*Stratte-McClure v. Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011) ........................................................................ 37

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ....................................................................................... 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................. *passim*

*In re Tronox, Inc. Sec. Litig.*,
    769 F. Supp. 2d 202 (S.D.N.Y. 2011) .................................................................. 47, 48

*In re UBS AG Sec. Litig.*,
    No. 12-4355 (2d Cir.) (*sub judice* since argument on Dec. 12, 2013) ..................... 49

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ......................................................................................... 49

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011) ........................................................................ 45

*In re Veeco Instruments, Inc., Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................... 37

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................................ 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ........................................................................ 49

*In re Winstar Commc'ns*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .............................................................. 39

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ........................................................................ 48

**Statutes**

15 U.S.C. §77a .................................................................................................................. 20

15 U.S.C. §77k .................................................................................................................. 20

15 U.S.C. §77l .................................................................................................................... 20

15 U.S.C. §78c ........................................................................................................................1

15 U.S.C. §78j .........................................................................................................................1

15 U.S.C. §78u-4 ...................................................................................................................30

15 U.S.C. §78u-5(c) ..............................................................................................................17

15 U.S.C. §7201 .....................................................................................................................24

**Other Authorities**

17 C.F.R. §240.10b-5(b) ........................................................................................................15

Fed. R. Civ. P. 8(a)(2) ...............................................................................................41, 42, 47

Fed. R. Civ. P. 23(f) ..............................................................................................................49

Lead Plaintiffs Union Asset Management Holding AG and LRI Invest S.A. ("Plaintiffs")

respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

In particular, Defendants seek to dismiss Plaintiffs' claims under §§10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), as alleged in the Consolidated Amended

Class Action Complaint (ECF No. 50) (the "Complaint").[1]  For the reasons stated herein,

Defendants' motion to dismiss should be denied.

## PRELIMINARY STATEMENT

This securities class action arises from Defendants' fraudulent false and misleading

statements concerning the Pascua-Lama project (the "Project"), Barrick's internal controls, and

its financial condition.  As shareholders eventually learned the truth, the Project was halted and

then indefinitely suspended; Moody's and S&P downgraded Barrick's corporate debt rating;

Barrick admitted to all but one of 23 environmental violations and was forced to pay the

maximum penalty under Chilean law; regulators concluded that Defendants' representations

"weren't correct, truthful or provable"; Barrick took a $5 billion charge against earnings; over

eight specific corrective disclosure dates, Barrick's share price collapsed 42.5%, wiping out

$12.1 billion in market capitalization; and Barrick's CEO and COO were fired.

Years before the Class Period, Defendants knew that the true cost of Pascua-Lama would

exceed $5 billion.  Rather than disclose these figures, Defendants searched for support that

---

[1] The corporate defendant Barrick Gold Corporation is referred to herein as "Barrick" or the "Company."  The "Individual Defendants" are Aaron W. Regent ("Regent"), Jamie C. Sokalsky ("Sokalsky"), Ammar Al-Joundi ("Al-Joundi"), Peter Kinver ("Kinver"), Igor Gonzales ("Gonzales"), and George Potter ("Potter").  Defendant Sybil E. Veenman ("Veenman") is liable as a control person.  *See* ¶¶22-29 (detailing the Individual Defendants' and Veenman's positions within the Company).  Collectively, Barrick, the Individual Defendants, and Veenman are referred to as "Defendants."  The Individual Defendants and Veenman are referred to as the "20(a) Defendants." Further, citations to the Complaint appear as "¶__."  References to "D-Br. __" are to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint.  (ECF No. 56.).  References to D-Ex. __ are to the Exhibits attached to the Declaration of Elliot Greenfield in Support of Defendants' Motion to Dismiss the Amended Complaint.  (ECF No. 57).  Capitalized terms not defined herein have the same meaning as defined in the Complaint.  All emphasis is added unless otherwise noted.  Internal quotations and citations to case law are omitted.

Pascua-Lama was a "low cost" project. This assertion was necessary for Defendants to garner shareholders' approval and to obtain critical project financing. At the outset of the Class Period, Defendants asserted that with capital costs of $2.8 to $3 billion, the Project was to generate "double-digit . . . [return] at a gold price of $800 per ounce." ¶¶58, 243. With costs of less than $50 per ounce of gold, Defendants stated that "Pascua-Lama's costs are expected to be near the bottom of the operating cost curve for the industry." ¶50.

It was also necessary for Defendants to obtain environmental permits from the Chilean and Argentine governments. Vociferous opposition to the Project arose from the mining activities' threat to critical water supplies deriving from the glaciers, under which the mining activities occurred. To placate these opponents, Barrick agreed to over 400 environmental regulations as a precondition to obtaining the environmental permits. *See infra* § I.A.2.

In reality, however, Pascua-Lama was neither a low cost project, nor did Defendants abide by the environmental constraints. Despite soaring gold prices during the Class Period, the true costs of the Project became a reality, confirming that the Project was economically infeasible. *See infra* § I.A.1. While having agreed to the vast number of pre-conditions, Defendants unilaterally altered the construction plans in breach of the environmental requirements. *See infra* § I.A.2. As a result of their environmental violations, regulators forced the suspension of the mine and imposed the maximum penalty under Chilean law.

As internal documents and former senior managers revealed, Defendants knew that management controls that were essential to the Project's success were ineffective, if not completely non-existent. *See infra* § I.A.3. Defendants also knew, and had access to, information that contradicted their public statements concerning the Project's cost and environmental compliance. *See infra* §§ I.A.; I.C.1.

Rather than grapple with Plaintiff's well-pled allegations, Defendants offer an improper counter-factual narrative. Chief among their arguments is that the decline in Barrick's stock price was "perhaps most important[ly due to] the sharply declining price of gold." D-Br. at 1. This red herring argument fails. Defendants announced the Project was economically feasible at $800 per ounce of gold. Gold prices soared during the Class Period, averaging $1410, and ending at $1,316 on the last day of the Class Period. In reality, the Project was not feasible at $800 an ounce or at any price during the Class Period. As one analyst put it, given "the poor [returns] for Pascua-Lama [] the project should not have been developed if current capital costs were properly anticipated." ¶125. Indeed, throughout the Class Period, the true costs were known, as were Defendants' violations of the agreed-upon environmental conditions.

For the reasons set forth herein, Defendants' motion to dismiss should be denied in full.

## STATEMENT OF FACTS

By 2009, Barrick was faced with a desperate situation of declining production levels, principally as a result of older mines producing only lower-grade ore and an accompanying depletion of reserves. ¶1. Shareholders and analysts knew that the Company's prospects would only improve if it developed a project that would deliver "significant low-cost production." ¶38. Of these, Pascua-Lama was the "flagship" project and "key priority," ¶40, and Defendants described it as the most important of this "new generation of low cost mines," ¶¶39, 40. According to Defendants, Pascua-Lama was to be a low-cost contributor of: (i) roughly $1.65 billion of average annual earnings to the Company; (ii) approximately 13% of Barrick's worldwide gold reserves; (iii) at least 9% of Barrick's annual gold production; and (iv) 700,000-750,000 ounces of gold/year over a 20-year mine life. ¶37.

Spanning the border between Argentina and Chile, the Pascua-Lama mine was regarded as one of the biggest and most difficult industrial ventures in the world. ¶¶35-36. To access the

gold, Barrick had to work around surrounding glaciers to carve a massive, open-pit mine into the peaks of the Andes, 15,000 feet above sea level.  ¶36.  The extraction was to take place year round, including during the extreme winter months, with temperatures of minus 60 degrees Celsius, winds in excess of 60 mph, and several meters of snow.  *Id.*

**Prior To The Start Of The Class Period, Defendants**
**Knew Costs Would Far Exceed Their Public Statements**

Even before the Class Period began, Defendants knew full-well from the logistical and environmental challenges of the Project that the cost of production at Pascua-Lama would far exceed their public statements.  In February 2007, Defendants issued a press release, which "updated capital cost estimate [to] $2.3-2.4 billion."  ¶50.  While noting that overall capital requirements increased, Defendants stated that "***operating costs have been reduced*** from the 2004 estimate of $90-100 per ounce to $40-50 [per ounce] for the first five years."  *Id.*  At $50 per ounce, Defendants stated "Pascua-Lama's costs are expected to be near the bottom of the operating cost curve for the industry."  *Id.*

Unknown to shareholders and analysts, however, at that time, Barrick solicited a proposal from Bechtel Corporation ("Bechtel"), one of the world's most experienced construction and engineering companies, to develop Pascua-Lama (the "Bechtel Report").  ¶52.  The Bechtel Report concluded that project development would cost $5 billion, more than twice Defendants' public statements at the time of the report, and would take 4-5 years to complete, not the 36 months Defendants had told the market.  ¶¶53-54.

The Bechtel Report was the topic of extensive discussion among Barrick executives, including Defendant Potter, the Senior Vice President ("SVP") of Technical Services & Capital Projects; Ron Kettles, Pascua-Lama's Project Director; and Peter Holmes, Barrick's Director of Construction.  ¶55.  Rather than release the conclusions of the Bechtel Report, Defendants

sought out a much lower proposal – one they used to justify the Project to the Company's shareholders and potential Project financers as low-cost.  ¶56.

Defendants' key focus was to use the lower cost figures to advance "discussions with global financial institutions to provide project financing."  ¶57.  Rather than go public with the $5 billion proposal from Bechtel, SVP Potter went in search of obtaining a figure under $2 billion – a figure in line with the 2007 disclosure that Barrick would use to obtain financing – despite the unprecedented challenges of bringing the mine to completion.  ¶56.

**In The Face Of Opposition To The Project,
<u>Barrick Agreed To Stringent Environmental Requirements</u>**

While in search of Project financing and shareholder approval, Defendants had to contend with the environmental challenges inherent in the Project's development.  ¶¶35-36, 42. Because the gold at Pascua-Lama was located in a remote transnational location beneath and around three massive glaciers, the environmental and water-management impact of the Project was at the forefront of staunch opposition.  ¶¶34-35, 42.  To suppress this opposition, even before the Class Period, Barrick had to repeatedly and prominently agree to develop Pascua-Lama as an environmentally responsible and accountable project.

Defendants emphasized their "commitment ... that there will be no significant impact on the water users in the valley, either in terms of quality or quantity."  ¶48.  The Company further emphasized "its confidence in its operations and commitment to responsible mining practices" by "commit[ing] that should the water quality change, it would immediately stop the project." *Id.*  Kettles confirmed in a *New York Times* article that "[t]his is far and away the safest and most environmentally sensitive project that I've ... built in 40 years."  ¶49.

Defendants ultimately agreed to ***over 400 environmental requirements*** imposed by the Chilean government alone.  ¶45; D-Ex. 6.  Only by agreeing to comply with Chilean

environmental impact assessments ("EIA") and the Argentinian environmental impact reports

("EIR") could Barrick begin developing the Project.  ¶¶43-45.  The Company also was obligated

to ensure that its mining activities at Pascua-Lama would not pollute or destroy the

environmental gems of the region and the vital water supply from the glaciers.  ¶¶4, 41-49.

These strict environmental requirements focused on glacier protection, water

management, and dust mitigation to protect the water supply.  ¶¶46-48.  For example, Barrick

agreed to implement dust control measures to prevent toxic dust from the mine site and access

roads from drifting onto the glaciers, thereby poisoning the water supply.  ¶46.  The Company

committed to wet the paths for mining trucks into the mine by permanent irrigation to limit

pollution by particulates and toxic dust onto the nearby glaciers.  *Id.*  The Company also agreed

to implement a vast number of detection measures.  *Id.*

Barrick also was obligated to implement a water management system designed to divert

around the facility any waters not impacted by operations.  ¶47.  As part of that system, the

Company was required to capture, treat, and reuse any water used in Project operations to further

minimize the environmental impact and to construct canals to control the mine's run-off water

and channel it to a treatment system.  *Id.*  Defendants confirmed publicly that "Barrick [would]

comply with the Chilean approval and protect the icefields [*i.e.*, glaciers]."  ¶50.

**Defendants Announce Commencement Of Environmentally Compliant Project**

With these approvals in hand, Barrick was able to commence development of the Project

on May 7, 2009, the start of the Class Period.  ¶57.  At that time, SVP Potter confirmed that

Barrick had "incorporated all of the conditions of the environmental approval as well as the key

sectorial permits for construction."  ¶59.  COO Kinver also emphasized that the experienced

Project managers included a "strong environmental team that works very closely with local

authorities and communities and who in turn are familiar with Barrick's strong commitment to

high environmental program standards." *Id.* Barrick issued a related press release confirming that it had "[f]ully compliant environmental management and monitoring plans developed and being implemented" and that it was moving forward with "environmental protection measures," including those limiting the impact to icefields/glaciers, and ensuring appropriate water management and protection of water to downstream users.  D-Ex. 6 at 1, 4.

**Defendants Fraudulently State That Pascua-Lama Is A Low-Cost Mine**

Defendants drew particular attention to their conclusion that Pascua-Lama was a "world-class project" that would both "be one of the lowest-cost gold mines in the world" and "contribute low-cost ounces at double digit returns to Barrick."  ¶58.  Defendants repeatedly emphasized that the Project would contribute significantly to decreasing Barrick's costs on the whole.  *See, e.g.*, ¶62.  Investors and analysts heeded these statements.  As an analyst at TD Newcrest concluded, "Pascua will be one of [Barrick's] lowest cost mines – in fact, during the first five years of production it will likely be the company's lowest cost operation."  ¶61.

At the start of the Class Period on May 7, 2009, CEO Regent announced that the "combination of the project's attractive economics, significant production at low cash costs, and support by the governments of Chile and Argentina for this environmentally responsible project will generate enduring and substantial benefits for all concerned."  ¶57.

Specifically, Regent affirmed that an "updated feasibility study confirm[ed] that the project has very attractive economics.  Updated capital costs are estimated at [$]2.8 to $3 billion given a double-digit . . . [return] at a gold price of $800 per ounce ...."  ¶58.[2]  Potter further assured investors that the "overall level of engineering [on the Project] is about 75% complete

---

[2] The price of gold steadily increased throughout the Class Period, reaching an all-time high of $1,900.02 on Sept. 5, 2011, and achieving an average of $1410 per ounce over the course of the Class Period.  The Court may take judicial notice of publicly available commodity prices.  *See In re Crude Oil Commodity Futures Litig.*, 2012 WL 6645728, at *52 (S.D.N.Y. Dec. 21, 2012).

versus what you would typically expect in a project at this stage at about 25%," ¶59 – meaning that the Project cost planning was more reliable than typical.

**Contrary To Their Public Disclosures, Defendants Prioritized**
**Cost Cutting Measures Over Environmental Compliance**

To adhere to its "low cost" mantra, Defendants prioritized cost cutting measures over environmental compliance at Pascua-Lama.  ¶¶66, 90, 98, 128.  From at least April 2010 on, information from internal and third-party reports and former Project managers demonstrate that despite agreeing to the critical environmental preconditions, Defendants refused to implement required compliance measures to save money.  ¶¶90, 98, 128.

For example, according to Barrick's former Project Manager, who started work on the Project in April 2010, he knew immediately that the publicly disclosed budget was insufficient to deal with the logistics of the Project, including the brutal climate, elevation, topography, and remoteness of the area.  ¶¶32, 63, 65.  To properly deal with these issues, more money was needed for the Project, but when the Project Manager met with COO Kinver and told him that he needed additional funds to maintain compliance with environmental requirements and the schedule, Kinver told him that he had to make do with the existing budget.  ¶66.  The Project Manager had similar conversations with SVP Potter, who also refused to reconsider budgeting issues despite the Project Manager's specific complaints that the then-current budget and schedule were infeasible.  *Id.*  Without the necessary budget, Defendants' refusals directly resulted in the Project's environmental non-compliance from no later than April 2010.  ¶90.

Many of the environmental compliance problems stemmed from the need to keep the roads near the mine wet to prevent toxic dust from being blown onto nearby glaciers.  *Id.*  The Project simply did not have enough water to comply with this requirement.  *Id*.  To deal with this compliance problem, the Project Manager found a compound that could be used instead of water,

which proved successful.  *Id.*  Defendants stopped using it because it was too costly.  *Id.*  As a result, the Project was in constant violation of related environmental obligations.  *Id.*

Internal reports corroborate these accounts and reveal that Barrick violated other dust mitigation procedures.  ¶¶93, 107-08.  For example, in January 2010, Barrick was sanctioned for its failure "to implement the suitable measures intended to reduce or eliminate particulate matter emissions."  ¶¶107-08.  According to the same presentation, a May 2011 report from the regulators observed that "dust [was] falling on top of the glaciers."  *Id.*

Other managers confirmed Barrick's non-compliance with the water management system during the Class Period.  ¶¶97-99.  According to the Operations Manager, Barrick agreed to build canals near the mine to remove runoff water to a plant to be treated before the water was discharged into the rivers.  ¶98.  These canals had to be built to certain specifications.  ¶¶47, 98.  The Operations Manager confirmed that, in the first quarter of 2011, Defendants unilaterally changed the plans to build these water canals to cut costs by 35% without the government's approval.  ¶98.

The Operations Manager drafted three reports explaining these concerns and how the changes to the canals would hurt Barrick in the long run.  ¶99.  He presented these reports to Barrick's South American Operations Manager, who would have forwarded them to COO Gonzales.  *Id.*  Nevertheless, Defendants went ahead with the unauthorized changes, resulting in such severe environmental problems that Barrick was forced to inform the Chilean authorities, which ultimately led to the government's injunction on the Project in April 2013.  *Id.*

Other internal reports further corroborated the environmental violations.  ¶¶101, 104.  For example, Barrick's Monthly Progress Reports for July and September 2011 identified "main issues," including Barrick's failure to fulfill its obligations to implement an effective glacier

monitoring program that allowed construction to proceed without risk to the glaciers.  ¶92.  The Reports also detailed how the Company was failing to meet its water management system construction commitments – a "key commitment" in the environmental impact statements – an issue the Chilean regulators ultimately cited for suspending the mine's construction.  ¶¶94-95.

The water management issues identified in these reports were also detailed in presentations given during a March 6 and 7, 2012 La Serena Meeting, attended by employees from Barrick's Toronto headquarters.  ¶¶102-09.  A presentation on March 7 was devoted to the water management system, the Company's related EIA commitments, and Barrick's known violations of those commitments – focusing on the "concern" that "[water management] [s]ystem design committed in EIA differ[s from] the current system under construction," meaning that Barrick was intentionally proceeding with construction that violated the EIA.  ¶104; D-Ex. 33 at 3.  According to the presentation, Barrick had requested approval for the system, but the authorities' "approval [was] refused due to an inconsistent design."  *Id.*; D-Ex. 33 at 5.

**Despite Numerous Violations, Defendants Touted Barrick's Environmental Compliance**

Despite this pervasive known non-compliance, throughout the Class Period, Defendants misrepresented to shareholders that:  (i) they were engaging in activity at Pascua-Lama "undertaken pursuant to [these] existing environmental approvals"; (ii) Barrick had a "comprehensive range of measures in place to protect" the areas and glaciers around Pascua-Lama; (iii) they had "put in place a range of measures to mitigate the potential impact of dust emissions on glaciers"; (iv) they had "implemented" requirements associated with "glacier protection as mandated in the project's environmental approval by Chilean authorities"; (v) "Barrick has always been supportive of legislation and measures to protect glaciers, and that neither the Pascua-Lama project or Veladero are impacting the glaciers surrounding our operations"; and (vi) "as far as we're concerned, we're fully compliant with the provincial

10

legislation.  And that in any event ... we're in compliance with our permits and we're in compliance with the provincial legislation."[3]  These categorical affirmations had Defendants' intended effect; as analysts stated, "Barrick management believes it is fully compliant with the permits and provincial legislation, including legislation for glacier protection."  *See, e.g.*, ¶71.

**The Consequences Of Defendants' Environmental Non-Compliance Are Revealed**

Despite these repeated assurances that the Company was complying with its obligations, it inevitably became clear that it was not.  While during a February 14, 2013 earnings call Defendants attributed the halting of pre-stripping activities to "unusually high wind," ¶127, on April 10, 2013, Barrick announced that "pre-stripping activities" had been fully suspended by Chilean regulators.  ¶131.  In response, the Company's stock price dropped roughly 8.4%.  ¶133.  Just over a month later, on May 24, 2013, Chile's Environmental Superintendent compelled Barrick to complete the water management system in accordance with the Project's environmental permit before resuming construction activities.  ¶137.

Chile's environmental regulators further identified 23 violations and imposed the maximum penalty possible.  ¶138.  The fine was imposed after regulators cited "'very serious' violations of its environmental permit as well as ***a failure by the company to accurately describe what it had done wrong***."  ¶¶138-39.  After a four-month investigation, regulators "***found that the acts [Defendants] described weren't correct, truthful or provable***."  ¶138.

**Throughout the Class Period, Internal Reports**
**Revealed That Defendants' Publicly Stated Figures Were False**

In mid-October 2010 the "Project Plan Report," an internal report drafted by a team tasked with assessing the soundness of Pascua-Lama's execution plan, was issued.  *Id.*  The Project Plan Report concluded that the current capital budget estimate of $2.8 billion was

---

[3] *See, e.g.*, ¶¶70, 110, 111, 123, 303(b), 304, 307(c), 313, 318, 324, 326(b), 335, 353, 360(b), 362, 373, 393, 397(b).

infeasible within the Company's allotted 36-month time frame, *id.*, and the timeline was 18 months too short, meaning the Project could not be completed until the second half of 2014, not the first quarter of 2013.  ¶69.  This internal assessment corroborated the time frame first identified in the Bechtel Report, ¶54, and reiterated by Project managers.  ¶63.  Despite these developments, during the October 28, 2010 earnings call, CEO Regent continued to report that Pascua-Lama "remains in line with its pre-production capital budget of about $3 billion, with production scheduled to begin in the first quarter of 2013."  ¶67.

In February 2011, Defendants disclosed capital cost increases of 10-20% to $3.3 to $3.6 billion, attributing them to macroeconomic factors, including inflationary pressures, high labor costs, exchange rates, and increased commodity prices.  ¶70.  Nevertheless, according to Defendants, "[d]espite these increases ... Pascua-Lama continue[s] to have very strong economics," and "when complete, it is expected to be one of the lowest operating cost gold producing mines in the world."  *Id.*  In reality, however, by March 2011, Defendants knew that costs would exceed $1.05 billion for the remaining nine months of 2011 alone, or nearly 30% of the overall budget, even though the project had just broken ground.  ¶72.

Starting no later than July 2011, a number of internal reports concluded that Defendants' cost estimates were baseless and that the Company's internal controls were ineffective.  ¶¶75-80.  In July 2011, a "high-level estimate review" performed by the consulting firm Turner & Townsend (the "T&T Report") determined that the Company's new capital budget was not an adequate basis for the Company's public cost estimates, ¶75, which had recently been increased to $4.7-5.0 billion, ¶73.  The T&T Report found that Barrick's 2011 budget was "wholly based on data from the February 2009 estimate," an approach that did not comply with general estimating principles and the Company's internal standards for a "Class III estimate."  ¶¶75-76.

The T&T Report further stated that: (i) "[t]he June 2011 estimate is not supported by any Basis of Estimate"; (ii) "[t]he project logistic plan should be revisited"; and (iii) "the forecast 2011 estimate should be frozen and any changes should be documented as additional scope requirements." ¶77.  Nonetheless, Defendants continued to publicly tout the 2011 budget, and instructed T&T that "no adjustments were to be made following [T&T's] findings." ¶75.

Also in July 2011, the Company undertook a "high level review of risk exposure ... to establish a suitable risk contingency for the Pascua-Lama Project." ¶78.  The result was the July 2011 Risk Exposure Report, which likewise confirmed that Defendants' statements were false and unreliable. *Id.*  It concluded that Barrick's internal controls at Pascua-Lama suffered from "[i]naccurate reporting of deliverables/failure to adequately monitor progress" and had "[n]o formal system in place for scope/change management." *Id.*

Monthly Progress Reports for Pascua-Lama also were created no later than July 2011. ¶79.  These reports were circulated to Project team members in Chile and to the Company's Toronto office, including Defendants Kinver and Gonzales. *Id.*  The July report identified critical Project concerns and internal control deficiencies, including: (i) "Significant inaccuracies, omissions and inconsistencies in monthly reports"; (ii) "Cost Management Process weaknesses and inaccurate reporting"; and (iii) "Risk Management Process weaknesses contributing to inaccurate reporting." ¶80.  The same conclusions were repeated in the September 2011 Monthly Progress Report. *Id.*

The September report further determined that Defendants had not fully established from the outset a "program management framework," *id.*, which would have incorporated a plan for the Project's execution and included a definite organizational structure, strategy, and contracting plan.  Kinver and Gonzales were among the recipients of the September 2011 report. *Id.*

13

In July 2011, Defendants attributed cost increases primarily to macroeconomic circumstances, such as inflation and "global cost trends." ¶344. These statements concealed Defendants' true assessment of the Company-specific control deficiencies identified in the Monthly Progress Reports, the Risk Exposure Report, the T&T Report, and the conclusions of managers and other reports that the Project was never achievable as promised.

The Project's senior managers repeatedly corroborated the observations and conclusions of these internal reports in their discussions with Defendants. *See, e.g.*, ¶¶32, 56, 63-69. For example, when the Project Manager met with Defendants Kinver and Potter and told them that he needed additional funds to maintain compliance with environmental requirements and the proposed schedule, Kinver told him that he had to make do with the existing budget. ¶66.

Later reports continued to confirm that costs were actually far above $5 billion. ¶¶82-88. Moreover, the January 2012 Monthly Progress Report reiterated "Cost Management Process weakness & inaccurate reporting" were significant issues, as was "Risk Management Process weakness contributing to inaccurate reporting." D-Ex. 29 at 31-32. Defendants also knew that their Project reporting and internal controls were so deficient, ¶¶75-83, 86-88, 152, that they had no reasonable basis to reiterate, as they did on February 17, 2012, the "previously announced pre-production capital of $4.7-$5.0 billion," ¶84. Tellingly, none of these internal reports identified the price of gold or macroeconomic inflationary issues as the cause of the Project's escalating costs or infeasibility.

**<u>Defendants' Scheme Unravels Completely</u>**

On June 28, 2013, the Company issued a press release detailing that it had taken a substantial impairment of $4.5-5.5 billion – almost its entire investment in the Project − and that production had been pushed back again to mid-2016, from the previously revised expectation of late 2014. ¶141. The risks that Defendants had concealed since May 2009 further materialized

14

on October 31, 2013, less than three months after the Company disclosed the $5.1 billion impairment charge.  ¶148.  That day, Barrick announced that it would not pursue construction at Pascua-Lama upon environmental approval, but instead was indefinitely suspending construction at the mine, except for activities required for environmental protection and regulatory compliance.  *Id.*  On this news, Barrick's stock price dropped from $20.50 per share on October 30, 2013, to $19.39 on October 31, 2013, a decline of approximately 5.4%.  ¶150.  The next day, the slide continued as Barrick's stock price dropped from $19.39 on October 31, 2013, to $18.01 on November 1, 2103, a decline of approximately 7.1%.  ¶151.

## ARGUMENT

**I.      PLAINTIFFS STATE A CLAIM UNDER §10(b).**

      **A.      The Complaint Adequately Alleges Material Misrepresentations.**

A §10(b) securities-fraud complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  A plaintiff need not "plead with particularity every single fact upon which [its] beliefs concerning false or misleading statements are based."  *Id.* at 313.[4]  The Complaint's allegations readily meet this standard with respect to Defendants' Class Period statements that: (1) Pascua-Lama was being built in compliance with applicable environmental regulations and commitments; (2) Pascua-Lama was a low-cost project; (3) Barrick's internal controls over the Project were effective; and (4) Barrick was properly capitalizing the costs associated with the Project and accurately reporting the Company's financial condition.

---

[4] Plaintiffs also plead that Defendants "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b).  ¶¶522, 535.

     1.     **Defendants' Statements That Pascua-Lama Was
A Low-Cost Project Are Actionable.**

The Complaint alleges with sufficient particularity Defendants' numerous false and

misleading statements that Pascua-Lama was a low-cost project that would yield profits for years

to come.  At the outset of the Class Period, Barrick stated that the Pascua-Lama Project would

cost an estimated $2.8 to $3.0 billion, with commissioning expected in late 2012 and the first

gold in early 2013.  ¶¶241, 243.  These figures were based on capital costs of $20-$50 per ounce

of gold, which yielded a double digit return "at a gold price of $800 per ounce."  ¶58.  According

to Defendants, these figures were more certain, as they were based on an engineering level of

75%, versus the typical 25%.  ¶¶59, 241(c).  At that time, Defendants knew from the Bechtel

Report that the costs for the Project exceeded $5 billion and the time necessary to comply with

environmental and engineering challenges was almost twice as long.  ¶53.

     During the Class Period, the truth that Pascua-Lama was not a low-cost project and that it

would require materially more time to complete was reiterated internally.  For instance:

- Beginning in <u>mid-2010</u>, the Project Plan Report, which was submitted to Kettles, concluded that the current capital budget estimate of $2.8 billion was infeasible within the Company's 36-month timeframe.  ¶67.

- In <u>March 2011</u>, the Company received internal estimates that the cost of Project operations for the remaining nine months of 2011 alone would exceed $1.05 billion, even though the Project had just begun.  Only one month earlier, however, Barrick had assured investors that total costs would only be $3.3-3.6 billion.  ¶72.

- The <u>July 2011</u> T&T Report further concluded that the publicly announced capital budget ($4.7-$5.0 billion) was inadequate and that Barrick's adjustments and methodology were inaccurate.  ¶¶75-77.  A Risk Exposure Report that same month likewise found that the information provided to shareholders was "[i]naccuarate."  ¶78.

- From <u>July 2011</u> onwards, Monthly Progress Reports were disseminated to recipients, including Kinver and Gonzales.  These Monthly Progress Reports noted "inaccuracies, omissions and inconsistencies" in Pascua-Lama project reporting.  ¶¶79-80.

- The <u>January 23, 2012</u> Lama Master FCST [i.e., forecast] indicated that the total capital costs for Pascua-Lama as of January 2012 would exceed $6.1 billion.  ¶¶82-83.  However, on February 17, 2012, the Company reaffirmed its pre-production capital figure of $4.7-$5.0 billion.  ¶84.

As the Class Period came to an end, Defendants continued to receive multiple reports that the Project was not low-cost.  For example, a December 2012 internal document forecast a completion figure of $8.96 billion, nearly $500 million more than the upper limit of the Company's November 2012 public estimate of $8-8.5 billion.  ¶¶85-86.  The Company's ECPM contractor, Fluor, calculated costs exceeding $8.8 billion in March 2013, ¶87, and, in July 2013, approximately $10 billion.  ¶88.

In response to these well-pled allegations, Defendants argue that each statement is inactionable because the statements were either: (1) forward-looking statements accompanied by meaningful cautionary language and therefore protected under the PSLRA's "safe harbor" provision, 15 U.S.C. §78u-5(c), and the "bespeaks caution" doctrine, D-Br. at 13-16; or (2) protected under the Second Circuit's decision in *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), as a statement of opinion, D-Br. at 16-17.  Both arguments fail.

>    **(a)     Defendants' Statements Are Not Protected As Forward-Looking Statements Or By The "Bespeaks Caution" Doctrine.**

As alleged, Defendants had access to and obtained information that rendered their purported forward-looking statements false when made.  Here, the false statements at issue concerned contemporaneous facts and provided information that was contradicted by information known to Defendants when they spoke.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or present fact − knowledge within the grasp of the offeror − is a different matter.  Such facts exist and are known; they are not unforeseen or contingent."); *Novak*, 216 F.3d at 315 ("[D]efendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

Moreover, having spoken regarding the low-cost nature of the Project, even if couched in terms of estimates, Defendants had a duty to speak truthfully.  *In re NovaGold Res. Inc. Sec.*

*Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009), is instructive here.  In *NovaGold*, the court found

actionable a series of statements, like here, that confirmed the viability of a mining project based

on a feasibility study.  *Id.* at 299.  "NovaGold continued to refer to the [feasibility] Study despite

mounting evidence that the ... Study was materially obsolete," and the defendants "knew that the

... Study and its cost estimate of US$ 1.8 billion were unreliable and misleading shortly after

release, ***if not at release***."  *Id.* at 301 n.20, 299.  The court concluded that the allegations pointed

to "contrary ... widespread knowledge at NovaGold that the Project was over budget and that the

[feasibility] Study's figures were inaccurate."  *Id.* at 300.

      In response to defendants' arguments that their statements were forward-looking, the

*NovaGold* court concluded that "'[s]tatements that are opinions or predictions are not *per se*

inactionable under the securities laws.'  Having chosen to speak out publicly regarding the

Project's cost estimates, NovaGold was under a duty to 'speak truthfully about material issues,'

and to correct misleading statements, regardless of whether or not they were 'forecasts.'"

*NovaGold*, 629 F. Supp. 2d at 301.[5]

      Here, Defendants' statements were false and concealed material information necessary to

render them not misleading.  Defendants possessed the Bechtel Report, the Project Plan Report,

the T&T Report, and Monthly Progress Reports, *see, e.g.*, ¶¶53, 67-69, 79-80, 92-96 – as well as

reports from confidential witnesses, *see, e.g.*, ¶¶53-56, 63, 66, 82, 88, 97; *infra* § I.C.1, which

indicated the project was not viable as promised.

      Defendants' invocation of the "bespeaks caution" doctrine likewise fails.  *See* D-Br. at

13-16.  Defendants point specifically to their purported risk warnings about "changes in the []

---

[5] The *NovaGold* court quoted *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) and *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) (holding that, once the defendant chose to speak, "it had a duty to be ***both*** accurate and complete"); *see also Ellenburg v. JA Solar Holdings Co. Ltd.*, 2010 WL 1983375, at *3-4 (S.D.N.Y. May 17, 2010) (same).

price of gold," "availability and costs associated with mining inputs and labor," "operating or technical difficulties in connection with mining or development activities," and "the risks of obtaining necessary licenses and permits." D-Br. at 15. As a general matter, these boilerplate warnings do not insulate Defendants from liability when the known risks already have materialized. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) (noting that "boilerplate warnings will not suffice"). The doctrine "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d. 277, 305 (S.D.N.Y. 2013) (Even despite cautionary language, "defendants had to appreciate … that a material delay of the prior schedule for construction and production was likely, and that the schedule was no longer realistic.")

Here, Defendants "did more than just offer rosy predictions." *The New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) (holding the safe harbor inapplicable when defendants "stated that present [circumstances were] under control or omitted [them] as a contributor to the company's costs, despite recklessly disregarding that the opposite was true") (citing *Novak*, 216 F.3d at 315). The truth was that Pascua-Lama was not a low-cost project that could begin production by 2013.

Moreover, Defendants repeatedly advance the red-herring argument that the decline in the price of gold resulted in the infeasibility of the Project, and was a repeated risk factor. The indisputable fact is that Defendants announced the feasibility of the Project and "double-digit, unlevered after-tax IRR [internal rate of return] at a gold price of $800 per ounce." ¶58. Defendants made these statements on the purported basis on costs of $20-$50 per ounce of gold.

¶255(a).  During the Class Period, gold traded at an average price of $1410, and reached an all-time high of $1,900 per ounce before resting at $1316 on the last day of the Class Period.  What Defendants were forced to concede was that the Project was not feasible at any gold price – whether it was $800 or double that amount.  The true cost of meeting the required environmental conditions, the environmental challenges, and the sheer engineering feat were too expensive and time consuming.  ¶¶36, 63, 65.

### (b) *Fait* Is Irrelevant; In Any Event, The Complaint's Allegations Surpass The *Fait* Requirement.

Defendants' reliance on *Fait* also fails.  *See* D-Br. at 16-17.  Defendants contend that the Complaint "allege[s] no facts indicating that ["such estimates"] were both objectively false and not honestly believed when made."  D-Br. at 16.  Defendants' argument is misplaced.

Statements "that are opinions or predictions are not *per se* inactionable under the securities laws."  *NovaGold*, 629 F. Supp. 2d at 301.  Moreover, Defendants fail to explain that *Fait* involved a statutory claim under Sections 11 and 12 of the Securities Act of 1933, which, unlike §10(b), does not require a showing of defendants' mental state.  Here, as discussed below, the Complaint sets forth specific allegations of the Defendants' fraudulent scienter, which exceeds the notion of objective falsity and honest belief discussed in *Fait*.  *See infra* § I.C.[6]

### 2. Defendants' Statements Regarding Compliance With Environmental Regulations Were False When Made.

Defendants argue that their statements concerning compliance with environmental regulations are inactionable because "Plaintiffs allege no facts indicating that the identified statements were false when made," D-Br. at 17, and that Plaintiffs have "allege[d] no facts

---

[6] The Supreme Court recently granted *certiorari* in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 719 F.3d 498 (6th Cir. 2013) *cert. granted*, 82 U.S.L.W. 3242 (U.S. Mar. 3, 2014) (No. 13-435), to resolve the apparent Circuit split between the Sixth Circuit's ruling that does not require pleading of subjective falsity in the context of Securities Act of 1933 claims and the ruling in *Fait*.  The case is expected to be heard next term.

indicating that the Project was not undertaken pursuant to existing approvals or that Barrick did

not have a range of measures in place to protect the environment," *id.* at 17-18.  Defendants

ignore the allegations and mischaracterized the alleged facts.

As an initial matter, Defendants cannot credibly dispute these basic factual allegations:

before the Class Period, to develop the Project, Defendants agreed to comply with a

comprehensive set of environmental regulations and conditions, ¶¶43-46, many of which were

focused on glacier protection, water management, and dust mitigation to protect the water

supply, ¶¶46-48.  Information from internal and third-party reports and former Pascua-Lama

managers demonstrate that Defendants were violating these environmental obligations, ¶¶89-99,

107-108, by prioritizing cost-cutting measures over compliance, ¶¶90, 98, 128.

Far from Defendants undertaking the Project "pursuant to [the] existing environmental

approvals," implementing a "comprehensive range of measures in place to protect" the glaciers

and water supply, and "implement[ing]" requirements associated with "glacier protection as

mandated in the project's environmental approval by Chilean authorities,"[7] they deceived

shareholders and regulators.  As the authorities concluded, Barrick committed "'very serious'

violations of its environmental permit as well as *a failure by the company to accurately describe*

*what it had done wrong*."  ¶139.  Barrick admitted to 22 of the 23 violations, and regulators

imposed the maximum penalty possible under Chilean law.  ¶¶137-38.  Ultimately, the regulators

"*found that the acts [Defendants] described weren't correct, truthful or provable*."  ¶138.

The Complaint's well-pled allegations satisfy Plaintiffs' burden at this stage.  As alleged,

Defendants were not in compliance with agreed-to environmental regulations.  For example:

- In <u>January 2010</u>, Barrick was sanctioned for its failing "to implement the suitable measures
  intended to reduce or eliminate particulate matter emissions," according to a March 7, 2012

---

[7] *See, e.g.*, ¶¶70, 110, 111, 123, 303(b), 304, 307(c), 313, 318, 324, 326(b), 335, 353, 360(b), 362, 373, 393, 397(b).

Company presentation concerning Barrick's "Integrated Dust Management System."  ¶¶107-08.

- By <u>April 2010</u>, the Project Manager informed COO Kinver and SVP Potter that the Project was not compliant with the environmental conditions.  Defendants told the Project Manager to make do with the constrained resources.  ¶¶66, 90.

- A <u>May 2011</u> report from the regulators observed that "dust [was] falling on top of the glaciers," in violation of Barrick's obligations.  ¶¶107-08.

- During the <u>first quarter 2011</u>, the Operations Manager confirmed that Defendants *unilaterally changed the plans* to build the mandatory water management canals without the Chilean government's knowledge in order to cut costs by 35%.  ¶¶97-99.  In response, he drafted three reports detailing how the changes to the canals would hurt Barrick in the long run.  These reports were presented to Barrick's South American Operations Manager, who would have forwarded them to COO Gonzales.  ¶99.

- Barrick's Monthly Progress Reports for <u>July and September 2011</u> identified "main issues," detailing how the Company was failing to meet its water management system construction commitments – "a key commitment emphatically stated in the project's environmental approval," which, if not met, put the project "in grave danger of being paralyzed."  ¶¶94-95; D-Ex. 27 at 80-81, D-Ex. 28 at 93.[8]  These reports also demonstrated that Defendants were violating dust mitigation requirements.  ¶93.

- The water management issues were also detailed in presentations given during a <u>March 6 and 7, 2012</u> La Serena Meeting, attended by employees from Barrick's Toronto headquarters.  ¶¶102-09.  One presentation focused on the "concern" the water management "[s]ystem design committed in EIA differ[s from] the current system under construction."  ¶104; D-Ex. 33 at 3.  According to the presentation, Defendants had requested approval for the system, but the authorities' "*approval [was] refused due to an inconsistent design*."  ¶104; D-Ex. 33 at 5.  The severe environmental consequences of the expressly unapproved design forced the Chilean authorities to shut down the Project in <u>April 2013</u>.  ¶99.

Many of these same reports and presentations, ¶¶93, 107, also detailed Barrick's dust mitigation obligation failures.  While Defendants repeated throughout the Class Period that they had a comprehensive range of measures in place to mitigate "generat[ing] damaging dust accumulation in areas where glaciers are present," *e.g.*, ¶111, as late as December 2011, Barrick had yet to "put in place a set of dust abatement and control measures such as road watering and proper road planning," *id.*  According to the Project Manager, he tried to comply with Barrick's dust mitigation and water protection obligations by finding a compound that could be used on

---

[8] Indeed, this same language was also articulated in the January 2012 Monthly Progress Report.  ¶¶94-95; D-Ex. 29 at 93.

roads to prevent dust from being blown onto glaciers.  ¶90.  This compound was used and proved effective, but was stopped after Barrick prioritized cost over compliance.  *Id*.  Ultimately, Defendants' failure to design, let alone implement, the required measures resulted in the halting of Barrick's "pre-stripping activities" for the Project.  ¶127.

In response, to attack Plaintiffs' environmental misstatement allegations, Defendants direct the Court to a single line of the July 2011 Monthly Progress Report, which states: "there are no non-compliance commitments which hinder the development of the project."  D-Br. at 18; D-Ex. 27 at 80.  Defendants' attempt to mischaracterize their prior statement to mean conclusively that there was no non-compliance **with** commitments is wholly implausible – and, in any event, a factual issue for trial.[9]

Each of the internal reports, presentations, and management accounts consistently, repeatedly, and unambiguously provide corroborative evidence of the falsity of Defendants' statements.  These allegations demonstrate that Defendants failed to comply with their environmental obligations from the outset of the Class Period.  In the end, the deficiencies identified internally during the Class Period led to the Company admitting to 22 out of 23 environmental violations, regulators imposing the maximum fine under Chilean law on Barrick, and regulators shutting down the Project due to the known environmental violations that persisted for years.  Accordingly, due to the environmental deficiencies internally documented and identified throughout the Class Period, Defendants' statements and omissions concerning compliance with environmental regulations were false when made.[10]

---

[9] A plausible reading  of the phrase "non-compliance commitments" in the context of the report is that this is a term of art that refers to "components of the Pascua Lama project whose implementation has not been decided or have not yet been initiated" – not to commitments to compliance with the Project's environmental regulations.  D-Ex. 27 at 80.  In any event, this is a factual dispute; Plaintiffs plausible reading shall stand at the pleading stage.

[10] Defendants summarily argue that *certain* of their statements concerning Barrick's compliance with a "comprehensive range of measures" and "existing environmental approvals" relate **only** to Argentina, and not Chile,

3.    **Statements Regarding Internal Controls And
Accounting For Capital Costs Are Actionable.**

Defendants' argument that statements regarding internal controls, accounting for costs, and certifications of controls and financial statements are inactionable is unfounded.  *See* D-Br. at 19-22.  As alleged, internal controls are the processes Barrick was required to design and maintain to provide reasonable assurance regarding the achievement of objectives, including: (i) effectiveness and efficiency of operations, including the environmental commitments for the Project; (ii) reliability of financial reporting and disclosures; and (iii) compliance with applicable laws and regulations.  ¶154.  Under the Sarbanes-Oxley Act of 2002 ("SOX") §§302 and 404, Regent, Sokalsky, and Al-Joundi certified with the SEC that the Company had effective internal controls, and they were further obligated to report any significant changes or factors that could impact the Company's internal controls.  ¶155.

It is sufficient to plead falsity of SOX certifications when Defendants have "common knowledge at the Company that its internal systems were inadequate."  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007).  The Complaint specifically alleges that Defendants had knowledge, or at least recklessly disregarded, that Barrick's internal controls were ineffective.  For example:

- The <u>T&T Report</u>, a "high-level estimate review," concluded that the  new capital budget was not an adequate basis for the Company's public cost estimates (which had recently been increased to $4.7-5.0 billion).  ¶¶75-77.  The T&T Report concluded that Barrick's 2011 budget was "wholly based on data from the February 2009 estimate," an approach that did not comply with general estimating principles and the Company's internal standards for a "Class III estimate."  ¶75.  Defendants continued to publicly tout the 2011 budget, and instructed T&T that "no adjustments were to be made following [T&T's] findings."  *Id.*

---

and are therefore not actionable. D-Br. at 19.  This is belied by logic and Defendants' repeated, categorical, and unambiguous statements that the Project complied with all environmental requirements.  *See, e.g.*, ¶110 (statement is in no way limited to the Argentinian side of Pascua-Lama, but instead is focused on the protection of "water resources, glaciers and other sensitive environmental areas around ... Pascua-Lama" as a whole).  To now suggest that their statements were isolated to the Argentine side of the Project – let alone that they disclosed that the Chilean side of the Project, which accounted for 75% of the mine, was non-compliant – is not merely implausible, but wrong.

- The <u>Risk Exposure Report</u> was undertaken in July 2011 as a "high level review of risk exposure ... to establish a suitable risk contingency for the Pascua-Lama Project." ¶78. This report concluded that Barrick's controls at Pascua-Lama suffered from "[i]naccurate reporting of deliverables/failure to adequately monitor progress" and had "[n]o formal system in place for scope/change management." *Id.*

- <u>Monthly Progress Reports</u> repeatedly stated that the Project suffered from: (i) "Significant inaccuracies, omissions and inconsistencies in monthly reports"; (ii) "Cost Management Process weaknesses and inaccurate reporting"; and (iii) "Risk Management Process weaknesses contributing to inaccurate reporting." ¶80. These reports further concluded that the Company had not fully established at the outset of the Project a "program management framework," which would have incorporated a plan for the Project's execution and included a definite organizational structure, strategy, and contracting plan. *Id.* Defendants Kinver and Gonzales were among the recipients of the September 2011 report. *Id.*

In the face of these internal communications and documents, Defendants argue that in July 2011 they disclosed that Barrick "was 'in the process of assessing the impact on, and, as required, redesigning, the internal controls over financial reporting and disclosure frameworks to reflect' organizational changes at the Project." D-Br. at 20. Similarly, they cite to a disclosure that "work continues to enhance and standardize the project controls." *Id.* Defendants miss the point; these statements continued to deceive investors that controls were effective. In reality, Defendants knew there were significant inaccuracies, failures to monitor the Project, and failures to implement effective Project management from the outset. They cannot point to any disclosure of such facts, and Plaintiffs' allegations exceed the pleading requirements.[11]

Defendants also contend that their statements reflect "a Company that is committed to both disclosing and addressing issues related to internal controls as they arise." D-Br. at 20. Specifically, Defendants point to a July 2012 disclosure of a "comprehensive review and changes to the management team" and an assessment of "the impact on internal control over financial reporting and disclosure." *Id.* That disclosure, which was made only after CEO Regent was

---

[11] *See NovaGold*, 629 F. Supp. 2d at 300, 299 (without specific allegations of internal meetings or documents, "***widespread knowledge*** at NovaGold that the Project was over budget and that the ... [s]tudy's figures were inaccurate" were sufficient, because "massive revision of ... estimates could not have occurred without NovaGold realizing ... that its [public] estimates were unreliable").

fired and the ensuing management shakeup, is part of the same July 26, 2012 disclosures Plaintiffs allege partially revealed the truth. ¶¶213-17.[12]  Rather than show commitment to disclosure, these statements support the plausible inference that Barrick's controls were ineffective throughout the Class Period, and upon Regent's termination, finally began to be revealed as false and misleading.  ¶¶152-73.

###### 4.     Defendants' Misstatements Concerning Accounting For The Project Are Actionable.

Defendants contend that Plaintiffs' allegations that "Barrick should not have calculated the Project as an asset on its balance sheet rests on the unsupported assertion that Barrick knew, from the start, that the Project would never generate a net positive cash flow."  D-Br. at 20. Defendants again mischaracterize the allegations.  ¶¶174-92, 459-506.

Detailed at length in the Complaint, ¶¶174-78, 186, 190, the accounting rules have a simple purpose: to ensure that Barrick's financial statements reflect the true state of affairs.  For the Project, Barrick had two options: (i) expense the amount it invested in the Project, meaning that every dollar spent would reduce net earnings by an equal amount; or (ii) capitalize the amount spent on the Project, and rather than reduce earnings dollar-for-dollar, the amount would be placed on the balance sheet as an asset contingent on the expectation of future earnings. Defendants chose the second option.

Because capitalizing expenses gives rise to the significant risk that earnings may be overstated, the accounting rules Defendants claimed to apply had specific requirements.  In particular, Defendants were required to determine whether their capital investment in the Project would be recoverable.  ¶175.  Defendants claimed to have abided by these requirements.  ¶¶459-

---

[12] Because Defendants continued to conceal the full extent of the true state of affairs at Barrick, Plaintiffs alleged that the July 26, 2012 statements were partial corrective disclosures as well as materially false and misleading. ¶¶385-94.

503.  But the evidence indicates that Defendants' claims were not true.  In addition to the Bechtel Report revealing before the outset of the Class Period that the Project costs would exceed $5 billion, Defendants continued to breach the accounting requirements by improperly capitalizing Pascua-Lama expenditures knowingly using unreliable cost projections.

*First*, during the Class Period, Barrick's internal controls were so deficient that Defendants did not have a reasonable basis to evaluate whether an impairment of the Project had occurred.  That is, would the Project costs exceed the Project earnings?  Internal reports revealed, for instance: significant inaccuracies, omissions, and inconsistencies in monthly reports; program management framework that was not fully established at outset of project; cost management process weaknesses and inaccurate reporting; program plans left incomplete; program plans that were not consistently updated; risk management process weaknesses contributing to inaccurate reporting; and inadequate control over invoiced time and expenses.  ¶169.  Other reports revealed that environmental requirements were being breached, ¶¶182-83, and costs 66% higher than the original figures did "not adhere to general estimating principles," ¶185.  With such ineffective controls, Defendants knew that they could not reasonably rely on their cost estimates to determine whether continued capitalization was appropriate.

*Second*, Defendants knew that the Project's costs were going to be far higher than initially disclosed.  The applicable accounting provisions required Defendants to assess an impairment of the accumulated costs when those costs were "significantly in excess of the amount originally expected for the acquisition or construction of the long-lived asset."  ¶175.  They were also required to assess an impairment when "internal reporting ... indicates that the economic performance of an asset is, or will be, worse than expected."  ¶176.  That is precisely

what the internal reporting at Barrick consistently and repeatedly revealed to Defendants.  ¶¶63, 66-69, 72, 75-84, 86-88, 182-85.  *See supra* §§ I.A.1, 3.

Having chosen to capitalize the Project's costs, and refused to take the required impairment when the evidence revealed the costs exceeded the expected recovery, Defendants inflated Barrick's earnings by over $5 billion in capitalized expenses.  ¶¶504-06.

### 5.     Defendants' Misstatements Are Not Corporate Optimism And Puffery.

Defendants also contend that a number of statements are inactionable as corporate optimism or puffery.  D-Br. at 22.  Here, Defendants argue that statements regarding Pascua-Lama's "[a]ttractive economics," ¶¶57, 242, 247, 250, 252, and "strong environmental team," ¶¶59, 245, as well as their statements that the mine "is expected to become one of the gold industry's largest and lowest cost mines," are inactionable.  D-Br. at 22.  Defendants submit that even if proven false, their statements could not be reasonably relied upon – *i.e.*, the statements were not material.  *Id*.

Defendants are incorrect.  "Cost estimates, a forecast that the Project will be commercially viable, or a comment that the Project's budget and construction schedule are unchanged are too specific to be considered mere puffery."  *NovaGold*, 629 F. Supp. 2d at 301-02.  The alleged false statements are material because:  (i) they distorted the assets and earnings of the Company; (ii) the underlying project was significant to the Company's operations and profitability; and (iii) the stock price precipitously declined upon the disclosure of the truth.  *Celestica*, 455 F. App'x at 16.  Here, the Complaint's allegations satisfy this standard.[13]

---

[13] Furthermore, the Complaint alleges that Defendants were in possession information contrary to their statements.  *See supra* § I.A.1.  This alone is dispositive on the issue.  *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (noting statements are actionable if the speaker is "aware of undisclosed facts that seriously undermined" his representations).

### 6.    The Individual Defendants Are Liable
### For Statements They Did Not Make.

Defendants contend that because Defendants Kinver, Potter, and Gonzales did not sign

any of the Company's SEC filings they can only be liable for statements they made personally.

*See* D-Br. at 23.[14]  Not so.  Defendants' reliance on *Janus Capital Group., Inc. v. First*

*Derivative Traders*, 131 S. Ct. 2296 (2011), is misplaced.[15]  In *Janus*, plaintiffs alleged that an

investment advisor "made" misstatements by helping a mutual fund prepare misleading

prospectuses, which the fund filed with the SEC.  131 S. Ct. at 2305.  Because "none of the

statements in the prospectuses were attributed, explicitly or implicitly, to [the advisor]," there

was no basis for investors to rely on any statements by the advisor.  *Id.* at 2305 n.11.

Here, each of Defendants Kinver, Potter, and Gonzales was a corporate insider

responsible for the day-to-day affairs of the Company, not, as in *Janus*, a third-party advisor, and

each acted as an agent of the Company.  Moreover, even if a Defendant did not utter a statement,

each was a senior officer responsible for ensuring that Barrick's public disclosures were free of

fraudulent or misleading statements or omitted material facts, and are thus liable.  *See In re*

*Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 169-70 (S.D.N.Y. 2008) (a non-

speaking defendant can be liable under §10(b) if his conduct goes to "the very heart of the

fraudulent scheme" in question).[16]

---

[14] The Complaint sets forth the culpable statements of COO Kinver, *see, e.g.*, ¶¶59-60, 62, 245, 248, 371; SVP Potter, *see, e.g.*, ¶¶59, 244, 294; and EVP/COO Gonzales, *see, e.g.*, ¶354.

[15]  The group pleading doctrine continues to be applied within the Second Circuit.  *See City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373-74 (S.D.N.Y. 2012) (*citing In re Bisys Sec. Litig.*, 397 F. Supp. 2d 430, 439 & n. 4 (S.D.N.Y. 2005).

[16] *See In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (explaining that "*Janus* does not alter the well-established rule that 'a corporation can act only through its employees and agents'" and noting the defendant "was at the time of each attributed statement an officer of Merck"); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 93873, at *15 (N.D. Ala. Aug. 23, 2011) ("Unlike the issue of whether a third party could be liable for the statements made by a defendant, nothing in *Janus* stands for the proposition that CEOs and CFOs [cannot] be liable for false and misleading statements in their own company's financial statements.").

**B.     The Complaint Alleges Particularized Facts That Give Rise To A Strong Inference Of Scienter.**

**1.     Legal Standard**

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter:  either conscious misbehavior or recklessness.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-24 (2007).  The Court must: (i) "accept all factual allegations in the complaint as true"; (ii) consider the allegations "collectively"; and (iii) take into account "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 322-24, 326 ("We reiterate ... that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").  The Court shall sustain a complaint when the inference of scienter alleged is cogent and "***at least as likely*** as any plausible opposing inference."  *Id.* at 328 (emphasis in original).

"The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.*  The PSLRA does "not require the pleading of detailed evidentiary matter" to establish scienter.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  In sum, "[c]ommon sense requires that courts remember the purpose of a pleading – to state a claim and provide adequate notice of that claim.  A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage."  *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003).  Moreover, "the Second Circuit 'has ... long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth.'"  *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 349 (S.D.N.Y. 2011).  Recklessness exists when "defendants failed to review or check information that they had a duty to monitor," *Novak*, 216 F.3d at 308, or upon

an "egregious refusal to see the obvious, or to investigate the doubtful." *Chill v. GE Co.*, 101 F.3d 263, 269 (2d Cir. 1996).

## 2. Plaintiffs Adequately Allege Scienter Against Barrick (Count I)

Defendants barely dispute the scienter of Barrick as a corporate entity, arguing only that the Complaint "fail[s] to allege scienter against anyone whose intent could be imputed to the Company." D-Br. at 36.  Defendants' argument is belied by any reading of the Complaint.

As a preliminary matter, as alleged in Count I of the Complaint, ¶¶520-32, in the Second Circuit, Plaintiffs may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).[17]  Here, Plaintiffs have alleged that senior executives at Barrick, including the Individual Defendants, were in possession of numerous reports and information that gave rise to the Company's scienter.  For example, Defendants Kinver, Gonzales, and Potter were privy to Project managers' accounts and/or internal documents that discredited Barrick's public statements, including the Project Plan Report (the current capital budget estimate of $2.8 billion was infeasible within the Company's 36-month timeframe), ¶67; the T&T Report (the Company's new publicly announced capital budget ($4.7-5.0 billion) and adjustment approach were inadequate), ¶¶75-77; the Risk Exposure Report (the Project suffered from "[i]naccurate reporting of deliverables/failure to adequately monitor progress" and "[n]o formal system in place for scope/change management"), ¶78; and

---

[17] *See also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) (stating that "[t]here is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation" and that "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants"); *Makor Issues & Rights. Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.").

the <u>Monthly Progress Reports</u> (identifying "inaccuracies, omissions and inconsistencies" in the Project's reporting), ¶¶79-81.[18]

When, as here, the Complaint establishes "widespread knowledge at [the Company] that the Project was over budget and that the ... figures were inaccurate," scienter against the Company is adequately pled. *NovaGold*, 629 F. Supp. 2d at 300 (denying motion to dismiss against corporation, while dismissing §10(b) claims against individuals). While each of the Individual Defendants made statements on behalf of Barrick, scienter may be imputed to Barrick when an affiliated individual, who did not utter any of the allegedly misleading statements, had the requisite scienter. *See Moody's*, 599 F. Supp. 2d at 516 ("[T]he individual making an alleged misstatement and the one with scienter do not have to be one and the same.").

Barrick's scienter may be "easily inferred from the conscious misbehavior and recklessness of particular management-level employees identified," let alone the most senior executives at the Company. *In re Marsh & McLennan Co., Sec. Litig.*, 501 F. Supp. 2d 452, 481-82 (S.D.N.Y. 2006) ("While there is no simple formula … in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."). The Complaint pleads Barrick's scienter.

### 3.    The Complaint Alleges Particularized Facts That Raise A Strong Inference Of The Individual Defendants' Scienter (Count II)

Due in large part to the PSLRA's automatic stay of discovery, the adequacy of securities class action pleadings rarely turns on whether plaintiffs set forth documentary evidence demonstrating scienter. "[M]ost often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 287 (D. Conn. 2005).

---

[18] *See Celestica.,* 455 F. App'x at 15  (individual defendants' knowledge is "sufficient to establish corporate scienter on behalf of [the Company].").

As required under *Tellabs*, the facts alleged here give rise to a strong inference that Defendants consciously or recklessly ignored that nearly every piece of information informed them that completion of Pascua-Lama was infeasible within the publicly promised parameters. These well-pled allegations are underpinned by internal and third-party reports and presentations, regulatory findings, and accounts from former high-level Project managers. Moreover, many of these former employees and reports corroborate one another, providing further cogent support for a strong inference of scienter.[19]

### 4.   Internal Documents And Witness Accounts Support Scienter

When the well-pled allegations establish that the defendants had knowledge of, and/or access to, facts that arguably contradicted their public pronouncements, a motion to dismiss fails. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. "Such 'allegations alone are enough to satisfy the pleading requirement for scienter.'" *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).

Here, Plaintiffs have alleged that Defendants knew, received, and had access to documents – dating back to before the Project broke ground (the Bechtel Report) – that confirmed Pascua-Lama was not deliverable within the cost or time frame promised in Defendants' public pronouncements.[20] Plaintiffs have alleged that as the Class Period

---

[19] *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) ("Their consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees, possibly disgruntled.").

[20] Defendants contend that because the Bechtel Report was a "third-party bid it cannot be considered an objective measure of cost of the project." D-Br. at 27. In addition to having no support in the law, this argument is defeated by common sense. The report was provided by one of the world's most accomplished engineering firms and was its best estimate to developing the mine at the lowest cost and in the shortest time. Bechtel was rejected for the simple reason that the costs it projected rendered the Project infeasible to Barrick. Tellingly, while Defendants attached 38 exhibits to their motion, they did not attach the Bechtel Report.

progressed, the Company received additional documents repeatedly concluding that costs would exceed the public numbers and that Barrick's controls were inadequate to ensure reporting on, or delivery of, Pascua-Lama as promised.  These reports included the Project Plan Report, ¶67, T&T Report, ¶¶75-77, July 2011 Risk Expense Report, ¶78, and Monthly Progress Reports, ¶¶79-81, D-Exs. 27-29, among others.  *See supra* § I.A.1.  These reports were further corroborated by accounts from former Pascua-Lama managers who confirmed that based on their experience and direct knowledge of the Project, it was not deliverable within the timeframe or costs presented publicly.  ¶¶32, 56, 63-88.  This readily meets the required standard to plead scienter under *Novak* and *Tellabs*.  *See Kinross Gold*, 957 F. Supp. 2d. at 302 (Plaintiffs' scienter adequately pled where defendants "stated their opinion as to the [mining project's] timetable, knowing that this timetable did not reflect their true view as to the actual timetable.").

The same is true for Plaintiffs' allegations concerning environmental non-compliance. Defendants were privy to numerous internal documents that detailed the Company's failure to comply with applicable regulations.  For example, as discussed *supra* § I.A.2, Monthly Progress Reports identified the Company's failure to meet its obligations to implement an effective glacier monitoring program, dust mitigation procedures, and water management system commitments. ¶¶92-96 (recipients included Kinver and Gonzales), ¶80.  Failure to meet these conditions put the project in "grave danger of being paralyzed."  ¶94.  These same issues were again highlighted internally in presentations at the La Serena Meeting.  ¶¶102-08.

These reports are further corroborated by former Pascua-Lama managers who detail the unauthorized shortcuts Defendants took in dealing with water management, dust mitigation, and glacier protection.  *See supra* § I.A.2; *see also* ¶¶90-100.  When the Project Manager informed COO Kinver that additional funds were needed to maintain compliance with the requirements

and the schedule, he was told to make do with the existing budget.  ¶66 (also detailing similar conversations had with Defendant Potter).  These allegations suffice for pleading scienter.  *See Novak*, 216 F.3d at 308; *see also Reese v Malone*, 2014 WL 555911, at *17 (9th Cir. Feb. 13, 2014) ("In light of the magnitude of the violations, the immense public attention on [defendant] ... and the contemporaneous documents demonstrating management's awareness of the company's non-compliance with the Corrective Action Order, we find it 'absurd' that management was not aware of [defendant]'s significant, existing compliance issues.").

In response, Defendants attack Plaintiffs' allegations by attempting to diminish the significance of Plaintiffs' confidential witnesses.  D-Br. at 29-31.  These attacks are without merit.  Most unfounded is Defendants' suggestion, D-Br. at 29-30, that a single footnote in the Second Circuit's summary order in *Campo v. Sears Holdings Corp*., 371 F. App'x 212, 216 n.4 (2d Cir. 2010) – a  case without any precedential effect – indicates this Court's "skeptic[ism]" of confidential witnesses after *Tellabs*.  In reality, "nothing" in *Campo's* summary order "places in question the Second Circuit's holding in *Novak*."  *In re Ambac Fin. Grp., Inc. Sec. Litig*., 693 F. Supp. 2d 241, 283 & n.2 (S.D.N.Y. 2010).  Instead, under *Novak*, to determine whether confidential witness statements support a plaintiff's claims, the Court need only determine whether the allegations have "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  216 F.3d at 314; *see also Celestica*, 455 F. App'x at 14 (upholding confidential witness allegations post-*Campo*).  Here, Plaintiffs have readily met that burden with respect to all confidential witnesses described in the Complaint.  ¶¶32, 53, 55-56, 63-68, 82-83, 88, 90, 98-99.

Faced with these allegations, Defendants attempt to diminish the significance of the Project Manager.  D-Br. at 30.  But the facts speak for themselves:  In addition to the Project

Manager's 40 years of experience, he worked directly on the Pascua-Lama Project during the Class Period with oversight responsibilities, spoke with Defendants regarding budget and environmental compliance concerns, and personally was aware of circumstances in which Defendants prioritized cost cutting endeavors over environmental compliance.  ¶¶32, 53-56, 63-66, 72.  Based on the Project Manager's vast experience working on Pascua-Lama, he was in a position to assess the likelihood that an environmentally compliant Pascua-Lama Project could be completed within the schedule and budget touted to investors.[21]

In addition, the Project Manager's account is corroborated by the Bechtel Report, other experienced managers, and countless internal reports, ¶¶53-56, 64-65, 67-68, 79-84, all indicating that the Project could not be completed as promised.  *See NovaGold*, 629 F. Supp. 2d at 300 (crediting confidential witnesses statements corroborated by other facts); *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *8 (S.D.N.Y. Oct. 19, 2009) (crediting confidential witness statements that were corroborative of one another).  Nothing more is required under Second Circuit precedent.

### 5. The Project Was A "Core Operation," Further Supporting Scienter.

"Knowledge ... can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's ... statements were false when issued."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-90 (S.D.N.Y. 2004).[22]

---

[21] Defendants themselves touted the success of the Project based on the Pascua-Lama "team" being "enhanced with experience and knowledge of personnel from other sites" and Pascua-Lama having a "strong environmental team that works very closely with local authorities and communities and who in turn are familiar with Barrick's strong commitment to high environmental program standards."  ¶¶59-60.  Defendants now disingenuously argue that the team was not as experienced as they led shareholders to believe.

[22] Defendants mischaracterize the law in this Circuit, arguing that allegations of core operations categorically "cannot establish scienter independently."  D-Br. at 36.  This misstates the ruling in *Celestica*:  having upheld allegations of scienter "on the basis of the confidential witnesses' statements, we need not address defendants' arguments … regarding Celestica's core operations….  Both parties, however, ***appear to agree*** that allegations of a

Plaintiffs are entitled to rely on the core operations doctrine in establishing scienter here, where allegations center on Barrick's "flagship" Project, which was the focus of Defendants' false statements and conferences with analysts, ¶¶198-206, and was to be a "significant source of income" and "critical [to] long term viability" of Barrick. *See Hi-Crush Partners*, 2013 WL 6233561, at *26; *Reese v. Malone*, 2014 WL 555911, at *13 ("we can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company."); *see also, e.g.*, ¶199 (noting financial contribution of Pascua-Lama); ¶¶40, 200 (collecting Defendants' statements emphasizing that the Project had management's full attention given its "significant impact on [Barrick's] future production, cash costs.").[23]

Indeed, as a result of the truth regarding the Project coming to light, CEO Regent and COO Gonzales were fired,[24] along with a vast management shake up, ¶¶146, 210; the Project was suspended indefinitely, ¶148; the credit-rating firms downgraded Barrick, ¶¶134, 36; and Barrick's share price collapsed on the days the truth was revealed, ¶¶212-39.

### 6.   Plaintiffs Allegations Of Internal Control Weaknesses And Accounting Violations Further Support Scienter

Plaintiffs' allegations concerning Barrick's ineffective internal controls and accounting violations further bolster their scienter allegations. *In re Veeco Instruments, Inc., Sec. Litig.*, 235

---

company's core operations can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently." 455 F. App'x at 14 n.3. Defendants also ignore a recent decision specifically upholding the core operations as support for scienter. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business.... Core operations include matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'").

[23] *See Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 389 (S.D.N.Y. 2011) ("While officers cannot be imputed with knowledge about all transactions which occur at a corporation, they do have a duty to familiarize themselves with the core operations of the Company.") (collecting cases).

[24] Executives' terminations are circumstantial evidence of scienter. *See Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (CEO's forced resignation adds "to the overall pleading of circumstantial evidence of fraud" when defendants fail to suggest a plausible opposing inference); *In re Scottish Re Grp.*, 524 F. Supp. 2d at 394 n.176 (resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A] failure to maintain sufficient internal controls to avoid

fraud is sufficiently indicative of scienter."); *Novak*, 216 F.3d at 309 (GAAP violations "coupled

with evidence of 'corresponding fraudulent intent'" may establish scienter).[25]

As alleged in the Complaint, and argued above, CEO Regent, CEO Sokalsky, and CFO

Al-Joundi were aware of facts that made their certified statements concerning Barrick's internal

controls false when made.  *See supra* § I.A.3.  Plaintiffs have also alleged that Defendants were

aware of, or recklessly disregarded, internal information that demonstrated a clear departure from

the Company's internal controls.  *See supra* §§ I.A.1, 2, 3.  These allegations further support a

strong inference of scienter.

### 7.    The Complaint Alleges Specific Facts As To Each Individual Defendants' Scienter

Faced with abundant allegations of the Individual Defendants' scienter, Defendants resort

to claiming that the Complaint "lumps all of the Individual Defendants together."  D-Br. at 35.

Far from it, Plaintiffs have alleged particularized facts establishing the scienter of each

Individual Defendant.  Indeed, Defendants recognize as much with respect to Defendants Potter,

Kinver, and Gonzales, acknowledging:  (1) that the Project Manager reported his concerns to

Defendants Potter and Kinver; and (2) that Monthly Progress Reports were distributed to

Defendants Kinver and Gonzales.  *Id.* at 36.

Defendants' only argument is that this is somehow insufficient.  But as explained *supra*

§§ I.A.2, B.1, both the Project Manager's account and the documents viewed by these

Defendants readily establish their scienter.  Moreover, these "officers were 'directly responsible

for [the company's] day-to-day operations,'" and the issues at Pascua-Lama – including the

suspension of the mine – "'were prominent enough that it would be 'absurd to suggest' that top

---

[25] *See also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19-20 (D. Mass. 2004) (noting that internal control allegations "are probative of scienter ... and can add to the strength of a case based on other allegations.").

management was unaware of them." *Reese*, 2014 WL 555911, at *14.  Further, Regent, Al-Joundi, and Sokalsky were aware that their public statements were false because high level corporate officers who sign SEC filings containing the company's financial statements have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations.  *See In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).  It would be absurd to suggest that the CEOs and former CFO of the Company, Regent and Sokalsky, were ignorant of the truth about the Project, which ultimately unraveled their careers and resulted in a $5 billion charge to earnings.  *Cf.* ¶¶40, 200 (Defendants describing the Project as a top priority).[26]

### 8.    Plaintiffs Are Not Required To Plead Motive, But Have Done So Nonetheless.

Defendants assert (incorrectly) that Plaintiffs are "[u]nable to allege any plausible motive" and that "Plaintiffs' entire case rests on the nonsensical and wholly unsupported assertion that Barrick purposely pursued a massive, multi-billion dollar mining project at Pascua-Lama despite knowing – from the outset – that the Project was not economically or environmentally feasible."  D-Br. at 24.  But, to survive a motion to dismiss, plaintiffs are not required to show that the defendants had any special motive to commit fraud.  *See Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal" to demonstrating scienter).

In any event, the Complaint readily demonstrates Defendants' motive:  only by concealing the true cost could the Company obtain financing and shareholder approval to undertake the Project.  *See* ¶¶56-57.  This is far from a "suicide mission" of securities fraud, D-Br. at 25; it was Defendants' calculated risk to take on the Project using shareholders' and

---

[26] The magnitude of the write-down – $5.1 billion – that followed the unraveling of Defendants' scheme, ¶179, when viewed collectively with Plaintiffs' other allegations, supports a strong inference of scienter.  *See, e.g.*, *E*Trade*, 712 F. Supp. 2d at 199 ("Courts have recognized that the magnitude of write-offs alleged to be the subject of the misstatements supports a strong inference of scienter.").

investors' money – not their own – to gamble that increasing gold prices would lift this infeasible Project into reality, along with their careers.[27]  Faced with this reality, Defendants attempt to twist Plaintiffs' allegations.  Indeed, "irrational schemes have as much potential to defraud investors as do rational schemes."  *See, e.g.*, *Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 191 n.8 (S.D.N.Y. 1992).  Defendants' visceral motivations add to the totality of the allegations that support a strong inference of scienter under *Tellabs*.

### C.      Plaintiffs Adequately Plead Loss Causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).  To establish loss causation, the alleged misstatement or omission must have "concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (stating a plaintiff must allege "a causal connection between the material misrepresentation and the loss.").

Defendants here contend that none of their misstatements are causally connected to the losses the Class suffered.  D-Br. at 38.  Defendants reassert their red herring argument that the cause for the decline in Barrick's share price was caused by the "plummeting price of gold."  *Id.*  These arguments completely ignore the Complaint's well pled loss causation allegations, raise numerous improper questions of fact at this stage of the litigation, and are squarely at odds with the facts alleged in the Complaint and the Supreme Court's dictates in *Dura*.

---

[27] In connection with the Company's Pascua-Lama operations, CEO Regent was terminated, ¶210, and COO Gonzales abruptly "retired," ¶146.  This further supports Plaintiffs' allegations of scienter.  *See, e.g.*, *In re Scottish Re Grp.*, 524 F. Supp. 2d at 394 n.176 (mandatory resignations "lend further support to the inference of scienter"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000) (termination of key personnel supports scienter).

### 1.      Loss Causation Allegations Are Subject To Rule 8(a).

In *Dura*, the Supreme Court clarified the standard for pleading loss causation under

§10(b).  544 U.S. at 346.  While Defendants cite generally to *Dura*, they fail to acknowledge that

the Court in *Dura* applied the relaxed notice requirements of Fed. R. Civ. P. 8(a)(2) ("Rule 8"),

which is satisfied by "some indication of the loss and the causal connection that the plaintiff has

in mind."  *Id.*  "[O]rdinary pleading rules are not meant to impose a great burden upon a

plaintiff," rather a plaintiff need only "provide a defendant with some indication of the loss and

the causal connection that the plaintiff has in mind."  *Id.*

*Dura* also made clear that plaintiffs are not required to plead loss causation in a rigid or

formulaic manner.  *Id.* ("[n]either the Rules nor the securities statutes impose any special further

requirement in respect to the pleading of proximate causation or economic loss.").  As Judge

Scheindlin explained in *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580 (S.D.N.Y.  2008),

"there is no requirement that the disclosure take a particular form or be of a particular quality,"

*id.* at 584; rather,

> [T]here are several possible methods of pleading loss causation.... Where the
> alleged misstatement conceals a condition or event which then occurs and causes
> the plaintiff's loss, a plaintiff may plead that it is the materialization of the
> undisclosed condition or event that causes the loss.
> Alternatively a plaintiff may identify particular disclosing event[s] that reveal the
> false information, and tie the dissipation of artificial price inflation to those events
> ....

*Id.*[28]  "Moreover, neither the Supreme Court in *Dura*, nor any other court addressing the loss

causation pleading standard, require a corrective disclosure be a 'mirror image' tantamount to a

confession of fraud."  *E*Trade*, 712 F. Supp. 2d at 202; *see also Mass. Ret. Sys. v. CVS*

---

[28] *See also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y.  2005) ("[a] corrective disclosure is
not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their
loss.").

*Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013) ("[A] corrective disclosure need not be a 'mirror-image' disclosure − a direct admission that a previous statement is untrue.").

### 2.   The Disclosures Caused Plaintiffs' Losses.

Far exceeding the "short and plain statement" required under Rule 8 and *Dura*, the Complaint plausibly alleges how Defendants' misrepresentations, omissions, and fraud-related disclosures were causally connected to Barrick's stock declines.  ¶¶207-39.

As alleged in the Complaint, before June 6, 2012, the market was unaware that:  (i) the Pascua-Lama Project was not feasible as promised, ¶¶58-59, 61-84; (ii) the Company's choice of cost-saving measures over compliance with critical environmental regulations would further jeopardize the delivery of the Project, ¶¶128-29; (iii) Barrick's true financial condition, earnings, and assets were not properly reflected; and (iv) its internal controls were not effective, ¶240.  The market's lack of awareness was fostered by Defendants' statements to shareholders before June 6, 2012, that Barrick would deliver on Pascua-Lama in a manner that would enable it to be a "world class project that will contribute low-cost ounces at double digit returns to Barrick," ¶58; that Barrick was complying with its critical environmental obligations at Pascua-Lama, ¶¶110-12; that its internal controls were effective, ¶¶419-21, 426, 428, 430, 434-35; and that its financial statements were accurate, ¶¶286-87, 326-27.  This depiction of the state of affairs at Barrick was not true.

On eight specific dates between June 6, 2012, and November 1, 2013, as information was disclosed relating to Barrick's true financial condition (impacted by the cost overruns and delays at Pascua-Lama), the consequences of its control weaknesses, and the infeasible nature of delivering Pascua-Lama as previously promised, Barrick's stock price collapsed – losing over 66% of its value from its stock period high, ¶14:

- **June 6, 2012**.  The Company announced the sudden termination of CEO Regent, and his replacement by Sokalsky.  The announcement was made only weeks before the Company announced that capital costs for Pascua-Lama were skyrocketing and that the Project would experience delays.  ¶39.  The announcement led to an immediate stock price decline of 3.9% on June 6.  ¶212.  News media and analysts attributed the ouster in part to "problems with the giant Pascua-Lama project."  ¶¶210-21.[29]

- **July 26, 2012**.  On the heels of the termination of Defendant Regent, the Company disclosed for the first time that Pascua-Lama would cost approximately twice the previously disclosed costs, and that it would take at least a year longer to begin production than previously disclosed.  ¶213.  CEO Sokolsky conceded that "overall project management structure let us down."  ¶117-23.  In response, Barrick's stock price dropped approximately 3.2% and media and analyst reports emerged describing the news as "outrageous" and indicative of a "lack of controls."  ¶¶213-17.[30]

- **November 1, 2012**.  Despite prior assurances that Defendants had Pascua-Lama under control, ¶¶215, 220, the Company again disclosed substantial increases in capital costs and the first production timeline for the Project.  ¶¶124, 218.  In response, Barrick's stock price declined 9.4% on November 1.  ¶221.  News reports linked this decline to the Company's troubles at Pascua-Lama.  *See, e.g.*, ¶220 (Barrick's stock price "dropped 9.5% Thursday as it warned of even more cost escalation at Pascua-Lama" and "[t]o investors, this news was especially upsetting because it came just three months after Barrick reported cost inflation of 50% to 60% at Pascua-Lama.").

- **April 10, 2013**.  Media reports emerged that an Appeals Court in Chile had issued an order halting construction work on Pascua-Lama and that Barrick could be fined millions as a result of "fail[ing] to comply with environmental rules."  ¶¶130-31, 222.  In response, Barrick's stock price declined approximately 8.4% on April 10.  ¶226.[31]

---

[29] Defendants' citation to *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 511 (2d Cir. 2010), D-Br. at 38, to suggest otherwise is inapposite.  *Omnicom* is a decision at summary judgment amidst significant expert testimony concerning loss causation, not at the pleading stage.  Furthermore, the facts there involved a "negative journalistic characterization of previously disclosed facts," *Omnicom*, 597 F.3d at 512, not the circumstances here.  Instead, more relevant here is *CVS Caremark*, in which the First Circuit held loss causation was satisfied at the pleading stage after concluding that the announcement of the CEO's sudden "retirement" alerted a surprised market to problems in a particular segment of the Company's business.  *See* 716 F.3d at 241.

[30] Contrary to Defendants' argument that Plaintiffs fail to allege loss causation as to internal controls, D-Br. at 41, analysts labeled the July 26, 2012 disclosure as "outrageous" and indicative of a "***lack of controls***."  ¶216.  Moreover, Plaintiffs specifically allege that "Defendants' failure to implement, let alone adhere to, Barrick's internal controls and environmental obligations only exacerbated the infeasibility of the mine," which ultimately led to losses sustained by Barrick shareholders.  ¶11; *see also, e.g.*, ¶¶80, 152.

[31] Defendants' footnoted contention that the Complaint fails to allege loss causation as to the "dust mitigation issue" is simply wrong.  D-Br. at 39, n.11.  Defendants are liable for wide-ranging breaches of the environmental requirements.  *See, e.g.*, ¶¶4, 46, 89-91, 93, 107-08 (sanctions for breach of dust mitigation), 362 (explicit statement regarding dust mitigation).  On April 10 and May 24, 2013, revelations of Defendants' breaches materialized, ¶¶222-29, included their failure "to monitor glaciers at Pascua-Lama" and to prevent pollution caused by the toxic dust.  On May 24, investors also learned that Barrick was subject to 23 violations, ¶227, and needed to comply with "all aspects" of the requirements, ¶228.  Revelations that Defendants failed to comply with wide-ranging environmental requirements, ¶¶207, 222-25, 227-28, 234, suffices to plead loss causation.  *See also supra* § I.A.2.

- **May 24, 2013**.  The media reported that Chile's Environmental Superintendent had issued a resolution suspending Pascua-Lama for non-compliance with environmental permits, that it had imposed the maximum penalty possible under Chilean law, that Barrick had admitted to all but one of 23 environmental violations, and that during the course of its investigation, "***the agency's own inspectors found that the company wasn't telling the full truth***."  ¶¶227-28.  In response, Barrick's stock price fell 2.0%, despite the Company halting trading for approximately three hours during the day.  ¶229.[32]

- **June 28, 2013**.  The Company issued a press release detailing the need to take an impairment of nearly all of the investment in the Project and that gold production for the Project had been delayed up to a year and a half.  ¶¶141, 230-31.  Media reports linked shareholders' displeasure to Barrick's reliance on the gold at Pascua-Lama to "add significant revenue at a key time for the beleaguered miner."  ¶¶142, 230.  In response, Barrick's stock price dropped approximately 3.1% on July 1, 2013.  ¶232.[33]

- **October 31, 2013**.  The Company announced that it had fully suspended the entire Pascua-Lama Project indefinitely, later confirming the need to suspend the Project mainly to address "cost pressures" and to consider "improved economics."  ¶¶233, 235.  The media reported that the indefinite suspension was a "surprise reversal" on the project that had already cost Barrick more than $5 billion.  In response, Barrick's stock price dropped approximately 5.4% on October 31, 2013.  ¶236.

- **November 1, 2013**.  Minutes after the close of trading on October 31, 2013, Barrick further shocked shareholders by announcing a $3 billion equity offering in order to pay down debt and for other corporate purposes, including "capital expenditures relating to Barrick's existing portfolio of mines."  ¶237.  Analysts attributed this need to raise capital to factors including "cost overruns" and reported that "delays with Pascua-Lama have left Barrick with less cashflow to service its debt."  ¶238.[34]  In response, Barrick's stock price dropped approximately 7.1% on November 1, 2013.  ¶232.

---

[32] Defendants argue that these disclosures were not concealed risks because Barrick previously disclosed the Chilean litigation and that the environmental authority in Chile had issued a resolution concerning acid rock drainage in Chile.  *See* D-Br. at 39-40.  However, Plaintiffs' allegations go far beyond the litigation or acid rock drainage issues.  Indeed, there is no reading of Defendants' prior disclosures that would have alerted shareholders of the imminent risk that:  (i) construction would be halted at Pascua-Lama because Barrick admittedly had failed to abide by critical environmental regulations; (ii) Barrick would be fined the maximum penalty allowed under Chilean law because of these failures; (iii) Barrick would ***admit*** to environmental violations; or (iv) regulators would find that Barrick "***wasn't telling the full truth***" concerning its environmental violations.  ¶¶222-29; *see, e.g.*, D-Ex. 5 at 103 (Defendants' asserted disclosure).  The events revealed on April 10 and May 24, 2013, were a direct consequence of Defendants prioritizing cost cutting measures over environmental compliance on the Project, ¶128 − in contravention of Defendants' prior disclosures to shareholders that Barrick was complying with critical regulations, *see, e.g.*, ¶318.  These allegations are sufficient to plead loss causation under *Dura* at the motion to dismiss stage.

[33] Despite Defendants' selective citations to Company filings, which suggest that the impairment charge was attributed solely to the decline in gold, D-Br. at 40, Defendants' disclosures make clear that the impairment was taken in part because of "the delay in first gold production" at Pascua-Lama and that further testing on assumptions including "capital costs, and the construction schedule re-sequencing work for the project" would lead to further impairments.  *See, e.g.*, ¶141; D-Ex. 19 at 2 & n.2.

[34] Analyst commentary refutes Defendants' conclusory argument that there is "no basis whatsoever to conclude [the equity offering] revealed any facts regarding the Project."  D-Br. at 41.  *See E*Trade*, 712 F. Supp. 2d at 202 (no

The Complaint's allegations sufficiently set forth a plausible causal connection between

Defendants' misrepresentations and omissions and the Class's loss under *Dura*.

### 3.    Defendants' Loss Causation Arguments Concerning Disaggregation Are Unavailing.

Defendants attempt to argue that the losses suffered by shareholders were a result of the

declining price of gold during the Class Period.  D-Br. at 41-44.  The Court should reject this

argument.  To be clear, Plaintiffs attribute their harm to the 42.5% stock price decline arising

from the eight loss-causing disclosures – not general market-wide declines throughout the Class

Period.  Moreover, whether a loss "was caused by an intervening event," like a general market

decline, "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Defendants do not, nor can they, cite any authority to the contrary.[35]

Moreover, contrary to Defendants' assertion, D-Br. at 41, 43, *Dura* does not require

Plaintiffs to "disaggregate losses" attributable to fraud at the pleading stage.  *See King County,*

*Washington v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010)

("[N]either *Lentell* nor *Dura* burden plaintiffs with pleading that *no other possible* event could

have caused plaintiffs' losses"; to hold otherwise "would place too much weight on one single

---

mirror image requirement); *see also CVS Caremark*, 716 F.3d at 240 (same).  In *CVS Caremark*, the First Circuit also concluded that analyst reports can be examined to determine what was revealed.  716 F.3d at 243 ("When a plaintiff alleges corrective disclosures that are not straightforward admissions of a defendant's previous misrepresentations, it is appropriate to look for indications of the market's contemporaneous response to those statements.  To preclude a plaintiff from relying on analyst reports that expose the limitations of a defendant's statements could permit the defendant to 'defeat liability by refusing to admit the falsity of its prior misstatements'").

[35] *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 596 n.22 (S.D.N.Y.  2010) (holding that the extent to which "general market decline" caused stock drop was a "fact issue[] that cannot be decided on a motion to dismiss"); *In re GE Co. Sec. Litig.*, 857 F. Supp. 2d 367, 398-99 (S.D.N.Y. 2012) (holding that, by alleging stock-price declines following disclosures, plaintiffs had adequately alleged loss causation, notwithstanding that the "stock market as a whole lost value during the Class Period"); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 321 (S.D.N.Y. 2011) ("Difficult causal distinctions ... are not appropriately resolved on a motion to dismiss.").

factor and would permit [defendants] to blame the asset-backed securities industry when their alleged conduct plausibly caused at least some proportion of plaintiffs' losses.").[36]

*Lehman Brothers* is illustrative; the Court held that the defendants' materially false and misleading statements regarding Lehman's exposure to high-risk mortgage assets "concealed the extent of Lehman's exposure" to these risky asset classes and "overstated Lehman's financial strength generally." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 306 (S.D.N.Y. 2011). The Court further concluded that the plaintiffs, who had pled that "it was the materialization of the risks thus concealed [in the form of losses and write-downs] that ultimately killed Lehman," were "entitled to an opportunity to attempt to prove that some ascertainable amount of the losses they suffered was attributable to the allegedly false picture of relative security attributable to those misstatements and omissions." *Id.* at 306-07.

Side stepping the well-pled allegations, Defendants repeatedly suggest that the losses were a result of the decline in the price of gold, which they contend impacted other gold companies similarly. D-Br. at 42 (pointing to general stock declines of other gold companies during the same time, including Goldcorp Inc., Newmont Mining Corp., and AngloGold Ashanti Ltd.). Analysis of this argument would require the Court to go beyond the four corners of the Complaint and to make detailed factual findings as to the price of gold during the Class Period and why the stock price of other gold mining Companies moved during the relevant period.[37] To

---

[36] *See also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[A plaintiff] need not rule out all competing theories for the drop in [a defendant's] stock price; that is an issue to be determined by the trier of fact on a fully developed record."); *CLAL Fin. Batucha Inv. Mgmt. Ltd. v. Perrigo Co.*, 2010 WL 4177103, at *8 (S.D.N.Y. Oct. 7, 2010) (concluding a plaintiff need not allege that a fraud-related disclosure was the "sole cause" of the decline); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) (holding the possibility that injuries could have equally been caused by non-fraud factors did not negate allegations of loss causation at the pleading stage).

[37] Defendants' introduction of information regarding other gold mining companies should be stricken. *See Kinross Gold.*, 957 F. Supp. 2d at 288 (striking exhibits containing analyst commentary regarding problems affecting the mining industry at large; finding that these exhibits were improperly introduced for their truth and were therefore not appropriate for a motion to dismiss).

the extent permissible, such fact-based arguments are at best premature and better addressed with the help of an expert at summary judgment or trial.  *See Emergent Capital*, 343 F.3d at 197.[38]

Furthermore, Defendants' fact-based arguments are belied by the facts.  Here, the facts alleged show that Company statements and analyst and media reports attributed the losses to the disclosure of previously concealed information concerning the operational, environmental, and economic infeasibility of Pascua-Lama, the financial condition of the Company, and Barrick's internal controls.  *See, e.g.*, ¶¶216, 220, 234, 238.[39]  Taking these well-pled allegations as true, Plaintiffs have far exceeded the "short and plain statement" required under Rule 8 and *Dura* to satisfy loss causation.  Nothing more is required.

## II.    PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON LIABILITY.

"In the Second Circuit, the 'control person' provisions are broadly construed as they were meant to expand the scope of liability under the securities laws.  For purposes of §20(a) liability, actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."  *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).  "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."  *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011). "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."  *CompuDyne,* 453 F. Supp. 2d at 829.

---

[38] *See also In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *13 (S.D.N.Y. Aug. 29, 2012) (noting "[t]here is no requirement at the pleading stage that Plaintiffs disaggregate potential confounding factors," and finding instead that "Defendants' arguments [regarding disaggregation] might appropriately be made on a motion for summary judgment.").

[39] Although purely a factual and expert-related issue, the price of gold, as well as the stock price of Barrick's competitors Goldcorp, AngloGold, and Newmont, rose on a number of the corrective disclosure dates, specifically: June 6, 2012, July 26, 2012, and June 28, 2013, undercutting Defendants' improper contention at the pleading stage. Again, the Court may take judicial notice of publicly available commodity and securities prices.  *See In re Crude Oil Commodity Futures Litig.*, 2012 WL 6645728, at *52 (S.D.N.Y. Dec. 21, 2012);  *see also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012) ("We are entitled to take judicial notice of well publicized stock prices without converting the motion to dismiss into one for summary judgment.").

Lack of participation is "an affirmative defense in a later stage of the proceedings." *Jacobs v. Coopers & Lybrand, L.L.P.*, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999). While not definitively resolved by the Second Circuit,[40] there is ample authority that "there is no required state of mind for a defendant's culpable participation" under §20(a). *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003). To the extent required, the power and influence to cause fraudulent conduct suffices to make one a "culpable participant." *In re Solucorp Indus., Ltd. Sec. Litig.*, 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000).

As to the Individual Defendants, the Complaint meets the heightened standards of §10(b), and far exceeds the pleading requirements of §20(a). ¶¶22-27, 29, 546 (Regent, Sokalsky, and Al-Joundi); ¶¶55-56, 66, 118, 244-45, 248, 354 (Kinver, Potter, and Gonzales). As to the remaining §20(a) Defendant, Veenman, the Complaint alleges the statements that she made on behalf of the Company. ¶¶29, 546. It "comport[s] with common sense to presume that a person who signs [her] name to a report has some measure of control over those who write the report." *Jacobs*, 1999 WL 101772, at *18; *see Patriot Exploration, LLC v. Sandridge Energy, Inc.*, 951 F. Supp. 2d 331, 362 (D. Conn. 2013) (finding when defendants "participated in investor presentations ... [as] an upper level officer who had the potential power to influence and direct the activities," §20(a) is satisfied).[41] A primary violation of §10(b) has been adequately pled; thus, the above-identified defendants are also liable under §20(a).

---

[40] *See, e.g.*, *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 330-31 (D. Conn. 2011) (concluding after the decision in *Lehman Bros.*, 799 F. Supp. 2d 258, cited by Defendants, that the Second Circuit has not conclusively determined whether pleading culpable participation is required under §20(a)). In any event, the Complaint pleads such allegations. ¶¶545-47.

[41] *See also In re Tronox* , 769 F. Supp. 2d at 208 (allegation that director signed fraudulent 10-K raised inference of control); *E*Trade*, 712 F. Supp. 2d at 205 (finding that officer who spoke during conference calls was a "controlling person.").

### III.    SECTION 10(b) APPLIES TO ALL TRANSACTIONS IN BARRICK STOCK, WHICH IS REGISTERED AND LISTED ON THE NYSE.

All of Barrick's common stock was registered on the NYSE.  ¶¶21, 507-08.  Thus, §10(b) applies to all transactions during the Class Period, irrespective of whether the transaction occurred in the United States or abroad.  In *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), the Supreme Court, tracking the text of §10(b) precisely, divided the application of §10(b) into two categories:  transactions involving (i) securities registered on a national exchange or (ii) securities not so registered.  The Second Circuit, in recent decisions, has recognized that §10(b) applies to all securities registered on a domestic exchange, without regard to the location of the transaction.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 n.4 (2d Cir. 2012) (while applying *Morrison*'s second prong, concluded "[o]f course, pursuant to the first prong of *Morrison*, §10(b) does apply to transactions in securities that are listed on a domestic exchange"); *United States v. Vilar*, 729 F.3d 62, 76 (2d Cir. 2013) (while applying §10(b) in a criminal context, concluding §10(b) applies to "(1) a security listed on an American exchange, **or** (2) a security purchased or sold in the United States.").  The plain language of §10(b) and *Morrison* provides that all Class Period transactions in Barrick common stock registered on the NYSE are subject to this Action.[42]

---

[42] The fact that Barrick registered and listed its common stock on the NYSE is distinguishable from listing American Depository Receipts ("ADRs"), which has been the subject of a number of District Court decisions regarding the application of *Morrison*.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 528-30 (S.D.N.Y. 2011) (finding §10(b) does not apply when common stock was "not [listed] for trading purposes").  Those cases have no bearing here.  The Second Circuit is currently considering two matters that relate to the registration of common stock that was listed in the United States and abroad.  *See In re UBS AG Sec. Litig.*, No. 12-4355 (2d Cir.) (appeal of dismissal on a motion to dismiss, in part, on *Morrison* grounds) (*sub judice* since argument on Dec. 12, 2013); *In re Celestica, Inc. Sec. Litig.*, No. 14-707 (2d Cir. filed Mar. 7, 2013) (ECF No.1) (petition pursuant to Fed. R. Civ. P. 23(f) seeking review of denial of class certification).  The arguments in *Celestica* are relevant to the issue here, as Celestica's common stock, like Barrick's, is listed in the United States and in Canada.  Accordingly, Plaintiffs respectfully direct the Court to the petition as further support for the arguments set forth herein.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.[43]

Dated: March 25, 2014                          Respectfully submitted,

MOTLEY RICE LLC                                LABATON SUCHAROW LLP


By: /s/ James M. Hughes                        By: /s/ Joseph A. Fonti
    James M. Hughes (*pro hac vice*)            Jonathan M. Plasse (JP-7515)
    David P. Abel (*pro hac vice*)              Joseph A. Fonti (JF 3201)
    Christopher F. Moriarty (*pro hac vice*)      Serena P. Hallowell (SH-1120)
28 Bridgeside Blvd.                                 140 Broadway
Mt. Pleasant, South Carolina 29464             New York, New York 10005
Telephone:  (843) 216-9000                     Telephone: (212) 907-0700
Facsimile:  (843) 216-9450                     Facsimile: (212) 818-0477
jhughes@motleyrice.com                         jplasse@labaton.com
dabel@motleyrice.com                           jfonti@labaton.com
cmoriarty@motleyrice.com                       shallowell@labaton.com

*Lead Counsel for Lead Plaintiffs and the*     *Liaison Counsel for Lead Plaintiffs and the*
*Putative Class*                               *Putative Class*

---

[43] Plaintiffs respectfully request that, if the Court dismisses the action, the Court give leave to replead. *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("The 'court should freely give leave when justice so requires,' [] and it is the usual practice upon granting a motion to dismiss to allow leave to replead….").

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re Barrick Gold Securities Litigation

Case No.  1:13-CV-03851

**CERTIFICATE OF SERVICE**

I, Joseph A. Fonti, hereby certify that on March 25, 2014, true and correct copies of Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint

were served in accordance with the Federal Rules of Civil Procedure and pursuant to the parties'

agreement, via electronic mail upon counsel for Defendants:

Colby A. Smith (casmith@debevoise.com)
Jonathan R. Tuttle (jrtuttle@debevoise.com)
Ada Fernandez Johnson (afjohnson@debevoise.com)
**Debevoise & Plimpton LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004

Bruce E. Yannett (beyannett@debevoise.com)
Elliot Greenfield (egreenfield@debevoise.com)
Anna A. Moody (amoody@debevoise.com)
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022

*Counsel for Defendants*

LABATON SUCHAROW LLP

By: */s/ Joseph A. Fonti*
     Joseph A. Fonti
     140 Broadway
     New York, New York 10005
     (212) 907-0700

     *Liaison Counsel for Lead Plaintiffs*
     *and the Class*