UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
                                           :

IN RE BARRICK GOLD SECURITIES LITIGATION       :     13 Civ. 3851 (RPP)
                                             :

------------------------------------------------------------------------- x

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Colby A. Smith
Jonathan R. Tuttle
Ada Fernandez Johnson
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 383-8000

Bruce E. Yannett
Elliot Greenfield
Anna A. Moody
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

*Attorneys for Defendants Barrick Gold
Corporation, Aaron W. Regent, Jamie C.
Sokalsky, Ammar Al-Joundi, Peter Kinver,
Igor Gonzales, George Potter, and Sybil E.
Veenman*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .............................................................................................................. 3

I.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b) ............................ 3

    A.  Plaintiffs Fail to Allege an Actionable Misrepresentation ........................ 3

        1.  Cost and Schedule Estimates Are Not Actionable ......................... 3

        2.  Statements Regarding Environmental Approvals Were Not False When Made ................................................................. 7

        3.  Statements Regarding Internal Controls and Accounting for Capital Costs Are Not Actionable ............................... 10

        4.  Individual Defendants Are Not Liable For Statements They Did Not Make ............................................................ 11

    B.  Plaintiffs Fail to Plead Scienter ............................................................. 11

        1.  The Inference of Non-Fraudulent Intent Is Far More Compelling ............ 11

        2.  Plaintiffs Fail to Plead Actual Knowledge of Falsity as to Cost and Schedule Estimates ............................................... 12

        3.  Plaintiffs Fail to Plead Recklessness as to Environmental Approvals ................................................................ 14

        4.  Plaintiffs Fail to Plead Scienter as to Internal Controls ............................ 14

        5.  Plaintiffs Fail to Plead Scienter as to Each Individual Defendant ............ 14

        6.  Plaintiffs Fail to Plead Corporate Scienter .................................... 15

    C.  Plaintiffs Fail to Plead Loss Causation ................................................. 17

        1.  None of the Identified Statements or Events Constitute "Corrective Disclosures" or the "Materialization of a Concealed Risk." ................. 17

        2.  Plaintiffs Fail to Disaggregate from Losses Caused by Other Events Affecting Barrick's Stock Price ................................. 18

II.  PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY ............................. 19

i

III.     PLAINTIFFS' NON-DOMESTIC CLAIMS SHOULD BE DISMISSED......................20

CONCLUSION.................................................................................................................20

24103623v01

## TABLE OF AUTHORITIES

**CASES**

*Cent. States v. Fed. Home Loan Mortg. Corp.*,
    543 Fed. App'x 72 (2d Cir. 2013)...................................................................18

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)...........................................................................5

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)...........................................................16

*City of Westland Police & Fire Ret. Sys. v. MetLife. Inc.*,
    928 F. Supp. 2d 705 (S.D.N.Y. 2013)...........................................................19

*Coronel v. Quanta Capital Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. 2009).................................................................20

*Deng v. 278 Gramercy Park Group LLC*,
    2014 WL 1016853 (S.D.N.Y. Mar. 14, 2014).................................................19

*In re Aegon N.V. Sec. Litig.*,
    2004 WL 1415973 (S.D.N.Y. June 23, 2004).................................................15

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
    2013 WL 144041 (S.D.N.Y. Jan. 14, 2013)....................................................7

*In re Alstom SA Sec. Litig.*,
    741 F. Supp. 2d 469 (S.D.N.Y. 2010)...........................................................20

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)...........................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)....................................................................17, 19

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011).........................................................................20

*In re MF Global Holdings Ltd. Sec. Litig.*,
    2013 WL 5996426 (S.D.N.Y. 2013)..............................................................20

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)...................................................3, 5, 16

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)....................................................................13, 14

24103623v01

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...................................................................11

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .......................................................11

*In re UBS Sec. Litig.*,
2011 WL 4059356 (S.D.N.Y. 2011) .....................................................................20

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ...................................................................16

*Janbay v. Can. Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...............................................17, 18

*Janus Capital Group, Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011) ....................................................................................3, 11

*Johnson v. Sequans Commc'ns S.A.*,
2013 WL 214297 (S.D.N.Y. 2013) .......................................................................16

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) .................................................................................19

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005) ...........................................................................18, 19

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010) ........................................................................................3, 20

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 Fed. App'x 10 (2d Cir. 2011) .........................................................................16

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ...................................................................................9

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010). (Mem. 3-11) .......................................................5, 12

*Steinberg v. Ericsson LM Tel. Co.*,
2008 WL 5170640 (S.D.N.Y. 2008) ................................................................14, 15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008) ............................................................................15, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................1, 3, 11

24103623v01

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011)..................................................................17

*Wallace v. IntraLinks*,
    2013 WL 1907685 (S.D.N.Y. 2013)..............................................................16, 17

**STATUTES**

Private Securities Litigation Reform Act of 1995,
    15 U.S.C. § 78u-4 ........................................................... 9, 11,  14, 16, 20

    15 U.S.C. § 78u-5 ...........................................................................3, 4, 5, 12

**OTHER AUTHORITIES**

17 C.F.R. § 229.308(a)(3)................................................................................10

Federal Rule of Civil Procedure 9(b)..............................................................9, 14, 20

24103623v01

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms that this case represents precisely the kind of "fraud-by-hindsight" that Congress sought to deter when it enacted the PSLRA and posits precisely the kind of implausible theory that the Supreme Court sought to eliminate in *Tellabs*. There is no dispute that Barrick suspended work on the Pascua-Lama mining project, and that the Company, its executives, and its shareholders and other constituents are disappointed with that development. But nothing in the AC's repetitive allegations and nothing in the obfuscation of Plaintiffs' Opposition can transform those unfortunate developments into securities fraud.

*First*, **Plaintiffs cannot avoid the fact that their core theory of fraud is implausible.** Plaintiffs offer no response to the fact that the central premise of their claims – that Barrick purposefully pursued a multi-billion dollar mining project despite knowing, from the outset, that it was not economically feasible – makes no sense. Plaintiffs thus ask the Court to disregard the requirement from *Tellabs* that the inference of scienter be cogent and at least as compelling as any competing inference of non-fraudulent intent. Indeed, there is no rational inference consistent with Plaintiffs' fraud theory.

*Second*, **Plaintiffs' continued reliance on an alleged Bechtel bid confirms their theory's weakness.** Plaintiffs rely most heavily on an alleged "Bechtel Report," which they admit was nothing more than an unsuccessful bid by a potential third-party contractor made some indeterminate years before construction commenced. Assuming the Bechtel proposal even exists (as Plaintiffs allege no first-hand information on the existence or content of the purported bid), its alleged $5 billion price tag represents the amount Bechtel sought to be paid, not an objective estimate of cost. It is ludicrous to suggest that a company must credit an early, rejected third-party bid as the "true cost" of a project or be liable for securities fraud. Yet, the Bechtel proposal is the sole basis of Plaintiffs' core theory that Barrick decided to proceed with Pascua-

Lama despite knowing it was not economically feasible.  That theory is implausible and finds no factual support from the Bechtel document.

**Third**, **Plaintiffs' attempt to demonstrate misstatements through mischaracterized documents and conclusory assertions as to their contents must fail.**  Plaintiffs consistently mischaracterize internal documents purporting to address cost, schedule, environmental, and internal controls issues.  None of those documents indicate that the Company's public statements were false when made, much less that Defendants knew or believed that those statements were false.  In fact, they reflect ongoing good faith efforts to monitor and address issues as they arose during the course of an extraordinarily complex and ambitious project.  As a result, Plaintiffs' conclusory assertions that these documents indicate falsity and scienter are unfounded.

**Fourth**, **Plaintiffs seek to ignore the timeliness of Barrick's disclosures and the fact that the Company revised estimates and provided updates throughout the Class Period.**  Plaintiffs distort the timing of events and disclosures in an attempt to give the false impression that Defendants failed to disclose available facts.  But Plaintiffs consistently fail to acknowledge that Defendants made new disclosures when newly confirmed facts were known.  For example, Plaintiffs ignore that indications of cost pressures did not render Barrick's previously disclosed cost estimates false, that the Company announced that it was reviewing its estimates due to those cost pressures, and that the Company revised the estimates when reliable new estimates were available.  Likewise, Plaintiffs rely on actions taken by Chilean authorities in 2013 to suggest that statements made months or years earlier were false.  But allegations predicated on hindsight are insufficient to support a securities fraud claim.

**Fifth**, **with respect to every element of their claims, Plaintiffs simply misstate the law as to the pleading requirements for securities fraud.**  Plaintiffs seek to avoid, for example, the

impact of the PSLRA's "safe harbor" provision and its heightened pleading standards for scienter, the Second Circuit's decision in *Fait*, and the Supreme Court's decisions in *Tellabs*, *Janus*, and *Morrison*.  That Plaintiffs feel obliged to misstate the law on these and other issues further highlights the inadequacy of their allegations.

Stripped of Plaintiffs' speculative and fact-starved theory, the record is clear:  (*i*) Barrick embarked on the Project with full disclosure that it was ambitious, challenging and accompanied by significant risk; (*ii*) the Company provided its best estimates of budget and project timelines accompanied by specific warnings as to the risks inherent in those estimates; and (*iii*) the Company pursued the Project diligently and provided periodic and timely updates to the market on the Project's developments, its new and continuing challenges, and – when appropriate – its revised budget and timeline estimates.  Plaintiffs' claims to the contrary are deficient and as a result this case should be dismissed.

## ARGUMENT

## I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b).

### A.     Plaintiffs Fail to Allege an Actionable Misrepresentation.

#### 1.     Cost and Schedule Estimates Are Not Actionable.

Plaintiffs do not substantively respond to the fact that Barrick's cost and schedule estimates are not actionable in light of the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, and the Second Circuit's decision in *Fait*.[1]

**Allegations Regarding "Low Cost."**  Plaintiffs repeatedly make the highly misleading assertion that Pascua-Lama was not the "low cost" project that Barrick claimed because its

---

[1]    Plaintiffs also offer no substantive response to the fact that certain of the alleged misrepresentations are inactionable puffery and statements of corporate optimism.  (Mem. 22; Opp. 28)  Plaintiffs' citation to *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009), is unrelated to the statements at issue.

capital cost estimates were inaccurate.  But this claim falsely and inexplicably conflates ***pre-production capital costs*** and ***production costs*** of the mine once in operation:

- Barrick's estimates of ***pre-production capital costs*** and the revisions to those estimates over time – which are the focus of the AC – relate to the cost of developing Pascua-Lama into an operating mine.   Pre-production capital costs were originally estimated at $2.8-$3.0 billion.  (AC ¶ 241(b))

- Barrick's estimates of ***production costs*** relate to the cost of mining each ounce of gold ***after*** Pascua-Lama was fully developed – which Plaintiffs ***do not allege were misstated***.  Production costs were estimated at $20-$50 per ounce.  (AC ¶ 241(c))

Every alleged statement by Barrick that it expected Pascua-Lama to be a "low cost" mine unambiguously refers to anticipated production costs, not to pre-production capital costs.  Most expressly refer to "low cost production" (AC ¶¶ 38, 203, 288, 354, 368, 370, 395) or the production of "low cost ounces" (AC ¶¶ 8, 40, 58, 200, 250, 322, 364).[2]  Plaintiffs' distortions of Barrick's disclosures should be rejected.  (Opp. 2-8, 15-17, 42)

  **Estimates Are Protected Forward-Looking Statements.**  Barrick's estimates of pre-production capital costs and timing of first production are forward-looking statements protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine.  (Mem. 13-16)  The PSLRA is unambiguous:  a "forward-looking statement" includes a "projection . . . of capital expenditures" or a "statement of the plans and objectives of management for future operations."  15 U.S.C. § 78u-5(i)(1)(A), (B).  Plaintiffs' unsupported assertion that Barrick's estimates are statements of "contemporaneous facts" is therefore utterly without merit.  (Opp. 17)  Plaintiffs have no response to the cases cited by Defendants.  (Mem. 13-15)

---

[2] Where Barrick refers to Pascua-Lama as a "low cost mine," context makes clear that refers to productions costs. (*See*, *e.g.*, AC ¶ 284 ("***Once operating***, [Pascua-Lama] is expected to ***produce*** between 750,000-800,000 ounces of ***gold annually at total cash costs of $20-$50 per ounce***, assuming a $12 per ounce silver price. This makes Pascua-Lama one of the ***lowest cost gold mines*** in the world."); AC ¶ 255 (explaining that "new generation of low cost mines" means that "*[a]t full capacity*, these projects are expected to collectively contribute 2.6 million ounces of average ***annual production at lower cash costs*** than the current Company profile."))

Plaintiffs do not – and cannot – dispute that Barrick expressly and repeatedly warned of precisely the risks that caused the Company to increase its cost estimates and ultimately suspend construction. (Mem. 15) Plaintiffs' response is to label those warnings "boilerplate" (Opp. 19), but Barrick's cautionary language regarding commodity costs, labor supply, currency inflation, gold prices, and environmental challenges was "substantive and tailored to the specific future projections, estimates or opinions" and is therefore sufficient under the PSLRA's "safe harbor" provision. *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010). (Mem. 3-11)

**Estimates Are Not Actionable Under *Fait*.** Under *Fait v. Regions Financial Corp.*, Barrick's cost and schedule estimates also are not actionable because Plaintiffs allege no facts indicating that those estimates were objectively false and not honestly believed when made. 655 F.3d 105, 110 (2d Cir. 2011). Plaintiffs' assertion that *Fait* is "irrelevant" and applies only to Securities Act claims is contrary to Second Circuit law. (Opp. 20) "Though *Fait* involved claims under Sections 11 and 12 of the Securities Act of 1933, . . . the same reasoning applies under Sections 10(b) and 20(a) of the 1934 Act, as these claims all share a material misstatement or omission element." *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012). Plaintiffs' respond only with citation to irrelevant pre-*Fait* cases, such as *NovaGold*, and their hope that the Supreme Court will alter the law. (Opp. 20 & n.6)

**Plaintiffs Mischaracterize Cited Documents.** Plaintiffs point to a handful of internal company documents that they contend contradict Barrick's publicly disclosed cost estimates, but Plaintiffs continue to blatantly mischaracterize the nature and content of those documents.

Plaintiffs rely most heavily on what they refer to as the "Bechtel Report," which they do not attach and can only guess as to its year of creation. But even by their own allegations, this so-called "report" was merely an early, unsuccessful third-party bid to become the Project's lead

contractor, and not an objective measure of cost that rendered Barrick's later estimates false. (AC ¶¶ 52-56)  Plaintiffs respond, in a footnote, by asserting in a purely conclusory fashion that the proposal represented Bechtel's "best estimate to developing the mine at the lowest cost and shortest time."  (Opp. 33 n.20)  Plaintiffs' position is implausible on its face:  a rejected proposal by a third party to provide goods and/or services at a certain price simply is not a measure of the true underlying costs of the Project, much less an objective, disinterested assessment of those costs.  Certainly, when a company receives such a bid – particularly one that it rejects – the company need not credit the bid amount as the "true" cost of the project or risk being held liable for securities fraud if it accepts a lower bid and publicly announces a lower estimate.

Plaintiffs' allegations regarding other documents are similarly flawed:

- ***Project Plan Report*** (October 2010):  Plaintiffs provide no information as to the content of this alleged document, except to say that it "concluded that the current estimate of $2.8 billion capital budget was infeasible within the Company's allotted 36-month time frame."  (AC ¶ 67; Opp. 16)  Plaintiffs ignore, however, that in February 2011, Barrick announced it had conducted a "line-by-line review" of expected capital costs and, as a result, was raising its estimate to $3.3-$3.6 billion.  (AC ¶¶ 309-310; Mem. 5-6)

- ***Internal estimate*** (March 2011):  Plaintiffs' allegation that an internal estimate predicted that costs for a nine-month period would "exceed $1.05 billion" does not in any way suggest that Barrick's $3.3-$3.6 billion estimate of capital costs for the entire development period was incorrect.  (AC ¶ 72; Opp. 16)

- ***Turner & Townsend report*** (July 2011): Fatal to Plaintiffs' own claim about Barrick's original cost estimate, the Turner & Townsend report expressly found that the methodology underlying that estimate was appropriate.  (Ex. 32 at 1)  In addition, the report did not, as Plaintiffs assert, "conclude[] that the publicly announced capital budget ($4.7-$5.0 billion) was inadequate" – an allegation that appears nowhere in the AC. (Opp. 16; Mem. 29; AC ¶¶ 75-77)  The report addressed the methodology underlying Barrick's July 2011 estimate, but it made no determination as to the accuracy of the estimate itself.  (Ex. 32 at 1)  There is no allegation that implementation of the suggested changes in methodology resulted in a material change in the estimate.

- ***Lama Master FCST*** (January 23, 2012):  Plaintiffs' allegation that this "worksheet," suggested that "total capital costs" would exceed $6.1 billion confuses "total capital costs" with "pre-production capital costs."  (AC ¶¶ 82-83; Opp. 16; Mem. 28 n.7)  In any event, Barrick announced in May 2012 that it had been conducting "a detailed cost and

6

schedule review" (Ex. 31 at 3) and, in July 2012, increased its pre-production capital cost estimate for Pascua-Lama to $7.5-$8.0 billion.  (AC ¶ 117)

None of these documents contradict any of Barrick's publicly disclosed cost estimates.  Nor do Plaintiffs allege that the Individual Defendants or anyone in senior management read any of the documents, much less that the documents caused them to disbelieve the Company's estimates. Accordingly, Plaintiffs have failed to allege both objective and subjective falsity of the Company's forward-looking cost estimates.  *See Fait*, 655 F.3d at 110.

These assertions suffer from another fundamental deficiency:  the existence of preliminary data suggesting that the Project's budget was under pressure does not imply that Barrick's estimates were "false."  (Mem. 28-29)  Plaintiffs' allegations make clear that Barrick properly reacted to preliminary indications of cost pressures by conducting thorough and publicly disclosed reviews, revising its cost estimates when those reviews were completed, disclosing the reasons for the revisions (which Plaintiffs do not contest), and warning investors of possible further revisions.  Nothing more is required by the securities laws.  *See In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) ("Taking the time necessary to get things right is both proper and lawful," and managers "are entitled to investigate for a reasonable time, until they have a full story to reveal.").

### 2.    Statements Regarding Environmental Approvals Were Not False When Made.

**Plaintiffs Misstate Their Own Allegations.**  Plaintiffs incorrectly assert that Barrick made "repeated, categorical, and unambiguous statements that the Project complied with all environmental regulations."  (Opp. 23-24 n.10)  No such statement appears in the AC and or in Barrick's public disclosures.  To the contrary, Barrick repeatedly cautioned:  "There can be ***no assurance that Barrick has been or will at all times be in full compliance*** with all such laws

and regulations and **with its environmental and health and safety permits** or that Barrick has all required permits." (Ex. 1 at 82-83; Ex. 2 at 88; Ex. 3 at 103-04; Ex. 4 at 119; Ex. 5 at 111)

Plaintiffs' claim regarding environmental approvals is based on statements misleadingly taken out of context from a response by Barrick to Argentina's enactment of a federal law restricting mining near glaciers in Argentina.[3] (AC ¶¶ 307, 313, 318, 324, 326, 335, 353, 360, 373, 393, 397; *see also* AC ¶ 304) This statement – repeated from October 2010 to November 2012 – addressed the concern that the new law could impede the *Argentine* side of the Project: the Company merely assured investors that its activities in Argentina were "undertaken pursuant to existing environmental approvals" and stated its belief that it was "legally entitled to continue [its] current activities on the basis of existing approvals." (Ex. 26 at 14) Nowhere did Barrick represent that Pascua-Lama was fully compliant with all environmental approvals, or as relevant to this case, the *Chilean* EIA.

Plaintiffs also allege that, in May 2009, Barrick stated that it "had incorporated all of the conditions of the environmental approval" into the Project plans. (AC ¶ 244) Plaintiffs identify no factual allegations indicating this statement was false when made. (Opp. 20-23; AC ¶ 246)

**Plaintiffs Mischaracterize Cited Documents and Rely on Events that Occurred Later in Time.** Even if Barrick had represented that the Project was fully compliant with its environmental approvals – which it did not – Plaintiffs' claim would still fail because Plaintiffs do not allege any facts indicating non-compliance at the time the alleged statements were made.

---

[3]     For example, the statement quoted in paragraph 110 of the AC, which Plaintiffs falsely state "declared that the Company was in compliance with environmental approvals," is taken from the following discussion in Barrick's quarterly report dated October 29, 2010: "**On the legislative front, Argentina recently passed a federal glacier protection law that restricts mining in areas on or near the nation's glaciers**. Our activities do not take place on glaciers, and **are undertaken pursuant to existing environmental approvals** issued on the basis of comprehensive environmental impact studies . . . . We have a comprehensive range of measures in place to protect such areas and resources. . . . The Province of San Juan, where our operations are located, previously enacted glacier protection legislation with which we comply. **We believe we are legally entitled to continue our current activities on the basis of existing approvals**." (Ex. 26 at 14 (emphasis added))

Rather, Plaintiffs' claim that Barrick did not comply with dust mitigation and the water management requirements under the Chilean EIA relies on the mischaracterization of documents and on events that occurred *after* the statements were made.

*First*, Plaintiffs' allegations regarding dust mitigation are irrelevant to their claims because they do not allege that dust mitigation issues caused any losses.  (Opp. 21-23; Mem. 39 n.11)  Plaintiffs do not dispute that both the April 2013 Chilean court order and the May 2013 fine related solely to the Project's water management system.  (Opp. 43 n.31; Ex. 21 at 6-7)

*Second*, with respect to the water management system, Plaintiffs erroneously rely on the May 2013 fine to assert that statements made months or years earlier were false.  (Opp. 21 (citing AC ¶¶ 137-39))  Such hindsight allegations are insufficient, as Rule 9(b) and the PSLRA require contemporaneous facts showing that the statements were "false when made." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  Unable to allege any such facts, Plaintiffs again resort to mischaracterizing documents, as well as their own allegations:

- *Project Manager conversation* (April 2010):  Plaintiffs assert that "the Project Manager informed COO Kinver and SVP Potter that the Project was *not compliant* with the environmental conditions" (Opp. 22), but the allegation in the AC is that the Project Manager "told him that he needed additional funds to *maintain compliance* with environmental requirements and the schedule."  (AC ¶ 66)

- *Operations Manager reports* (2011):  Plaintiffs do not allege that the Operations Manager had any responsibility for the water management system or environmental compliance, and they do not allege the content of the alleged reports.  (Opp. 22; AC ¶¶ 32, 99; Mem. 33 n.9)  The allegation that Barrick made unspecified changes to the design of the water canals does not demonstrate non-compliance, nor do Plaintiffs allege any basis to tie this alleged design change to the April 2013 injunction.  (AC ¶¶ 98-99)

- *Monthly Progress Reports* (July and September 2011):  The reports did not, as Plaintiffs assert, "detail[] how the Company was failing to meet its water management system construction commitments."  (Opp. 22)  To the contrary, they expressly stated that there had been no non-compliance, addressed the "[r]isk of not meeting the commitment to have the water management system fully operational before the start of prestripping," and emphasized the importance of continuing to meet commitments.  (Mem. 32; Exs. 27, 28)  Plaintiffs' only response is the facially implausible speculation that perhaps "non-compliance" is a "term of art."  (Opp. 23 n.9)

9

- ***La Serena presentation*** (March 2012):  Like the Monthly Progress Reports, the La Serena presentation does not indicate non-compliance.  (Opp. 22; Mem. 33)  In fact, it emphasized that pre-stripping could not proceed prior to completion of an approved water management system.  (Ex. 33)  Barrick subsequently reported:  "During the second quarter [of 2012], the project achieved critical milestones with completion of . . . the water management system in Chile, . . . which enabled the commencement of pre-stripping activities."  (Ex. 12 at 6)

Again, none of these documents contradict any of Barrick's public statements.  Nor do Plaintiffs allege that the Individual Defendants or anyone in senior management ever read the documents, much less that the documents caused them to disbelieve the Company's statements.

### 3.    Statements Regarding Internal Controls and Accounting for Capital Costs Are Not Actionable.

Plaintiffs' allegations regarding Barrick's statements that its internal controls were "effective" fail for the simple reason that none of the ***Project level*** control issues identified by Plaintiffs constitutes a "material weakness" in internal controls at the ***Company level***.  *See* 17 C.F.R. § 229.308(a)(3).  (Mem. 19-20; Opp. 24-25)  These allegations also misapprehend the purpose of internal controls:  the fact that the Company's internal controls were able to identify and address issues at the Project demonstrates the effectiveness of those controls.  As to the CEO and CFO certifications, which are "based on [the officer's] knowledge," Plaintiffs' allegations also fail because they allege no facts indicting that those officers knew of any material weakness in the Company's internal controls.  (Mem. 21-22)  Plaintiffs' controls allegations are wholly dependent on the inadequate allegations regarding estimates and likewise should be dismissed.

Plaintiffs' claim regarding capitalization of costs relies on the assertion that Barrick knew the Project had no "probable future benefit" (GAAP) and no "potential to contribute" to cashflow (IFRS), which is unsupported by any factual allegations.  (AC ¶ 190; Opp. 27-28; Mem. 20 n.5)  Plaintiffs allege no facts indicating that Barrick failed to conduct required impairment testing, or that Project costs would exceed Project earnings.   (Mem. 21)  Plaintiffs do not respond to the

fact that Barrick's judgments as to the Project's future economic benefits are subject to the pleading standard set forth in *Fait*, which Plaintiffs manifestly fail to satisfy.  (Mem. 20-21)

### 4.     Individual Defendants Are Not Liable For Statements They Did Not Make.

Plaintiffs' argument that the Individual Defendants may be liable for statements they did not make is directly contrary to the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011).  (Opp. 29; Mem. 23)  The "group pleading" doctrine  "does not survive the PSLRA and has been abrogated by the Supreme Court's recent *Janus* decision."  *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *9-10 (S.D.N.Y. Sept. 28, 2012).  Plaintiffs argue that *Janus* applies only to third-party advisors, but "nothing in the Court's decision in *Janus* limits the key holding . . . to legally separate entities."  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012).  Even before *Janus*, this Court found the group pleading doctrine inappropriate after the enactment of the PSLRA.  *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 262 (S.D.N.Y. 2004).

### B.     Plaintiffs Fail to Plead Scienter.

### 1.     The Inference of Non-Fraudulent Intent Is Far More Compelling.

Plaintiffs offer no response to the fact that the AC is founded on an utterly implausible central premise:  that Barrick chose to spend billions of dollars and years of effort on a project it knew from the outset had no chance of success.  Nor do Plaintiffs provide any explanation as to why Defendants possibly would have embarked on such a self-destructive path, with no cognizable benefit to the Company or to themselves.  In failing to respond, Plaintiffs ask the Court to ignore the requirement from *Tellabs* that it "engage in a comparative evaluation" and that the inference of scienter must be "cogent and at least as compelling" as any inference of non-fraudulent intent.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Plaintiffs acknowledge that Pascua-Lama was "one of the biggest and most difficult industrial ventures in the world" (Opp. 3-4), and they do not dispute that Barrick cautioned investors about a range of risks that could cause the Company to revise its capital cost and time estimates, including increased commodity costs, labor shortages, currency inflation, declining gold prices, and environmental challenges. (Mem. 3-11, 15) The far more cogent and compelling inference to be drawn from Plaintiffs' allegations and the documents they cite is that Barrick did not act with any fraudulent intent, but instead promptly reviewed and revised its cost and schedule estimates as previously disclosed risks materialized. (Mem. 25)

Likewise, with respect to environmental issues, the far more compelling inference is that Barrick was committed to complying with its environmental obligations and appropriately reviewed those aspects of the Project that posed a risk of non-compliance. That commitment is demonstrated by the fact that Barrick delayed pre-stripping until an approved water management system was in place and, a few months later, voluntarily halted pre-stripping because of high winds impacting dust at the site. Barrick's prompt and detailed disclosures further undermine any inference that the Company sought to conceal environmental issues. (*See*, *e.g.*, Ex. 12 at 6 (delay in pre-stripping); Ex. 14 (voluntary suspension of pre-stripping); Ex. 15 at 71 (filing of lawsuits); Ex. 5 at 83 (Chilean resolution))

### 2. Plaintiffs Fail to Plead Actual Knowledge of Falsity as to Cost and Schedule Estimates.

Plaintiffs misstate the legal standard for pleading scienter as to Barrick's cost and schedule estimates: "recklessness" is insufficient for forward-looking statements, as the PSLRA requires facts demonstrating "actual knowledge" of falsity. (Mem. 26-27; Opp. 30-31)[4]

---

[4]    Having failed to "allege facts supporting a motive . . ., [Plaintiffs'] circumstantial evidence of actual knowledge must be correspondingly greater." *Slayton*, 604 F.3d at 776. The assertion that Barrick had a motive to conceal the "true cost" of the Project in order to "obtain financing" is not only inadequate under

Plaintiffs cannot rely on internal Barrick documents to establish "actual knowledge" (or even "recklessness").  As discussed in Section I.A.1., Plaintiffs' mischaracterize those documents, none of which indicate that Barrick's publicly announced cost and schedule estimates were false or misleading.  The most glaring example of Plaintiffs' strategy is their reliance on the Bechtel proposal, which as an unsuccessful third-party bid, simply does not support an inference of actual knowledge that the Project's original cost and timing estimates were false when made.  Nor is there any basis to infer that anyone who read the other handful of documents cited by Plaintiffs would believe – much less have actual knowledge – that Barrick's public estimates were false.  Moreover, as to all of these documents, Plaintiffs fail to specify "who prepared them and when, how firm the numbers were or which company officers reviewed them."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Plaintiffs do not respond to the fact that none of the Individual Defendants and nobody in senior management are even alleged to have read any of the documents.  (Opp. 33-34)

With respect to the allegations based on anonymous sources, Plaintiffs fail to address the fact that none of the anonymous sources are alleged to have had responsibility for Barrick's cost or schedule estimates.  (Opp. 35-36; Mem. 30; AC ¶ 32)  As to the "Project Manager," the only anonymous source alleged to have communicated with any of the Individual Defendants or anyone in senior management, Plaintiffs argue that he had "oversight responsibilities" at Pascua-Lama, but fail to mention that the alleged "oversight" was limited to the construction of "camps and infrastructure."  (Opp. 36; AC ¶ 32)  In any event, the allegation that the "Project Manager" complained about his budget to Kinver and Potter in 2010 does not raise a strong inference that they had "actual knowledge" that Barrick's capital cost estimates were false.  (AC ¶¶ 63, 66)

---

Second Circuit law, but also makes no sense because the financing was dependent on the success of the Project.  (Opp. 39-40; Mem. 26)  Plaintiffs appear to concede that such a motive would have been "irrational." (Opp. 40)

3. **Plaintiffs Fail to Plead Recklessness as to Environmental Approvals.**

Plaintiffs allege no facts indicating that the Individual Defendants or anyone in senior management were aware that the water management system was not in compliance with the Chilean EIA prior to the April 2013 or May 2013 actions by Chilean authorities, much less that Barrick's statements about environmental matters were false. Plaintiffs again rely on distortions of internal Barrick documents, which do not indicate any non-compliance with environmental approvals. (Opp. 34) *See* Section I.A.2. above. In particular, neither the Monthly Reports nor the La Serena Presentation indicated non-compliance as to the water management system. In any case, Plaintiffs again fail to allege that either the Individual Defendants or anyone in senior management read the documents. The allegation that certain Monthly Reports were "***circulated*** . . . to the Company's Toronto office, including Defendants Kinver and Gonzales" (AC ¶79) does not specify "which company officers ***reviewed*** them." *In re Scholastic*, 252 F.3d at 72 (emphasis added); *see also Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. 2008).

4. **Plaintiffs Fail to Plead Scienter as to Internal Controls.**

Plaintiffs offer only the conclusory assertion that Defendants Regent, Sokalsky, and Al-Joundi were aware of facts contradicting their internal controls certifications, citing to other sections of their brief that do not include any allegations about the knowledge of those Defendants with respect to internal controls. (Opp. 38) As discussed in Section I.A.3., none of the cited documents indicate that Barrick's internal controls had a material weakness at the Company level, and none of the Individual Defendants are alleged to have read those documents.

5. **Plaintiffs Fail to Plead Scienter as to Each Individual Defendant.**

The Opposition confirms that Plaintiffs have not satisfied the requirement under the PSLRA and Rule 9(b) that they allege particularized facts supporting a strong inference of scienter as to each of the Individual Defendants. (Mem. 35-36; Opp. 39) With respect to

14

Defendants Regent, Al-Joundi and Sokalsky, Plaintiffs simply assert that it would be "absurd" to suggest that these "high level corporate officers" did not know the "truth." (Opp. 39) That assertion is insufficient under well-settled Second Circuit law. *See Steinberg*, 2008 WL 5170640, at *13 (finding insufficient the assertion that senior officers must have known facts contradicting their public statements); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (same; citing cases).

As to Defendants Kinver, Potter, and Gonzales, Plaintiffs rely on allegations that (*i*) the "Project Manager" complained about the construction budget to Potter and Kinver, and (*ii*) the Monthly Reports, which did not contradict Barrick's public statements regarding environmental approvals, were "circulated" to Kinver and Gonzales (but not that they actually reviewed those reports). (Opp. 38; AC ¶¶ 32, 63, 66, 79-80) These allegations plainly fall far short of supporting a strong inference that Kinver, Potter, or Gonzales acted with scienter. (Mem. 30-31, 33) These allegations also fail because: (*i*) Potter's only alleged statement (AC ¶ 244) occurred a year before the complaint by the "Project Manager" (AC ¶ 63); (*ii*) Gonzales's only alleged statement concerned cost estimates (AC ¶ 354), a subject not allegedly addressed in the Monthly Reports (AC ¶¶ 79-80, 92-96); and (*iii*) Kinver's only timely statement is unrelated to the complaint by the "Project Manager" or the Monthly Reports (AC ¶ 371).

### 6.    Plaintiffs Fail to Plead Corporate Scienter.

Plaintiffs' argument that they may plead corporate scienter without pleading scienter "with regard to a specific individual defendant" (Opp. 31) ignores that they still must allege particularized facts sufficient to "create a strong inference that ***someone whose intent could be imputed to the corporation*** acted with the requisite scienter." *Teamsters Local 445 Freight Div.*

*Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (emphasis added).[5]
Furthermore, the person whose scienter is imputed to the company must be "responsible for the
statements made to investors."  *Id.* at 197; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765
F. Supp. 2d 512, 543 (S.D.N.Y. 2011).

Plaintiffs attempt to avoid this conclusion by relying on *NovaGold*, in which the court
found corporate scienter adequately pleaded because the allegations indicated "widespread
knowledge" of falsity.  629 F. Supp. 2d at 300.  Here, Plaintiffs allege no facts indicating that
Defendants knew or believed that Barrick's cost estimates were inaccurate, much less that there
was "widespread knowledge."  Moreover, in *NovaGold*, plaintiff alleged knowledge of falsity
based on a feasibility study commissioned by the company – an objective measure of expected
costs – whereas Plaintiffs here rely on the unsuccessful Bechtel bid.  *Id.* at 281.

Plaintiffs also rely on the "core operations" doctrine, which, to the extent it survives the
PSLRA at all, does not independently support a finding of scienter.  (Opp. 36-37; Mem. 36-37)
Plaintiffs accuse Defendants of mischaracterizing the Second Circuit's guidance in *New Orleans
Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14 n.3 (2d Cir. 2011), but numerous courts
have found that language clear.  *See*, *e.g.*, *Wallace v. IntraLinks*, 2013 WL 1907685, at *8
(S.D.N.Y. 2013); *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *18 (S.D.N.Y.
2013); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359,
371-72 (S.D.N.Y. 2012).  Plaintiffs cite a single post-*Celestica* case, which relies on an outdated
pre-PSLRA case.  (Opp. 36-37 n.22)  Even if the doctrine were applicable, Plaintiffs do not

---

[5] The only exception to this rule has no application here.  Although "it is possible to draw a strong inference of
corporate scienter without being able to name the individuals who concocted and disseminated the fraud" (Opp.
31 n.17), such an inference is appropriate only where a company's announcement is "so dramatic" that it
necessarily "would have been approved by corporate officials sufficiently knowledgeable about the company to
know that the announcement was false."  *Teamsters*, 531 F.3d at 195-196.  The example offered by the Second
Circuit illustrates why this extremely narrow exception does not apply:  "Suppose General Motors announced
that it had sold one million SUVs in 2006, and the actual number was zero."  *Id.* at 195.

address that the Project did not "constitute nearly all of [Barrick's] business" and therefore was not a "core" operation. *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). The Project clearly was not "critical" to Barrick's viability, as it has been suspended and Barrick remains quite viable. (Opp. 37)

       **C.**     **Plaintiffs Fail to Plead Loss Causation.**

            **1.**     **None of the Identified Statements or Events Constitute "Corrective Disclosures" or the "Materialization of a Concealed Risk."**

Plaintiffs' Opposition makes clear that none of the eight statements or events they identify constitute "corrective disclosures" or the "materialization of a concealed risk." (Opp. 42-25; Mem. 38-41) Plaintiffs are unable to identify any facts revealed by the purported "corrective disclosures" indicating that Barrick's public statements regarding cost or schedule estimates were false when made. Nor do Plaintiffs plausibly allege that the environmental risks that ultimately materialized had been concealed.

- *June 6, 2012*. Plaintiffs fail to support their assertion that Barrick's announcement that Sokalsky would succeed Regent as CEO revealed any facts regarding the alleged misrepresentations. Plaintiffs' citation to media and analyst speculation that "attributed" the change to "problems" at Pascua-Lama (Opp. 43; AC ¶¶ 210-11) is insufficient to plead loss causation: "the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud as required by *Dura Pharms.*" *Janbay v. Can. Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012); *see also Wallace*, 2013 WL 1907685, at *10.

- *July 26, 2012* and *November 1, 2012*. Plaintiffs identify no facts revealed by Barrick's revisions of its cost and schedule estimates indicating that its earlier estimates were false when made. (Opp. 43; Mem. 38-39) Plaintiffs also ignore their express allegations that the July 26, 2012 statement ***did not "disclose the real cause*** of the cost overruns and delays" and "continued to mislead the market" (AC ¶¶ 214, 216), and that the November 1, 2012 statement "***continued to conceal*** the fundamental fact that the mine had never been technically or economically feasible under any of the Company's public cost estimates." (AC ¶¶ 85, 219) *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("Plaintiffs cannot have it both ways. They cannot . . . argue that the misstatement itself constituted a corrective disclosure . . . .").

- *April 10, 2013* and *May 24, 2013*. The actions by the Chilean authorities do not constitute concealed risks (Opp. 43-44) because Barrick had cautioned investors about

the specific litigation that resulted in the April 2013 injunction (*see, e.g.*, Ex. 15 at 71; Ex. 5 at 102-03), as well as the March 2013 resolution that resulted in the May 2013 fine. (Ex. 5 at 83)  Those events, therefore, do not support loss causation.  (Mem. 39-40)  Additionally, as noted in Section I.A.2., neither of these actions related to dust mitigation, and Plaintiffs therefore also fail to plead loss causation as to related allegations.

- ***June 28, 2013***.  Plaintiffs do not dispute that Barrick's statement that it expected to take an asset impairment charge did not disclose any facts indicating that Barrick's prior statements regarding impairment analysis were false, or that impairment indicators existed prior to when Barrick announced such indicators in April 2013.  (Opp. 44; Mem. 40)  Plaintiffs therefore do not plead loss causation as to capitalization of costs.

- ***October 31, 2013***.  Plaintiffs do not respond to the fact that Barrick's temporary suspension of construction did not reveal the falsity of any prior statement, or that Barrick had, on many occasions, warned that it might suspend the Project.  (Opp. 44; Mem. 40-41)

- ***October 31, 2013*** (after close of market).  Plaintiffs do not contest that Barrick's announcement of an equity offering did not mention Pascua-Lama, and they rely on analyst speculation linking the offering to "delays with Pascua-Lama."  (Opp. 44; Mem. 41; AC ¶ 237; Ex. 34)  Even if that speculation were credited, the "delays with Pascua-Lama" were public knowledge.

None of these statements or events revealed the falsity of a prior statement, and therefore Plaintiffs have not alleged a causal link between the alleged misstatements and a decline in stock price.[6]  Mere allegations of a decline following "bad news" do not demonstrate loss causation.

### 2. Plaintiffs Fail to Disaggregate from Losses Caused by Other Events Affecting Barrick's Stock Price.

Plaintiffs' assertion that they are not required to "'disaggregate losses' attributable to fraud at the pleading stage" is contrary to Second Circuit law.  (Opp. 45)  *See Cent. States v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72, 74 (2d Cir. 2013) ("[P]laintiff must plead facts sufficient to show 'that its loss was caused by the alleged misstatements as opposed to intervening events.'") (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir.

---

[6]   Plaintiffs' only allegation of loss causation as to internal controls is the speculation of an analyst that Barrick's July 26, 2012 estimate revision was due to a "lack of controls."  (Opp. 43 & n.30; AC ¶ 216)  Such speculation does not transform the estimate revision into a corrective disclosure regarding internal controls and is insufficient to plead loss causation.  *Janbay*, 2012 WL 1080306, at *16.

2005)); *In re Flag Telecom*, 574 F.3d at 36 ("*Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements.").  Courts routinely dismiss Section 10(b) claims where a plaintiff allege neither facts demonstrating that the defendant's misstatements, as opposed to intervening events, "'were the proximate cause of plaintiffs' loss,' nor any 'facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements.'" *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).  *See, e.g., Deng v. 278 Gramercy Park Group LLC*, 2014 WL 1016853, at *14 (S.D.N.Y. Mar. 14, 2014); *City of Westland Police & Fire Ret. Sys. v. MetLife. Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013).

Plaintiffs have no response to the fact that Barrick's July 26, 2012, November 1, 2012, and October 31, 2013 quarterly reports, in which the Company revised its cost and schedule estimates for Pascua-Lama and announced the suspension of construction, also disclosed sharply disappointing financial results, including steep declines in quarterly profits, rising costs of gold production, and decreased growth targets.  (Mem. 43-44)  Plaintiffs' assertion that the entire loss is attributable to the Pascua-Lama disclosures is therefore implausible.  (Mem. 44 n.12)

More broadly, the Court may take judicial notice of the collapse in gold prices in 2012 and 2013 (including its steepest quarterly decline in history in the second quarter of 2013), as well as the fact that other gold mining stocks declined precipitously during this period.  (Ex. 35) This industry-wide decline further diminishes the plausibility that any decline in Barrick's stock price was caused by the alleged misrepresentations.  *Lentell*, 396 F.3d at 174.

## II.   PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY.

Plaintiffs fail to plead control person liability.  ***First***, Plaintiffs fail to plead a primary violation.  ***Second***, as to as to Defendants Kinver, Potter, or Gonzales, who are not alleged to

have signed any of the Company's SEC filings, Plaintiffs do not allege "actual control."  ***Third***,

Plaintiffs fail to allege particularized facts supporting a strong inference of *any* Defendant's

culpable participation in the fraud.  *See In re MF Global Holdings Ltd. Sec. Litig.*, 2013 WL

5996426, at *20 (S.D.N.Y. 2013) (culpable participation is equivalent to scienter and is subject

to the heightened pleading requirements of Rule 9(b) and the PSLRA); *Coronel v. Quanta

Capital Holdings Ltd.*, 2009 WL 174656, at *24 (S.D.N.Y. 2009) (same).[7]   (Mem. 44-45)

As to Defendant Veenman, Barrick's General Counsel, Plaintiffs acknowledge that they

rely solely on the allegation that she signed SEC filings.  (Opp. 48; AC ¶ 29)  This lone

allegation does not remotely demonstrate culpable participation in any alleged fraud, and there is

no basis whatsoever for control person liability.  (Mem. 45)

## III.    PLAINTIFFS' NON-DOMESTIC CLAIMS SHOULD BE DISMISSED.

Plaintiffs' argument that transactions on the Toronto Stock Exchange are actionable

because Barrick stock is listed on the New York Stock Exchange is contrary to the Supreme

Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and has been

unanimously rejected in this Circuit.  *See, e.g.*, *In re UBS Sec. Litig.*, 2011 WL 4059356, at *5

(S.D.N.Y. 2011); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472-73 (S.D.N.Y. 2010).

## <u>CONCLUSION</u>

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: New York, New York            DEBEVOISE & PLIMPTON LLP
      April 22, 2014

                    By : /s/ Bruce E. Yannett_____
                    Bruce E. Yannett (*beyannett@debevoise.com*)
                    Elliot Greenfield (*egreenfield@debevoise.com*)
                    Anna A. Moody (*amoody@debevoise.com*)

---

[7]    The cases cited by Plaintiff do not reflect the prevailing view in the Second Circuit.  (Opp. 48)  *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011) (Section 20(a) claims require factual allegations demonstrating that the "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.").

919 Third Avenue
New York, New York  10022
Tel: (212) 909-6000
Fax: (212) 909-6836

Colby A. Smith (*casmith@debevoise.com*)
Jonathan R. Tuttle (*jrtuttle@debevoise.com*)
Ada Fernandez Johnson (*afjohnso@debevoise.com*)
555 13th Street, N.W.
Washington, D.C.  20004
Tel: (202) 383-8000
Fax: (202) 383-8118

*Attorneys for Defendants Barrick Gold Corporation, Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George Potter, and Sybil E. Veenman*

21