UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

IN RE BARRICK GOLD SECURITIES
LITIGATION

------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #: _____
DATE FILED: 4/1/15
```

OPINION AND ORDER

13 Civ. 3851 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

Lead plaintiffs Union Asset Management Holding AB and LRI Invest S.A. bring this action on behalf of themselves and others similarly situated against Barrick Gold Corporation ("Barrick" or the "Company"); Aaron Regent, Jamie Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, and George Potter (the "Individual Defendants"); and Sybil Veenman.  The putative class consists of all persons and entities who purchased or acquired Barrick common stock during the period May 7, 2009 through and including November 1, 2013 (the "Class Period") and who were allegedly damaged thereby.  Plaintiffs assert three causes of action for: violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Barrick; violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against the Individual Defendants; and violations of Section 20(a) of the Exchange Act against the Individual Defendants and Veenman.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants

now move to dismiss all claims.  For the following reasons, defendants' motion is granted in part and denied in part.

## II.    BACKGROUND[1]

Barrick is one of the world's largest gold mining companies, with a business focus on growing its base of low-cost gold production and gold reserves.[2] In 1994, Barrick acquired Pascua-Lama (the "Project"), an untapped gold mine spanning the border between Chile and Argentina.[3]  Pascua-Lama is "one of the biggest and most difficult industrial ventures in the world" presenting many "logistical, operational, and environmental challenges."[4]  To access the ore, Barrick planned to carve a massive open-pit gold mine into the peaks of the Andes mountains, fifteen thousand feet above sea level, while taking care not to disrupt the surrounding glaciers.[5]

Because of the possible negative impact of construction on the glaciers, Barrick could not begin the project without first obtaining the necessary

---

[1]    The facts below are taken from the Consolidated Amended Class Action Complaint ("Compl."), as well as documents incorporated by reference into the Complaint.

[2]    *See* Compl. ¶ 33.

[3]    *See id.* ¶¶ 34–35.

[4]    *Id.* ¶ 36.

[5]    *See id.*

environmental approvals from the governments of Chile and Argentina.[6]  Barrick

went through several rounds of proposals with both Chile and Argentina from 2000

through 2006, before gaining the requisite approvals from both countries.[7]  To gain

the approvals, Barrick agreed to abide by four hundred environmental conditions in

the Chilean environmental impact assessment ("EIA").[8]  These focused on

addressing environmental concerns related to the Andean glaciers and Barrick's

proposed management of water.[9]  Barrick was required to implement dust control

measures to prevent toxic dust from the mine site and access roads from drifting

onto the glaciers to avoid  poisoning the water supply.[10]  One of these measures

included wetting the paths of the mining trucks by permanent irrigation, which

would limit the spread of particulates and toxic dust.[11]  The approved design also

required Barrick to implement a water management system that would divert any

waters not impacted by the operations around the facility, and to capture, treat and

---

[6]      *See id.* ¶ 42.

[7]      *See id.* ¶¶ 43–44.

[8]      *See id.* ¶ 45.

[9]      *See id.* ¶ 46.

[10]      *See id.*

[11]      *See id.*

3

reuse any water used to minimize environmental impact.[12]  To this end, Barrick

agreed to construct canals to control the Project's run-off and channel it to a

treatment system.[13]

On May 7, 2009, Barrick announced that it would begin construction

of the Project.[14]  The press release highlighted a "[p]re-production construction

estimate of $2.8-$3.0 billion"; that "[c]ommissioning [was] expected in late 2012

and production in early 2013"; and that "[f]ully compliant environmental

management and monitoring plans [were] developed and being implemented."[15]

The release described Pascua-Lama as "one of the lowest cost gold mines in the

world."[16]  It explained that "[t]he anticipated total cash costs are $20–$50 per

ounce — which would make Pascua-Lama one of the lowest cost gold producing

mines in the world."[17]  The press release also contained extensive cautionary

language that the Company's forward-looking statements, including the cost and

---

[12]     See id. ¶ 47.

[13]     See id.

[14]     See id. ¶ 57.

[15]     Id. ¶ 58; May 7, 2009 Press Release, Ex. 6 to Declaration of Elliot Greenfield in Support of Defendants' Motion to Dismiss the Amended Complaint ("Greenfield Decl."), at 1.

[16]     May 7, 2009 Press Release, at 1.

[17]     Id. at 2.

schedule estimates, represented expectations and were subject to inherent risks and uncertainties.[18]

### A.    Cost and Schedule Estimates

In 2006 or 2007, Barrick received an Engineering, Procurement, and Construction Management ("EPCM") proposal to construct Pascua-Lama from the Bechtel Corporation (the "Bechtel Report").[19]  The Bechtel Report detailed that project development would cost more than $5 billion and that it would take 4-5 years to complete.[20]  Potter, the Senior Vice President of Technical Services and Capital Projects, did not accept this proposal and looked for other EPCM firms who would submit a lower proposal of costs.[21]

Barrick first reported in its May 7, 2009 Press Release and on a shareholder call the same day that the Project had a "pre-production construction estimate of $2.8-$3.0 billion" and that production was expected in early 2013.[22] Barrick confirmed these cost and schedule estimates on earnings calls on July 30, 2009, April 28, 2010, and October 28, 2010, and in its Form 6-K filed with the

---

[18]    *See* May 7, 2009 Press Release, at 5.

[19]    *See* Compl. ¶ 52.

[20]    *See id.* ¶¶ 53–54.

[21]    *See id.* ¶ 56.

[22]    May 7, 2009 Press Release, at 1; Compl. ¶¶ 57–58.

SEC on April 29, 2010.[23]  On February 18, 2011, Barrick reported in its Form 6-K that "capital costs at Pascua Lama were expected to increase 10-20% to $3.3-$3.6 billion due to inflationary pressures, high labor costs, exchange rates, and increased commodity (steel) prices."[24]  On July 28, 2011, Barrick announced an increase in the Project budget to $4.7-$5.0 billion.[25]  Barrick included this figure in its July 29, 2011 Form 6-K, and indicated that production was on schedule for mid-2013.[26]  On February 17, 2012, Barrick repeated the previously announced figure of $4.7-$5.0 billion.  However, on July 26, 2012, Barrick announced that capital costs for the Project would increase fifty to sixty percent over the previous budget of $4.7-$5.0 billion, making the new estimate $7.5-$8.0 billion, and disclosed that initial gold production was not expected until mid-2014.[27]  Barrick then announced in a November 1, 2012 earnings call that the estimate would be $8-$8.5 billion with first production in the second half of 2014.[28]  Barrick confirmed this estimate and schedule in an earnings call on February 14, 2013, Form 6-Ks filed February

---

[23]    *See* Compl. ¶¶ 62–63, 67.

[24]    *Id.* ¶ 70.

[25]    *See id.* ¶ 73.

[26]    *See id.* ¶ 74.

[27]    *See id.* ¶ 84; July 2012 Form 6-K, Ex. 12 to Greenfield Decl., at 5.

[28]    *See* Compl. ¶ 85.

15, 2013 and March 26, 2013, and a Form 40-F filed on March 28, 2013.[29]
However, on April 10, 2013, Barrick announced that construction work would be
suspended on the Chilean side of Pascua-Lama while the company worked to
address regulatory requirements, but stated that it was "too early to assess the
impact, if any, on the overall capital budget and schedule of the project."[30]  On
June 28, 2013, Barrick announced that it would delay production until mid-2016
and that it expected to take an after-tax impairment charge[31] of $4.5-$5.5 billion.[32]
Finally, on October 31, 2013, Barrick announced that it was indefinitely
suspending construction at Pascua-Lama, except for activities required for
environmental protection and regulatory compliance.[33]

During this period, there were a number of internal reports that
suggested the cost estimate and production schedule were inaccurate.  In mid-
October 2010, a Project Plan Report "concluded that the current estimate of $2.8
billion capital budget was infeasible within the Company's allotted 36-month time

---

[29]     *See id.* ¶¶ 402, 406, 408.

[30]     *See id.* ¶ 131, April 10, 2013 Press Release, Ex. 17 to Greenfield
Decl., at 1.

[31]     An asset is impaired when its carrying amount exceeds its recoverable
amount.  *See* Compl. ¶ 176.

[32]     *See id.* ¶ 141.

[33]     *See id.* ¶ 148.

frame" and that "the time line was at least 18 months too short."[34]  In July 2011,
Barrick engaged a third-party consulting firm to conduct a "high-level audit of the
original (2009 Estimate) and forecasted estimate (June 2011)."[35]  The T&T Report
concluded that the original estimate complied with typical Class III Barrick
standards, but that the forecast estimate required some adjustments.[36]  Also in July
2011, Barrick undertook a high level review of risk exposure, and concluded in the
Risk Exposure Report that internal controls at Pascua-Lama suffered from
"[i]naccurate reporting of deliverables/failure to adequately monitor progress" and
had "[n]o formal system in place for scope/change management."[37]  Monthly
progress reports in July and September 2011 and January 2012 identified Project
concerns and internal control deficiencies, including "[s]ignificant inaccuracies,
omissions and inconsistencies in monthly reports"; "[c]ost [m]anagement [p]rocess
weaknesses and inaccurate reporting"; and "[r]isk [m]anagement [p]rocess
weaknesses contributing to inaccurate reporting."[38]

---

[34]     *Id.* ¶¶ 67, 69.

[35]     *Id.* ¶¶ 75–76; Turner & Townsend Report ("T&T Report"), Ex. 32 to
Greenfield Decl., at 1.

[36]     T&T Report, at 1.

[37]     Compl. ¶ 78.

[38]     *Id.* ¶ 80; July 2011 Monthly Report, Ex. 27 to Greenfield Decl., at
2–3; September 2011 Monthly Report, Ex. 28 to Greenfield Decl., at 3–4; January

### B.     Environmental Compliance

In April 2010, the Pascua-Lama Project Manager (the "Project Manager") began oversight of construction and infrastructure within the Pascua-Lama Project.[39]  He met with Chief Operating Officer Kinver and told him that he needed additional funds to maintain compliance with environmental requirements and the schedule, but was told to make do with the existing budget.[40]  However, at the time the Project Manager began managing the Project, it was not environmentally compliant.[41]  The Project did not have enough water to comply with the requirement to keep the roads near the mine wet to prevent toxic dust from being blown onto nearby glaciers.[42]  The Project Manager found a compound that could be used instead of water, but Barrick determined that it was too expensive and refused to purchase it.[43]

In January 2010, Barrick was sanctioned for its failure to implement

---

2012 Monthly Report, Ex. 29 to Greenfield Decl., at 3–4.

[39]     *See* Compl. ¶ 32.

[40]     *See id.* ¶ 66.

[41]     *See id.* ¶ 90.

[42]     *See id.*

[43]     *See id.*

measures intended to reduce particulate matter emissions.[44]  A report in May 2011 from regulators stated that "dust [was] falling on top of the glaciers."[45]  Although Barrick had agreed to build canals near the mine to remove runoff water, Barrick changed the plans to build these canals to cut costs by thirty-five percent without prior governmental approval.[46]  The Operations Manager at Pascua-Lama drafted three reports explaining his concerns and how the changes to the canals would hurt Barrick in the long run, and presented these reports to Barrick's South American Operations Manager.[47]  However, Barrick made the changes, which resulted in environmental problems that were severe enough to cause Barrick to inform the Chilean government.[48]  This eventually led to an injunction suspending work on the Project.[49]  Internal reports throughout the period identified other issues with environmental compliance.[50]

Despite this, Barrick made numerous statements regarding its

---

[44]     *See id.* ¶ 108.

[45]     *Id.*

[46]     *See id.* ¶ 98.

[47]     *See id.* ¶ 99.

[48]     *See id.*

[49]     *See id.* ¶¶ 99, 131.

[50]     *See id.* ¶¶ 92, 93, 96, 101, 104.

environmental compliance.  In Barrick's October 28, 2010 earnings conference call, Regent, Barrick's Chief Executive Officer, stated that "the Pascua-Lama project . . . [is] not impacting the glaciers surrounding our operations" and that "we're in compliance with our permits and we're in compliance with the provincial legislation."[51]  Barrick also repeatedly stated in its Forms 6-K and other filings that Pascau-Lama had been "undertaken pursuant to existing environmental approvals" and that "[w]e have a comprehensive range of measures in place to protect [sensitive environmental] areas and resources."[52]

### C.   Disclosures

On June 6, 2012, Barrick announced the termination of CEO Regent, and his replacement by then-CFO Sokalsky.[53]  Media reports proposed that one explanation for replacing Regent was "problems with the giant Pascua-Lama Project."[54]  Barrick's stock declined approximately 3.8% on heavy trading volume.[55]  On July 26, 2012, Barrick disclosed that capital costs would increase by

---

[51]     *Id.* ¶¶ 303(b), 304.

[52]     *See id.* ¶¶ 70, 110, 123, 307(c), 313, 318, 324, 326(b), 335, 353, 360(b), 373, 393, 397(b).

[53]     *See id.* ¶ 210.

[54]     *Id.* ¶ 211.

[55]     *Id.* ¶ 212.

fifty to sixty percent, and production would be delayed until mid-2014.[56]  Sokalsky stated that "overall project management structure had let us down."[57]  Barrick's stock dropped 3.2% and media and analyst reports described the news as "outrageous" and indicative of a "lack of controls."[58]  Other analysts linked the disclosed problems with Pascua-Lama to Regent's termination.[59]  On November 1, 2012, Barrick again disclosed substantial increases in capital costs.[60]  In response, Barrick's stock declined 9.4%.[61]  On April 1, 2013, the media reported that an Appeals Court in Chile had issued an order halting construction work on Pascua-Lama and that Barrick could be fined millions as a result of failing to comply with environmental rules.[62]  Barrick issued a press release stating that it was suspending construction work on the Chilean side while working to address environmental

---

[56]     *See id.* ¶ 213.

[57]     *Id.* ¶ 119.

[58]     *Id.* ¶¶ 216–217.

[59]     *See id.* ¶ 121.

[60]     *See id.* ¶ 124.

[61]     *See id.* ¶ 126.

[62]     *See id.* ¶ 130.

requirements.[63]  Barrick's stock declined approximately 8.4%.[64]  On May 24, 2013, the media reported that Chile's Environmental Superintendent had issued a resolution suspending Pascua-Lama for non-compliance with environmental permits, that it had imposed the maximum penalty possible under Chilean law, and that Barrick had admitted to twenty-two of twenty-three environmental violations.[65]  Barrick's stock fell two percent, even though the Company halted trading for approximately three hours during the day.[66]  On June 28, 2013, Barrick disclosed that it would take an impairment charge of $4.5 to $5.5 billion, almost its entire investment in the project, and that production would be delayed up to a year and a half.[67]  Barrick's stock dropped approximately 3.1%.[68]  On October 31, 2013, Barrick announced that it had suspended the Project indefinitely and its stock dropped approximately 5.4%.  The next day, Barrick announced a three billion dollar equity offering in order to pay down debt and for other corporate purposes,

---

[63]     *See id.* ¶ 131.

[64]     *See id.* ¶ 226.

[65]     *See id.* ¶ 227.

[66]     *See id.* ¶ 229.

[67]     *See id.* ¶ 141.

[68]     *See id.* ¶ 232.

including "capital expenditures relating to Barrick's existing portfolio of mines."[69]

An analyst report attributed this need to raise capital to cost overruns and stated

that "delays with Pascua Lama have left Barrick with less cashflow to service its

debt."[70]  Barrick's stock dropped approximately 7.1%.[71]

## III.   STANDARD OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court

must "accept[] all factual allegations in the complaint as true and draw[] all

reasonable inferences in the plaintiff's favor."[72]  The court may consider "the

complaint, [] any documents attached thereto or incorporated by reference and

documents upon which the complaint relies heavily,"[73] as well as "legally required

public disclosure documents filed with the SEC[] . . . ."[74]

The court evaluates the sufficiency of the complaint under the "two-

---

[69]   *Id.* ¶ 237.

[70]   *Id.* ¶ 238.

[71]   *Id.* ¶ 239.

[72]   *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).

[73]   *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (quotation marks omitted).

[74]   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal.*[75]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[76]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[77]  Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[78]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[79]  "The plausibility standard is not akin to a probability requirement" because it requires "more than a sheer possibility that a defendant has acted unlawfully."[80]

> **B.** **Heightened Pleading Standard Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")**

---

[75]  *See* 556 U.S. 662, 678–79 (2009).

[76]  *Id.* at 679.

[77]  *Id.* at 678.

[78]  *Id.* at 679.

[79]  *Id.* at 678.

[80]  *Id.* (quotation marks omitted).

Private securities fraud claims are subject to a heightened pleading standard.  *First*, Rule 9(b) requires plaintiffs to allege the circumstances constituting fraud with particularity.  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[81]

*Second*, the PSLRA provides that, in actions alleging securities fraud, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[82]

### C.   Leave to Amend

Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion."[83]  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[84]  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."[85]  In particular, it is the usual practice to grant at

---

[81]   Fed. R. Civ. P. 9(b).

[82]   15 U.S.C. § 74u-4(b)(2).

[83]   *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[84]   Fed. R. Civ. P. 15(a).

[85]   *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b).[86]  Leave to amend should be denied, however, where the proposed amendment would be futile.[87]

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[88]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[89]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;

---

[86]     *See ATSI,* 493 F.3d at 108.

[87]     *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87–88 (2d Cir. 2002).

[88]     15 U.S.C. § 78j(b).

[89]     17 C.F.R. § 240.10b-5.

and (6) loss causation."[90]

## 1.    Material Misstatements or Omissions

In order to satisfactorily allege misstatements or omissions of material

fact, a complaint must "state with particularity the specific facts in support of

[plaintiffs'] belief that [defendants'] statements were false when made."[91]  "[A] fact

is to be considered material if there is a substantial likelihood that a reasonable

person would consider it important in deciding whether to buy or sell [securities] . .

. ."[92]  Mere "allegations that defendants should have anticipated future events and

made certain disclosures earlier than they actually did do not suffice to make out a

claim of securities fraud."[93]

Certain statements are protected by the PSLRA's safe harbor provision

and the bespeaks caution doctrine.  Under the safe harbor provision, a forward-

looking statement is non-actionable when it is "accompanied by meaningful

cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made

---

[90]    *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[91]    *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (internal quotation marks omitted).

[92]    *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (internal quotation marks omitted).

[93]    *Id.  Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

with actual knowledge that it was false or misleading."[94]  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information"[95] identifying "important factors that could cause actual results to differ materially from those in the forward-looking statements."[96] Moreover, statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality."[97]  The applicability of the immateriality prong of the safe harbor "necessarily depends on all relevant circumstances."[98]  Under the judicially created bespeaks caution doctrine, "alleged misrepresentations . . . are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider

_____

[94]     *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original).

[95]     *Id.* at 772.

[96]     15 U.S.C. §78u-5(c)(1)(A).

[97]     *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).  *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

[98]     *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

them important in light of adequate cautionary language. . . ."[99]  Statements may also be deemed immaterial as merely vague expressions of optimism or puffery.[100]  Liability under the actual knowledge prong of the safe harbor "attaches only upon proof of knowing falsity" — a showing of recklessness is insufficient.[101]  Lastly, pleadings based on fraud by hindsight are not actionable as a matter of law.[102]

### 2. Scienter

The required level of scienter under Section 10(b) is either "intent to deceive, manipulate, or defraud"[103] or "reckless disregard for the truth."[104]  Plaintiffs may meet this standard by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial

---

[99]     *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

[100]     *See ECA*, 553 F.3d at 206; *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004).

[101]     *Slayton*, 604 F.3d at 773.

[102]     *See Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410–11 (S.D.N.Y. 2007).

[103]     *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[104]     *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness — *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

evidence of conscious misbehavior or recklessness."[105]  Under the latter theory, plaintiffs must allege that the defendants have engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[106]  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."[107]  An inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[108]

### 3. Loss Causation

---

[105]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens United Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).

[106]    *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (quotation marks and citations omitted).

[107]    *Novak,* 216 F.3d at 308.

[108]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).  *Accord Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) (noting that "the tie . . . goes to the plaintiff" (quotation marks and citations omitted)).

A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation."[109]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[110]  "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . .'"[111]  Therefore, "to plead loss causation, the complaint[] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[112]

### B.   Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator.[113]  "To establish a prima facie case of

---

[109]   *ATSI*, 493 F.3d at 106.  Defendants do not dispute transaction causation.

[110]   *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)). *Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

[111]   *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[112]   *Lentell*, 396 F.3d at 175.

[113]   *See* 15 U.S.C. § 78t(a).

control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[114]   Where there is no primary violation, there can be no "control person" liability under Section 20(a).[115]

## V.   DISCUSSION

### A.   Section 10(b) Claims

Plaintiffs allege four main categories of actionable misstatements: statements regarding cost and schedule (including statements that Pascua-Lama was a "low-cost project"), statements regarding compliance with environmental regulations, statements regarding internal controls and accounting for capital costs, and statements concerning accounting for the project.

#### 1.   "Low-Cost Project"

Plaintiffs allege that defendants' repeated statements that Pascua-Lama was a "low-cost project" were material misrepresentations.  However, plaintiffs incorrectly characterize this statement as meaning that the Project would be "low cost" to build — a meaning that is unsupported by the context of the statement.

---

[114]     *ATSI*, 493 F.3d at 108.

[115]     *See id.  See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006).

Barrick repeatedly stated that Pascua-Lama would be a "low-cost" mine, but this refers to anticipated costs of mining each ounce of gold once the Project was fully developed, *not* the cost of developing Pascua-Lama into an operating mine.[116] Plaintiffs have not alleged that the anticipated cost of production was misstated, only that the estimates regarding the pre-production cost were misrepresented. Therefore, none of the statements expressing that Pascua-Lama was a "low-cost project" are actionable.

### 2.    Cost and Schedule Estimates

Defendants made extensive disclosures regarding the expected capital costs of the Project and the anticipated production schedule.  The company initially reported estimated costs of $2.8 to $3 billion, with production expected in early 2013.  The reported estimated cost of the project increased steadily — first to $3.3-$3.6 billion, then to $4.7-$5.0 billion, then to $7.5-$8.0 billion, and finally to $8.0-$8.5 billion.  Likewise, the expected production schedule was first pushed to mid-2014, then to the second half of 2014, then to mid-2016, and finally suspended indefinitely.

---

[116]    *See, e.g.*, Compl. ¶¶ 40 ("Pascua Lama was a 'world-class project that will contribute low-cost ounces at double digit returns to Barrick'"), 203 (Pascua-Lama "was expected to contribute to new low cost production that replace[s] declining higher cost mines"), 288 (Pascua-Lama is "anticipated to contribute to significant low cost production for many years to come").

### a.    PSLRA Safe Harbor

Defendants argue that the cost and schedule estimates are protected as forward-looking statements protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine.  Defendants contend that each of these statements used the words "estimate" and "expected," which made clear that the announcements reflected forecasts and anticipated outcomes, not statements of existing fact.  Further, Barrick accompanied these statements with cautionary language stating that

> [t]he words 'believe', 'expect', . . . 'estimate' and similar expressions identify forward-looking statements.  Forward-looking statements are necessarily based upon a number of estimates and assumptions that, while considered reasonable by management, are inherently subject to significant business, economic and competitive uncertainties and contingencies. . . . These risks, uncertainties and other factors include . . . changes in the worldwide price of gold, silver, copper or certain other commodities . . .; operating or technical difficulties in connection with mining or development activities; . . . availability and costs associated with mining inputs and labor; [and] the speculative nature of exploration and development, including the risks of obtaining necessary licenses and permits . . . .[117]

---

[117]    May 7, 2009 Press Release, at 5.  All other press releases contained similar, if not identical language.  Moreover, statements made on earnings calls were preceded by a statement that "we will be making forward-looking statements during the course of this presentation.  For a complete discussion of the risks, uncertainties and factors, which may lead to our actual financial results and performance being different from the estimates contained in our forward-looking statements, please refer to our year-end report or our most recent AIF filing." February 17, 2011 Earnings Call, Ex. 8 to Greenfield Decl., at 1.

The cost and schedule estimates are forward-looking statements as defined by the PSLRA — "a statement containing a projection of . . . capital expenditures, . . . [or] a statement of the plans and objectives of management for future operations . . . ."[118] The construction estimate was clearly identified as just that — an estimate — and the schedule was set out as "expected." These statements plainly qualify as forward-looking statements. Moreover, they were identified as forward-looking statements, as required by the PSLRA, and accompanied by meaningful cautionary language that identified with specificity the types of risks that might lead the estimates to be inaccurate. To be eligible for the safe harbor, the cautionary language must be "substantive and tailored to the specific future projections, estimates, or opinions" that the plaintiffs challenge.[119] Here, the language was not boilerplate, but rather conveyed substantive warnings referring to some of the very risks that materialized here — "availability and costs associated with mining inputs and labor," "operating or technical difficulties in connection with mining or development activities," and "the risks of obtaining necessary

---

[118]    15 U.S.C. § 78u-5(i).

[119]    *Slayton*, 604 F.3d at 772 (quoting *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009)).

licenses and permits."[120]   Thus, the safe harbor applies, and the cost and schedule

estimates are not actionable unless plaintiffs allege facts that show defendants had

actual knowledge that the statements were false or misleading when made.

### b.    Scienter

Plaintiffs allege that every cost and schedule estimate that defendants

reported was false and misleading, because defendants "concealed that the Project

was not economically or technically feasible under the parameters they disclosed to

shareholders."[121]   Plaintiffs base this allegation on several internal reports, which

they contend show both that the statements were false when made and that

defendants knew the falsity of the statements at the time they were made.   The first

such report is the so-called Bechtel Report.   Plaintiffs allege that "[i]n 2006 or

2007, the Bechtel Corporation, one of the world's largest construction and

engineering companies, submitted its EPCM proposal to construct Pascua-Lama."[122]

This proposal detailed that the project would cost more than $5 billion and would

take four to five years to complete.[123]   Plaintiffs allege that this proposal was the

---

[120]     May 7, 2009 Press Release, at 5.

[121]     Compl. ¶ 246.  The Complaint repeats this statement for every alleged
misstatement relating to cost and schedule.  *See id.* ¶¶ 246–418.

[122]     *Id.* ¶ 52.

[123]     *See id.* ¶¶ 53–54.

subject of discussion among Barrick executives, and that the executives, including Potter, "would not accept Bechtel's assessment and went looking for other EPCM firms who would submit a lower proposal of costs."[124]  Plaintiffs use this proposal — and only this proposal — to contend that, prior to the start of the class period, defendants knew that the costs of the project would far exceed their public statements.

> Plaintiffs may establish scienter by
>
>> alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.  In order to raise a strong inference of scienter through "motive and opportunity" to defraud, Plaintiffs must allege that [Barrick] or its officers benefitted in some concrete and personal way from the purported fraud.  Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute "motive" for purposes of this inquiry. . . . Alternatively, if Plaintiffs cannot make the "motive" showing, then they could raise a strong inference of scienter under the "strong circumstantial evidence" prong, though the strength of the circumstantial allegations must be correspondingly greater if there is no motive.[125]

Circumstances that may give rise to a strong inference of scienter include where the complaint sufficiently alleges that the defendants "knew facts or had access to

---

[124]   *Id.* ¶¶ 55–56.

[125]   *ECA*, 553 F.3d at 198–99 (internal quotations and citations omitted).

information suggesting that their public statements were not accurate . . . ."[126] Because the cost and schedule estimates are protected under the PSLRA safe harbor, plaintiffs must allege actual knowledge — recklessness will not suffice.

Here, plaintiffs allege no plausible motive to make fraudulent misstatements. Plaintiffs argue that the defendants' motive was to obtain financing and shareholder approval to undertake the Project to "gamble that increasing gold prices would lift this infeasible Project into reality, along with their careers."[127] *First*, gambling on a risky project in the hope that external events will conspire to make it profitable does not constitute motive for the purposes of securities fraud — it is instead a desire for profits that is "common to most corporate officers."[128] *Second*, even assuming that a motive of career enhancement was sufficient, there are no facts alleged in the Complaint that would support plaintiffs' argument that

---

[126]   *Id.* at 199.

[127]   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Opp. Mem."), at 39–40.

[128]   *ECA*, 553 F.3d at 198. A risky gamble may, in some circumstances, rise to the level of recklessness that would satisfy the scienter requirement for statements not protected by the PSLRA safe harbor. *See In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 Civ. 7960, 2013 WL 144041, at *19 (S.D.N.Y. Jan. 14, 2013) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). However, this would establish — if properly supported by facts pleaded in the Complaint — circumstantial evidence of scienter, *not* motive for the purposes of securities fraud.

the individual defendants sought to advance their careers in this way.

In the absence of motive, plaintiffs must assert strong circumstantial evidence that defendants knew facts or had access to information that would suggest that their public statements were not accurate.  Here, the Bechtel Report fails to provide the requisite evidence.  This Report is merely an unsuccessful bid from a third-party contractor.  It is certainly *possible* that defendants knew that this bid was more accurate than the bid they ultimately accepted.  However, plaintiffs themselves provide the more plausible interpretation — the defendants wanted a firm with a lower proposal, and sought to find one.[129]  That they looked for an estimate that fit their preferred budget does not indicate their knowledge that a lower proposal was inaccurate.  Moreover, speculation from the Project Manager — who was not employed by Barrick until three to four years *after* the Bechtel Report was submitted — that Barrick "knew going into the Project what the real costs would be, but was worried that it would not be able to get financing," is just that — speculation.[130]  Weighing the competing inferences, the opposing inference of nonfraudulent intent is more compelling.[131]

---

[129]     *See* Compl. ¶ 56.

[130]     *See id.* ¶¶ 32, 56.

[131]     *See Tellabs*, 551 U.S. at 314.

Without the Bechtel Report, plaintiffs have *no* circumstantial evidence that would show that defendants knew or had access to information suggesting that their statements regarding the cost and production schedule of the Project were inaccurate at the start of the class period.  Without this Report, no facts suggest that the project was a "gamble" at the outset, or that defendants knew that the project was infeasible for the cost and schedule they reported to the public.

Beyond the Bechtel Report, plaintiffs rely on statements from internal confidential sources, such as the Project Manager and the Operations Manager, as well as other internal reports that suggest that the Project would not be able to be developed within the cost and time frame presented in public statements.  Plaintiffs allege that in May and June 2010, the Project Manager discussed with Potter that the timeframe and budget was "unrealistic," but was told "the budget was what is [sic] was, and the Project Manager had to deal with it."[132]  Then, in mid-October 2010, a Project Plan Report "concluded that the current estimate of $2.8 billion capital budget was infeasible within the Company's allotted 36-month time frame" and that "the timeline was at least 18 months too short."[133]  In July 2011, Barrick engaged a third-party consulting firm to conduct a "high-level audit of the original

---

[132]     Compl. ¶ 63.

[133]     *Id.*  ¶¶ 67, 69.

(2009 Estimate) and forecasted estimate (June 2011)."[134]  The T&T Report

concluded that the original estimate complied with typical Class III Barrick

standards, but that the forecast estimate required some adjustments.[135]  Also in July

2011, an internal report concluded that project reporting at Pascua-Lama suffered

from "'[s]ignificant inaccuracies, omissions and inconsistencies in monthly

reports'; '[c]ost [m]anagement [p]rocess weaknesses and inaccurate reporting'; and

'[r]isk [m]anagment [p]rocess weaknesses contributing to inaccurate reporting.'"[136]

These were repeated in the September 2011 Monthly Report and the January 2012

Monthly Report.[137]

      While these documents plausibly allege recklessness with regard to the

estimates and schedules Barrick reported to the public, they do not support a strong

inference that the estimates were announced with actual knowledge of their falsity,

as required for forward-looking statements.  Moreover, Barrick continually updated

the cost and schedule estimates with the public, raising the estimate in February

---

[134]    T&T Report, at 2.

[135]    *See id.*

[136]    Compl. ¶ 80; July 2011 Monthly Report, Ex. 27 to Greenfield Decl., at 2–3.

[137]    *See* Compl. ¶¶ 80–81; September 2011 Monthly Report, Ex. 28 to Greenfield Decl., at 3–4; January 2012 Monthly Report, Ex. 29 to Greenfield Decl., at 3–4.

2011 to $3.3-$3.6 billion, and raising it again in July 2011 to $4.7-5.0 billion.  This raises a strong inference that Barrick was continually investigating and relaying updated information to the public.  Indeed, the T&T report, while concluding that the methodology of the updated estimate had some flaws, ultimately stated that adjustments would be implemented and documented over the next four to six weeks.[138]  This supports the inference that Barrick was working to confirm that its estimates were accurate and to make corrections where needed.  Conducting reviews of estimates before releasing information to the public is "'a prudent course of action that weakens rather than strengthens an inference of scienter.'"[139]

Therefore, plaintiffs fail to allege facts that support a strong inference of actual knowledge that any of the cost and schedule estimates were false or misleading.  Because plaintiffs have not sufficiently alleged scienter, their claims based on cost and schedule estimates must be dismissed.

### 3.   Statements Regarding Environmental Approvals

#### a.   Material Misstatements

---

[138]   *See* T&T Report, at 1.

[139]   *Slayton*, 604 F.3d at 777 (quoting *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009)).  *Accord Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

Defendants first contend that plaintiffs have failed to allege facts that indicate that statements regarding environmental approvals were false when made. I disagree. *First*, there is no dispute that the statements are material.[140] *Second*, plaintiffs have alleged sufficient facts indicating that defendants' statements were false or misleading when made. Defendants stated that "the Pascua-Lama project . . . [is] not impacting the glaciers surrounding our operations" and that "we're in compliance with our permits and we're in compliance with the provincial legislation."[141] However, plaintiffs have alleged that defendants knew that Barrick

---

[140]   *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 252 (2d Cir. 2014) ("[A] reasonable investor could conclude that a substantial non-compliance would constitute a substantial threat to earnings.").

[141]   Compl. ¶¶ 303(b), 304 (quoting Barrick's October 28, 2010 earnings conference call). There are other examples of statements regarding environmental compliance. *See, e.g.*, *id.* ¶ 111 ("[T]he company has put in place a range of measures to mitigate the potential impact of dust emissions on glaciers."). Plaintiffs also cite Barrick's statement, repeated in numerous Forms 6-K, that Pascua-Lama had been "undertaken pursuant to existing environmental approvals" and that Barrick "ha[d] a comprehensive range of measures in place to protect [sensitive environmental] areas and resources." *See id.* ¶ 110. Defendants contend that this statement referred only to compliance with a new Argentinian federal law, and not to compliance with Chilean requirements. To support this argument, defendants have attached one Form 6-K, which does indeed support their contention. *See* October 2010 Form 6-K, Ex. 26 to Greenfield Decl., at 14. However, plaintiffs have alleged that this statement was continually repeated throughout the class period, and defendants have not provided context for any of the other instances when this statement was made. Without context, I cannot conclude that *every* repetition of this statement referred only to compliance with Argentinian law.

was violating its environmental commitments as early as April 2010.[142]  For example, one compliance commitment involved the need to keep the roads near the mine wet to prevent dust from being blown onto the nearby glaciers.[143]  As the Project did not have enough water to fulfill this obligation, the Project Manager identified compounds that could be used instead of water and did in fact use these compounds for a period of time.[144]  However, defendants concluded that the compounds were too expensive and refused to purchase them, which caused the Project to violate the environmental obligations that Barrick had agreed to.[145]  Because of this, Barrick was continuously fined.[146]  These facts, as well as many others in the Complaint,[147] sufficiently allege material misstatements regarding compliance with environmental commitments.

---

[142]      *See* Compl. ¶ 90.

[143]      *See id.*

[144]      *See id.*

[145]      *See id.*

[146]      *See id.*

[147]      *See, e.g.*, *id.* ¶¶ 93 (monthly reports showed dust-mitigation procedures were being violated), 94 (monthly reports stated that Barrick was failing to meet its water management system construction commitments), 97 (Field Engineering Manager stated Barrick disregarded obligation to treat contaminated water), 98 (breaching commitment to capture runoff water and changing engineering plans to cut costs without the government's consent), 101 (violating obligation to divert sedimentation on Argentinian side of the mine).

### b.    Scienter

Plaintiffs may satisfy the scienter requirement by showing either actual knowledge or recklessness.[148]  As discussed above, plaintiffs have failed to allege a plausible motive, but may demonstrate scienter by alleging strong circumstantial evidence.[149]  With regard to statements of environmental compliance, plaintiffs have met this burden.  Plaintiffs provide detailed allegations supporting a strong inference that defendants had access to information that directly contradicted their public statements that Barrick was complying with all environmental commitments.[150]  Based on the facts alleged, defendants had access to information in the form of monthly progress reports and statements from the Project Manager that the Project was not complying with applicable environmental regulations and commitments.  Nevertheless, defendants continued to state, in a variety of different ways, that the Project was compliant.  This raises a strong inference that is at least as compelling as any opposing inference of nonfraudulent intent that Barrick either knew that its statements were false, or was recklessly indifferent to that

---

[148]    *See South Cherry St., LLC*, 573 F.3d at 109.

[149]    *See ECA*, 553 F.3d at 199.

[150]    *See supra* n.147.

possibility.[151]

Plaintiffs have sufficiently alleged scienter with regard to the Individual Defendants and with regard to Barrick.  *First*, plaintiffs allege that all Individual Defendants had access to specific reports and statements that contradicted their public statements regarding environmental compliance.[152] Though plaintiffs have not alleged a motive, they have sufficiently alleged strong circumstantial evidence of conscious misbehavior or recklessness by pleading facts showing that defendants had access to information suggesting that their public statements were not accurate.[153]  *Second*, plaintiffs have sufficiently alleged scienter against Barrick.  Defendants argue that plaintiffs failed to allege scienter against Barrick because they fail to allege scienter against anyone whose intent could be imputed to the Company.  However, "the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual

---

[151]    *See Tellabs*, 551 U.S. at 314.

[152]    *See Teamsters Local 445 Freight Div. Pension Fund. v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (noting that plaintiffs must specifically identify the reports or statements containing contrary facts); Compl. ¶¶ 66 (Project Manager told Kinver and Potter that additional funds were needed to maintain compliance with environmental regulations), 79 (monthly progress reports circulated to Kinver and Gonzales, Barrick's Pascua-Lama team in Chile, and the Toronto office).

[153]    *See ECA*, 553 F.3d at 199.

defendant . . . ."[154]  Because I conclude that plaintiffs have sufficiently alleged

scienter on behalf of the Individual Defendants, it follows that the Complaint also

alleges scienter on behalf of Barrick with regard to statements about environmental

compliance.

### c.    Loss Causation

Defendants contend that plaintiffs have failed to adequately plead loss

causation with respect to the statements regarding environmental compliance,

because the risks that ultimately materialized had not been concealed.  Plaintiffs

point to two specific dates on which previously concealed risks related to

environmental compliance materialized: April 10, 2013 and May 24, 2013.  On

April 10, the media reported that an appeals court in Chile had issued an order

halting construction work on Pascua-Lama and Barrick faced as much as $10.2

million in fines for failing to comply with environmental rules.[155]  The stock price

dropped approximately 8.4%.[156]  Similarly, on May 24, the media reported that

Chile's Environmental Superintendent had issued a resolution suspending the

Project pending compliance with an environmental permit, and imposed a fine of

---

[154]    *Teamsters*, 531 F.3d at 195.

[155]    *See* Compl. ¶ 130.

[156]    *See id.* ¶ 226.

sixteen million dollars.[157]  One article reported that Chile's environmental regulator had identified twenty-three violations and that Barrick had admitted to all but one.[158]  Barrick's stock fell two percent, despite the fact that Barrick had suspended trading for approximately three hours.[159]

Defendants argue that neither of these disclosures satisfy loss causation because the risks that materialized were not concealed.  Barrick warned in publicly filed documents that plaintiffs in the Chilean actions alleged non-compliance with the environmental approvals which resulted in negative impacts on water sources and the risk of contamination.[160]  Barrick further stated that the Chilean plaintiffs sought suspension of construction until all environmental obligations were fulfilled.[161]  Because these were the very risks that materialized in the April 10 and May 24 disclosures, defendants argue that they were not concealed, and therefore these disclosures do not satisfy loss causation.

The Second Circuit has described the materialization of the risk concept as following:

---

[157]   *See id.* ¶ 227.

[158]   *See id.*

[159]   *See id.* ¶ 229.

[160]   *See* November 2012 Form 6-K, Ex. 15 to Greenfield Decl., at 71.

[161]   *See id.*

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.[162]

Plaintiffs have met their burden here. Although Barrick did warn of the risk of the specific litigation that resulted in the April 2013 injunction and the possible consequences of that litigation, defendants' alleged misstatements regarding environmental compliance meant that investors could not accurately weigh that risk. The risk that caused the loss — the successful Chilean litigation — was within the "'zone of risk *concealed* by the misrepresentations.'"[163] In other words, because Barrick assured investors that it was complying with all environmental commitments, plaintiffs may have been aware of the Chilean litigation but "perceived [it] as remote or highly unlikely."[164] Had Barrick not made the alleged misstatements regarding environmental compliance, a reasonable investor may have taken the Chilean litigation and the risk of suspension of the Project construction

---

[162] *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir. 2001).

[163] *See In re Omnicom*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[164] *Castellano*, 257 F.3d at 188.

40

much more seriously.[165]   Therefore, plaintiffs have sufficiently alleged loss

causation with regard to statements relating to environmental compliance.

### 4.   Statements Regarding Internal Controls and Accounting for Capital Costs

Internal controls are the processes Barrick was required to design and

maintain to provide reasonable assurance regarding the achievement of objectives,

including "(i) effectiveness and efficiency of operations; (ii) reliability of financial

reporting and disclosures; and (iii) compliance with applicable laws and

regulations."[166]   Under the Sarbanes-Oxley Act of 2002 Sections 302 and 404,

---

[165]   Defendants also allege that these disclosures do not relate to dust mitigation, and therefore plaintiffs have failed to plead loss causation for the related misstatements.  Whether the Chilean litigation addressed the dust mitigation issue is a question of fact that can only be answered with a full record. At this stage, plaintiffs have alleged that the April and May 2013 disclosures related to wide-ranging breaches of environmental requirements and nothing in the Complaint (or the documents attached by defendants that were incorporated into the Complaint) shows that these allegations are incorrect.

Finally, defendants argue that plaintiffs have failed to disaggregate losses due to misstatements as opposed to other industry-wide factors or company-specific news.  For the two disclosure dates at issue here, this argument fails. Defendants point to only the steep decline in the price of gold that occurred during the second quarter of 2013 as a factor that could have contributed to Barrick's falling stock price.  However, plaintiffs need not, at this stage, provide detailed evidence attributing an exact portion of the fall in the stock price to the misstatements.  Rather, plaintiffs need only "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss" to Barrick's misstatements.  *Lattanzio*, 476 F.3d at 158.  Plaintiffs have met that burden here.

[166]   Compl. ¶ 154 (citing Committee of Sponsoring Organizations of the Treadway Commission, "Internal Control Integrated Framework," Ch. 1

Regent, Sokalsky, and Al-Joundi certified with the SEC that Barrick had effective internal controls, and were obligated to report any significant changes to Barrick's internal controls and any other factors that could impact Barrick's internal controls.[167]

Plaintiffs have alleged numerous deficiencies in the reporting structure for Pascua-Lama. For example, Barrick's July 2011 Risk Exposure Report concluded that controls at Pascua-Lama suffered from "[i]naccurate reporting of deliverables/failure to adequately monitor progress" and "[n]o formal system in place for scope/change management."[168] Also beginning in July 2011, monthly reports for Pascua-Lama were circulated internally.[169] The July 2011 Monthly Progress Report concluded that project reporting at Pascua-Lama suffered from "'[s]ignificant inaccuracies, omissions and inconsistencies in monthly reports'; '[c]ost [m]anagement [p]rocess weaknesses and inaccurate reporting'; and '[r]isk [m]anagment [p]rocess weaknesses contributing to inaccurate reporting.'"[170] These were repeated in the September 2011 Monthly Report and the January 2012

---

"Definitions").

[167]    See id. ¶ 155.

[168]    Id. ¶ 78.

[169]    See id. ¶ 79.

[170]    Id. ¶ 80; July 2011 Monthly Progress Report, at 2–3.

Monthly Report.[171]  However, during this period, Barrick stated that "[b]ased on Barrick management's assessment, Barrick's internal control over financial reporting is effective."[172]  Regent, Sokalsky, and Al-Joundi certified through this period that, based on each defendant's knowledge, the filed report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading . . . ."[173]  The defendants also certified that they "[d]isclosed . . . [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information . . . ."[174]

Defendants argue that plaintiffs' claims regarding internal controls fail because (1) plaintiffs have alleged only project-level issues that do not constitute a material weakness at the company level, and (2) plaintiffs allege no facts indicating that the officers who signed the certifications knew of any material weakness in the Company's internal controls.

---

[171]   *See* Compl. ¶¶ 80–81; September 2011 Monthly Progress Report, at 3–4; January 2012 Monthly Progress Report, at 3–4.

[172]   Compl. ¶ 166.

[173]   *Id.* ¶ 420.

[174]   *Id.*

*First*, the project-level issues identified by plaintiffs are significant enough to support a claim of a material weakness in internal controls at the company level.  Plaintiffs rely upon several internal Barrick documents that discuss serious weaknesses in internal controls at Pascua-Lama.  Plaintiffs also allege numerous statements by defendants that Pascua-Lama was a "key priority," a "flagship project," and one that is "expected to have a significant impact on [Barrick's] future production, cash, costs, and earnings."[175]  In 2011, Barrick spent $1.1 billion on the Project, more than twice its expenditures on any other project and nearly sixty-five percent of its total project capital expenditures.[176]  Thus, plaintiffs have alleged that expenditures on the Project formed a significant portion of Barrick's total company-wide capital expenditures during the class period.  In light of this, a weakness in internal controls at the project level could lead to a material weakness in internal controls at the company level.

*Second*, while defendants correctly note that a certification of internal controls and financial statements can give rise to a securities fraud claim only where the underlying financial forms contained material misstatements and defendants had

---

[175]     *Id*. ¶ 200.

[176]     *See id.* ¶ 201.

44

knowledge of those misstatements, plaintiffs have met that burden here.[177]   As

discussed above, plaintiffs have alleged that the filings contained misstatements in

failing to disclose material weaknesses in internal controls.  Defendants'

certifications, therefore, are materially false if they knew of those misstatements.

Plaintiffs have alleged numerous internal reports beginning in July 2011 that

discussed the weakness of internal controls at Pascua-Lama, and have alleged that

all defendants, including Regent, Sokalsky, and Al-Joundi, knew or had access to

the information included in those reports.[178]   As Pascua-Lama was a significant

project for Barrick, it is reasonable to conclude that all defendants knew the

information that these reports contained — or at the very least were reckless if they

failed to read these reports before certifying a lack of material weakness in internal

controls.

Regarding loss causation, plaintiffs have alleged eight specific dates on

which, in response to disclosures, Barrick's share price dropped as the truth

concealed by defendants' misstatements began to emerge.[179]   In particular, on July

---

[177]     *See*  Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Def. Mem."), at 22 (quoting *In re Scottish Re Grp. Sec. Litig*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007)).

[178]     *See supra* nn.168–171.

[179]     *See* Compl. ¶¶ 209–239.

26, 2012, Barrick disclosed a fifty to sixty percent increase in capital costs and

production estimates, and CEO Sokolsky stated that "overall project management

structure let us down."[180]  The same day, *Bloomberg* reported that an analyst

described the cost increase as "outrageous" and indicative of "a lack of controls."[181]

Another analyst report linked the cost increase with Regent's termination as CEO

six weeks earlier, stating, "[i]n hindsight, market suspicions that Aaron Regent's

dismissal was about more than was revealed by the company have proved valid."[182]

That day, Barrick's stock dropped approximately 3.2% with heavy trading

volume.[183]  Contrary to defendants' argument that "none of the statements or events

alleged to have caused a decline in stock price revealed any concealed information"

related to internal controls,[184] plaintiffs have specifically identified the July 26,

2012 disclosure as relating to a weakness in internal controls.  Furthermore, the

other disclosures similarly reveal cost escalation and production delays that

plausibly expose the previously concealed risk of material weaknesses in Barrick's

---

[180]   *Id.* ¶¶ 117, 119.

[181]   *Id.* ¶ 216.

[182]   *Id.* ¶ 121.

[183]   *See id.* ¶ 217.

[184]   Def. Mem. at 41.

internal controls.[185]

Finally, defendants argue that plaintiffs' claims of improper accounting for Pascua-Lama's capital costs and failure to evaluate Pascua-Lama's impairment must be dismissed because (1) plaintiffs failed to plead facts demonstrating that defendants knew or believed that Pascua-Lama would not generate future economic benefits in excess of the costs of the Project; and (2) plaintiffs fail to allege facts suggesting that the asset impairment analyses were performed inadequately. With regard to accounting, plaintiffs allege that "[t]hroughout the Class Period, Defendants were aware that Pascua-Lama was not economically feasible given the size of the Project, the inherent logistical challenges of the Project, and the applicable and necessary environmental commitments."[186] As such, Barrick "should not have calculated the Project as an asset on its balance sheet. Instead, the Project expenses should have been expensed as costs when incurred."[187] To the extent that plaintiffs rely on the Bechtel Report for their conclusion that Barrick knew at the outset that their capital investment in the Project would not be recoverable, their claim fails. The Bechtel Report does not support an inference

---

[185]    *See id.* ¶¶ 210–239.

[186]    *Id.* ¶ 191.

[187]    *Id.* ¶ 192.

that defendants knew of, or recklessly disregarded, an obvious risk that the Project would never be profitable.  As discussed above, the Bechtel Report is merely a third-party bid and defendants did not act recklessly in searching for a lower bid. However, plaintiffs have sufficiently alleged that there came a time during the Class Period on or after July 2011 that defendants either knew or recklessly disregarded the risk that their capital investment in Pascua-Lama might not be recoverable because of a material weakness in the Project's internal controls.[188]

Similarly, plaintiffs allege that Barrick's internal controls were so inadequate that defendants did not have a reasonable basis to evaluate whether an impairment of the Project had occurred.  Specifically, the Complaint alleges that "the Company had failed to disclose [potential indicators of impairment] and failed to conduct a proper impairment analysis when those indicators arose; and [] additional impairment indicators could have existed at Pascua-Lama prior to 2013, but a material weakness in the Company's internal controls compromised Defendants' ability to assess Pascua-Lama's impairment indicators."[189]  As defendants were obligated to analyze the impairment of an asset in the presence of

---

[188]     *See id.* ¶ 169.

[189]     *Id.* ¶ 181.

48

potential indicators of impairment,[190] the failure to assess an impairment before 2013 was an omission of a material fact.  The same analysis regarding scienter and loss causation discussed above is applicable here, and therefore plaintiffs have sufficiently stated a claim related to statements and omissions regarding accounting.

> ### B.      Control Person Liability Under Section 20(a)

Defendants first contend that the Section 20(a) claim should be dismissed because plaintiffs have failed to allege a primary violation of Section 10(b).  As discussed above, plaintiffs have adequately pleaded a Section 10(b) violation with regard to statements relating to environmental compliance. Defendants also argue that the Section 20(a) claim should be dismissed with regard to Kinver, Potter, and Gonzales because plaintiffs failed to plead that these defendants had actual control over the wrongdoer.  Defendants further contend that plaintiffs have failed to plead facts showing culpable participation as to any of the Individual Defendants.  Finally, defendants argue that the Section 20(a) claim should be dismissed with regard to Veenman because plaintiffs have not alleged that she participated in the alleged fraud in any way.

The Complaint alleges the high-level positions of the individual

---

[190]      *See id.* ¶ 178.

defendants and Veenman during the class period.[191]  It details the involvement of the Individual Defendants in the alleged fraud and alleges that the Individual Defendants and Veenman acted as controlling persons of Barrick.[192]  Plaintiffs have therefore adequately pleaded that the Individual Defendants had actual control. With regard to Veenman, plaintiffs have alleged facts regarding her position at Barrick and that she signed and filed false and misleading SEC filings and Company statements.[193]  While "a mere recitation of [her] title . . . is not sufficient, . . . [i]t comports with common sense to presume that a person who signs [her] name to a report has some measure of control over those who write the report."[194]

Thus, the remaining question is whether this claim should be dismissed as to the Individual Defendants and Veenman on the ground that the Complaint does not plead culpable participation.  It remains unsettled in this District whether control person liability is premised on fraud, and thus whether culpable participation requires proof of scienter.[195]  These issues in turn impact whether Rule

---

[191]    *See* Compl. ¶¶ 22–27, 29.

[192]    *See id.* ¶ 89–115, 546.

[193]    *See id.* ¶ 29.

[194]    *In re Alstom SA*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) (internal quotations omitted).

[195]    *See generally Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("While district

8, Rule 9(b), and/or the heightened pleading requirements of the PSLRA apply.  I

have previously held that scienter is not an essential element of a Section 20(a)

claim and that neither Rule 9(b) nor the PSLRA apply,[196] and I continue to adhere to

this view.

        The Complaint adequately pleads participation on the part of the

Individual Defendants.  Plaintiffs allege numerous misstatements regarding

environmental compliance and generally allege that the Individual Defendants knew

and participated in the fraud.[197]  With regard to Veenman, the allegations are sparse,

but nevertheless suffice to allege that, as the person who signed the statements and

SEC filings, she participated in the fraud.  These allegations are sufficient to state a

---

courts tend to frame the debate as whether 'culpable participation' is a required
element of a Section 20(a) claim, the debate is more properly understood as a
disagreement over the *meaning* of culpable participation.") (quotation marks and
citations omitted) (emphasis in original); *see also id.* at 437 ("[D]istrict courts
within the Second Circuit disagree on the question of whether Section 20(a)
plaintiffs must also allege 'culpable participation' as a third element of their claim,
or, alternatively, whether Section 20(a) created a burden-shifting framework where
plaintiffs must only plead a primary Section 10(b) violation and control, with
defendants allowed to raise a good faith defense in their answer that can later be
rebutted by plaintiffs.") (quotation marks omitted); *In re Parmalat Sec. Litig.*, 414
F. Supp. 2d 428, 440–41 (S.D.N.Y. 2006).

[196]    *See Carpenters Pension Trust Fund of St. Louis, St. Clair Shores
Police & Fire Ret. Sys. v. Barclays PLC*, No. 12 Civ. 5329, 2014 WL 5334053, at
*7 n.75 (S.D.N.Y. Oct. 20, 2014).

[197]    *See* Compl. ¶¶ 89–115.

claim against the Individual Defendants and Veenman under Section 20(a).

### C.    Non-Domestic Transactions

Plaintiffs argue that their Section 10(b) claim applies to all transactions in Barrick's stock that is registered and listed on the NYSE, irrespective of whether the transaction occurred in the United States or abroad.  However, the Second Circuit has squarely held that "*Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange."[198]  Thus, plaintiffs' claims related to transactions conducted on the Toronto Stock Exchange must be dismissed.

### D.    Leave to Amend

Plaintiffs have not requested leave to amend, and it is difficult to believe that plaintiffs will be able to plead additional facts that are not already included in their almost 200-page, 548-paragraph Complaint.  Nevertheless, leave to amend should be freely given "when justice so requires."[199]  Therefore, I grant plaintiffs leave to amend if they can correct the deficiencies noted in this Opinion in

---

[198]    *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010)).

[199]    Fed. R. Civ. P. 15(a)(2).

compliance with their obligations under Rule 11.  Any repleading must be made within thirty days of the date of this Order.

## VI.    CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED in part and DENIED in part.  The Clerk of the Court is directed to close this motion (Docket No. 55).  A conference is scheduled for May 4, 2015 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 1, 2015

**- Appearances -**

**For Plaintiffs**:

Christopher F. Moriarty, Esq.
David P. Abel, Esq.
James M. Hughes, Esq.
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9450

William H. Narwold, Esq.
Motley Rice LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1676

Jonathan M. Plasse, Esq.
Serena Pia Hallowell, Esq.
Christopher J. Keller, Esq.
Joel H. Bernstein, Esq.
Jonathan Gardner, Esq.
Labaton Sucharow
140 Broadway
New York, NY 10005
(212) 907-0700

Brian P. Murray, Esq.
Glancy Binkow & Goldberg LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
(212) 682-5340

Gregory B. Linkh, Esq.
Glancy Binkow & Goldberg LLP
77 Water Street, 7th Floor

New York, NY 10005
(646) 722-4180

Lionel Z. Glancy, Esq.
Michael Goldber, Esq.
Robert V. Prongay, Esq.
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 201-9160

Ira M. Press, Esq.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 371-6600

Jeffrey A. Barrack, Esq.
Barrack, Rodos & Bacine
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 963-0600

**For Defendants:**

Ada Fernandez Johnson, Esq.
Jonathan Rosser Tuttle, Esq.
Debevoise & Plimpon LLP
555 13th Street, N.W.
Washington, DC 20004
(202) 383-8070

Bruce E. Yannett, Esq.
Elliot Greenfield, Esq.
Debevoise & Plimpton LLP

919 Third Avenue, 31st Floor
New York, NY 10022
(212) 909-6000