UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re BARRICK GOLD SECURITIES LITIGATION | : : : | Civil Action No. 1:13-cv-03851-SAS <u>CLASS ACTION</u> |
| | : : | |
| This Document Relates To: | : : | <u>ECF Case</u> |
| ALL ACTIONS. | : : | |
| | x | |

**DECLARATION OF JAMES M. HUGHES IN SUPPORT OF
LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND
LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES
AND PAYMENT OF LITIGATION EXPENSES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.      PRELIMINARY STATEMENT:  THE SIGNIFICANT RECOVERY ACHIEVED .................. 2

II.     FACTUAL SUMMARY OF THE CLAIMS ............................................................ 5

III.    RELEVANT PROCEDURAL HISTORY ............................................................... 8

        A.    Initial Complaints And Appointment Of Lead Plaintiffs ................... 8

        B.    The Complaint And Motion To Dismiss ........................................... 8

        C.    Defendants' Motion For Reconsideration And Veenman's Motion For
              Interlocutory Appeal .................................................................... 11

        D.    Fact Discovery ............................................................................. 12

        E.    Discovery Propounded On Lead Plaintiffs ..................................... 15

        F.    Non-Party Discovery .................................................................... 16

        G.    Discovery Disputes ....................................................................... 17

        H.    International Discovery Efforts ...................................................... 18

        I.    Expert Discovery .......................................................................... 19

        J.    Lead Plaintiffs' Motion To Certify The Class ................................ 20

IV.     SETTLEMENT NEGOTIATIONS ..................................................................... 20

V.      RISKS OF CONTINUED LITIGATION ............................................................. 21

        A.    Risks Concerning Establishing Liability Of Defendants ................. 23

              1.    Risks Concerning Falsity of Alleged Misstatements ............... 23

              2.    Risks Concerning Materiality ................................................ 26

              3.    Risks Concerning Scienter .................................................... 26

        B.    Risks Concerning Loss Causation And Damages ............................ 28

        C.    Risks Concerning Delineation Of The Class Period ........................ 32

        D.    Jury And Trial Risk ...................................................................... 33

VI.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER AND CLASS REACTION TO DATE ...................................................... 34

VII.    PLAN OF ALLOCATION ............................................................................. 36

VIII.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES ........... 37

        A.    Lead Plaintiffs Support The Fee And Expense Application .............. 38

        B.    The Risks And Unique Complexities Of The Litigation ................... 39

        C.    The Significant Time And Labor Devoted To The Litigation ............ 41

|     | D.  | The Quality Of Lead Plaintiffs' Counsel's Representation And Their Standing And Expertise | 44 |
|     | E.  | Standing And Caliber Of Defense Counsel | 46 |
| IX. | | Request For Payment Of Litigation Expenses | 46 |
| X.  | | The Reaction Of The Class To The Fee And Expense Application | 48 |
| XI. | | Miscellaneous Exhibits | 49 |
| XII.| | Conclusion | 49 |
| CERTIFICATE OF SERVICE | | | 50 |

## TABLE OF AUTHORITIES

**CASES**

*Anixter v. Home-Stake Production Co.*,
77 F.3d 1215 (10th Cir. 1996) ................................................................. 40

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ......................... 32

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................ 28

*Glickenhaus & Co. v. Household International, Inc.*,
787 F.3d 408 (7th Cir. 2015) ................................................................... 41

*Hicks v. Morgan Stanley & Co.*,
No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005) ................ 2

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ................................................................. 40

*In re Apollo Group, Inc. Securities Litigation*,
No. CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008),
*rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010),
*cert. denied*, *Apollo Group, Inc. v. Policemen's Annuity & Benefit Fund of Chicago*,
562 U.S. 1270 (2011) .............................................................................. 40

*In re Ikon Office Solutions, Inc. Securities Litigation*,
194 F.R.D. 166 (E.D. Pa. 2000) ............................................................... 23

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ..................................................... 38

*In re Security Capital Assurance, Ltd. Securities Litigation*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) ..................................................... 28

*Robbins v. Koger Properties, Inc.*,
116 F.3d 1441 (11th Cir. 1997) ............................................................... 40

*Ward v. Succession of Freeman*,
854 F.2d 780 (5th Cir. 1988) ................................................................. 40

I, JAMES M. HUGHES, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Motley Rice LLC ("Motley Rice"), Court-appointed Lead Counsel for LRI Invest S.A. ("LRI") and Union Asset Management Holding AG ("Union") (together, "Lead Plaintiffs") and the certified Class in this securities class action (the "Action").[1]  I am familiar with the proceedings in this Litigation and have personal knowledge of the matters set forth herein based upon my firm's close supervision and active participation in the Litigation.  If called as a witness, I could and would testify competently thereto.

2.      The purpose of this declaration is to set forth the background of the Litigation, its procedural history, and the negotiations that led to the proposed Settlement with Barrick Gold Corporation ("Barrick" or the "Company"), Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George Potter, and Sybil E. Veenman (the "Individual Defendants," and, with Barrick, the "Defendants").  This declaration demonstrates why the Settlement is fair and reasonable and should be approved by the Court, why the proposed Plan of Allocation is reasonable, and why the application for attorneys' fees and expenses is reasonable and should be approved by the Court.

3.      The Settlement will resolve all claims asserted in the Litigation against Defendants on behalf of the Class previously certified by the Court, which consists of:  all persons and entities who purchased Barrick publicly traded common stock on the New York

---

[1]      All capitalized terms not otherwise defined herein have the same meaning as those set forth in the Amended Stipulation of Settlement, dated June 9, 2016 (the "Stipulation").  ECF No. 167-1.  Citations to "Ex. _" herein refer to exhibits to this declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. _-_."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second reference refers to the exhibit designation within the exhibit itself.

Stock Exchange from May 7, 2009, through and including November 1, 2013.[2]  ECF No. 152 at 31.  The Court preliminarily approved the Settlement by Order entered June 15, 2016 (the "Preliminary Approval Order").  ECF No. 169.

## I.   PRELIMINARY STATEMENT:  THE SIGNIFICANT RECOVERY ACHIEVED

4.   After nearly three years of vigorously contested litigation, Lead Plaintiffs and Lead Plaintiffs' Counsel have succeeded in obtaining a recovery for the Class in the amount of $140 million in cash, which has been deposited in an interest-bearing escrow account for the benefit of the Class.  The Settlement provides a very favorable result for the Class, which faced the genuine possibility of a much smaller recovery or no recovery at all had the case continued to summary judgment or trial.  As set forth in the Stipulation, in exchange for the Settlement Amount, the proposed Settlement resolves all claims asserted, or that could have been asserted, by Lead Plaintiffs and the Class against the Released Defendant Parties.

5.   Based on Lead Plaintiffs' expert's analyses, under a best-case scenario in which a jury credited all of Lead Plaintiffs' loss causation evidence and the Class Period was upheld in its entirety, the maximum damages in the Litigation with no disaggregation applied (i.e., 100% of each alleged corrective disclosure was applied) were $3.987 billion.  The Settlement accordingly translates to a recovery of approximately 3.51% of maximum provable damages, assuming that liability were established.  *See, e.g., Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *19 (S.D.N.Y. Oct. 24, 2005) (finding settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness).

---

[2]   Excluded from the Class are:  (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) all subsidiaries and affiliates of Defendants, including Barrick's employee retirement and benefit plans; (d) any person who was a Barrick director or officer during the Class Period, as well as their liability insurance carriers, assigns, or subsidiaries thereof; (e) any entity in which any Defendant has a controlling interest; and (f) the legal representatives, heirs, successors, or assigns of any excluded party.  *See* ECF No. 152 at 31-32.

6.      However, based on the Court's order on the motion to dismiss, which provided that "Plaintiffs have alleged numerous internal reports beginning in July 2011 that discussed the weakness of internal controls at Pascua-Lama," Op. & Order at 45, ECF No. 76, Defendants have argued, and would be expected to continue to argue, that the Class Period should start no earlier than July 2011.  If this argument prevailed, the maximum damages with no disaggregation applied would be $2.518 billion, which would amount to a recovery of approximately 5.56%. Further, Defendants would undoubtedly argue that Plaintiffs would have to disaggregate the confounding, non-fraud-related information revealed contemporaneously with the corrective disclosures.  Indeed, Judge Scheindlin held as much when she noted that "[s]everal of the identified disclosures relate, at least in part, to statements regarding cost and schedule estimates that are no longer [t]he basis of any claims in this case."  Op. & Order at 2 n.6, ECF No. 152. Disaggregating confounding non-fraud related information would reduce damages to $1.496 billion for the as-pleaded Class Period and to $1.040 billion for the potential shortened class period; this would result in a recovery of approximately 9.36% and 13.46%, respectfully.

7.      The Settlement exceeds other recent settlements in absolute terms.  More specifically, the percentage of recovery here (3.51% to 13.46%) exceeds that in median settlements within in the Second Circuit from 2006 through 2015 (2.3%).  *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2015 Review and Analysis* at 22, fig.21 (Cornerstone Research 2016) (attached hereto as Ex. 1).  The $140 million Settlement is also significantly greater than the average settlement amount of $37.9 million in 2015 and far greater than the median settlement amount of $6.1 million in 2015.  *Id*. at 6, fig.5.

8.      As discussed below, Lead Plaintiffs obtained this recovery for the Class despite the significant challenges inherent in complex securities class actions generally, and the case-

specific hurdles they faced in prosecuting the Litigation against Defendants.  The Parties were less than six months away from summary judgment and less than seven months away from the pre-trial conference when they reached an agreement-in-principle to settle.  The outcome of summary judgment and a jury trial, especially in a highly complex case such as this one, can never be predicted with reasonable certainty.  Even if Lead Plaintiffs prevailed at summary judgment and trial, there is no assurance that they would have recovered an amount equal to, let alone greater than, the proposed Settlement Amount.  Moreover, any such recovery following a trial could be further delayed by years of appellate practice.

9.    Lead Plaintiffs not only had a clear understanding of the practical considerations confronting them, but at the time the Settlement was agreed to, also understood the strengths and weaknesses of the claims through Lead Plaintiffs' Counsel's investigation and prosecution of the case.  Over the course of nearly three years, Lead Plaintiffs' Counsel engaged in comprehensive and vigorous litigation efforts in which they, *inter alia*:  (i) conducted a thorough pre-trial investigation into the Class's claims; (ii) drafted a detailed consolidated class action complaint; (iii) successfully opposed Defendants' motion to dismiss the complaint; (iv) defeated Defendants' motion for reconsideration and Defendant Veenman's motion to certify the motion to dismiss order for appeal pursuant to 28 U.S.C. § 1292(b); (v) engaged in extensive fact and expert discovery; (vi) successfully moved for class certification; and (vii) participated in three arm's-length mediation sessions.

10.    Between July 2015 and April 2016, the Parties engaged in various efforts to explore whether the Litigation could be settled, including in-person meetings and other communications among counsel.  The Settlement was accomplished through arm's-length

settlement discussions facilitated by former United States Attorney and former federal District Judge, Layn R. Phillips (Ret.) ("Judge Phillips"), a well-respected and experienced mediator.

11.     The Settlement has the full support of the Lead Plaintiffs, as set forth in the Declaration of René Thiel on behalf of LRI (attached hereto as Ex. 2) and the Declaration of Dr. Carsten Fischer and Dr. Fabian Hannich on behalf of Union (attached hereto as Ex. 3).

12.     For all of the reasons set forth herein, including the excellent result obtained and the significant litigation risks, I respectfully submit that the Settlement and Plan of Allocation are fair and reasonable in all respects, and that the Court should approve them pursuant to Federal Rule of Civil Procedure Rule 23(e).  For similar reasons, and for the additional reasons set forth in Sections VIII through IX below, I respectfully submit that Lead Counsel's request for attorneys' fees and payment of litigation expenses is also fair and reasonable, and should be approved.

## II.     FACTUAL SUMMARY OF THE CLAIMS

13.     Lead Plaintiffs' claims arose from Defendants' allegedly false and misleading statements concerning Barrick's proposed flagship new mine – Pascua Lama – that was to be built in the Andes Mountains, on the border between Argentina and Chile.  Lead Plaintiffs allege that between May 7, 2009, through November 1, 2013, inclusive (the "Class Period"), Defendants made materially false and misleading statements concerning Barrick's Pascua-Lama Project – one of the world's largest untapped gold mines.  Lead Plaintiffs generally allege that Defendants made false and misleading statements by, among other things:  (i) stating that the Pascua-Lama mine would be a "low cost" mine; (ii) assuring investors that Pascua-Lama would completed at the cost and in accordance with the schedule provided to the market; (iii) informing investors that construction of the Pascua-Lama Project was being undertaken in compliance with applicable Argentinian and Chilean environmental regulations, while knowing it was not;

(iv) misrepresenting the adequacy of internal financial and reporting controls such that they had no reasonable basis for statements estimating the Pascua-Lama Project's completion costs and first gold production; and (v) lacking a reasonable basis for their capital cost and accounting estimates.[3]

14.     The Class Period begins on May 7, 2009, when Defendants issued a press release announcing that the Pascua-Lama Project would proceed to construction at a cost estimate of $2.8-3.0 billion, and that first gold production was expected in early 2013.

15.     Throughout the Class Period, at the same time that Defendants were publicly representing that the Pascua-Lama mine would be completed on time, for the cost stated, and in compliance with applicable environmental regulations, Defendants allegedly knew that Barrick lacked sufficient internal controls to support the cost and scheduling figures released to the market and that the Pascua-Lama Project was, in fact, not in compliance with applicable environmental regulations.

16.     For example, Defendants represented that they were undertaking the Pascua-Lama Project "pursuant to [the] existing environmental approvals," and were implementing a "comprehensive range of measures in place to protect" the surrounding glaciers and water supply, and "implement[ing]" requirements associated with "glacier protection as mandated in the project's environmental approval by Chilean authorities." Compl., ECF No. 50, ¶¶ 70, 362. On April 10, 2013, however, Barrick announced that a Chilean court had issued a preliminary injunction suspending construction on the Chilean side of the mine because of violations of applicable environmental regulations. *Id.* ¶¶ 130-31. In response, Lead Plaintiffs alleged that

---

[3]     As described *infra*, the Court dismissed Lead Plaintiffs' allegations regarding (i) and (ii).

this news caused the Company's stock price to decline from $26.69 per share on April 9, 2013, to $24.46 per share on April 10, 2013, a decline of approximately 8.4%.  *Id.* ¶ 133.

17.     On May 24, 2013, Chile's Environmental Superintendent (Superintendencia del Medio Ambiente) issued a resolution suspending the Pascua-Lama Project pending compliance with an environmental permit, and imposing a fine equivalent to $16 million – the maximum penalty possible under Chilean law.  *Id.* ¶ 137.   Authorities concluded that Barrick had committed "'very serious' violations of its environmental permit as well as a failure by the company to accurately describe what it had done wrong."  *Id.* ¶ 139.  Barrick admitted to 22 of the 23 violations.  *Id.* ¶¶ 137-38.  Ultimately, the regulators "found that the acts [Defendants] described weren't correct, truthful or provable."  *Id.* ¶ 138.  In response, Lead Plaintiffs alleged that Barrick's stock price dropped from $19.55 per share on May 23, 2013, to $19.16 per share on May 24, 2013.  *Id.* ¶ 140.

18.     In addition to making allegedly false and misleading statements concerning the Company's compliance with applicable environmental regulations, Defendants allegedly falsely assured investors throughout the Class Period that Barrick's internal controls were adequate and the Company's accounting for capital costs in connection with the construction of Pascua-Lama were accurate.  Lead Plaintiffs maintained that Defendants consistently received information, including monthly progress reports, concerning the increasing cost and time required to complete construction of Pascua-Lama that was not fully revealed to the market and that demonstrated that the Company's internal controls were deficient and the accounting for capital costs unreliable.

19.     On June 28, 2013, the Company issued a press release detailing that it had taken a substantial impairment charge of $4.5-5.5 billion – almost its entire investment in the Pascua-Lama Project – and that production had been pushed back again to mid-2016, from the

previously revised expectation of late 2014. *Id.* ¶ 141. On October 31, 2013, the last day of the Class Period, Barrick announced that it would not pursue construction at Pascua-Lama upon environmental approval, but instead was indefinitely suspending construction at the mine, except for activities required for environmental protection and regulatory compliance. *Id.* ¶ 148. As a result, the Company's stock price fell from $20.50 per share on October 30, 2013, to $19.39 per share on October 31, 2013, a drop of approximately 5.4%. *Id.* ¶ 150. The next day, the slide continued as Barrick's stock price dropped from $19.39 per share on October 31, 2013, to $18.01 per share on November 1, 2103, a decline of approximately 7.1%. *Id.* ¶ 151.

## III.   RELEVANT PROCEDURAL HISTORY

### A.   Initial Complaints And Appointment Of Lead Plaintiffs

20.     The initial complaints in this action were filed on June 5, 2013, June 14, 2013, and August 2, 2013, in the U.S. District Court for the Southern District of New York, on behalf of purchasers of Barrick common stock during the period May 7, 2009, through May 23, 2013.

21.     On August 5, 2013, LRI and Union moved for appointment as lead plaintiffs and requested that their counsel, Motley Rice, be appointed lead counsel, and Labaton Sucharow LLP ("Labaton Sucharow") be appointed as liaison counsel. *See* ECF Nos. 15, 19-20. Five other shareholder groups also moved for lead plaintiff.

22.     After the lead plaintiff movants had fully briefed their positions, on September 20, 2013, the Court appointed LRI and Union as lead plaintiffs and approved their selection of Motley Rice as lead counsel and Labaton Sucharow as liaison counsel to represent the putative class. ECF No. 36.

### B.   The Complaint And Motion To Dismiss

23.     On December 12, 2013, Lead Plaintiffs filed the Consolidated Amended Class Action Complaint (the "Complaint"). ECF No. 50. The Complaint alleged claims against

Barrick, Aaron W. Regent, Jamie C. Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George Potter, and Sybil E. Veenman arising from violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, on behalf of a class of all persons and entities who purchased or otherwise acquired Barrick common stock from May 7, 2009, through November 1, 2013, inclusive, and who were damaged thereby.

24.    The Complaint was the result of a rigorous and extensive investigation over many months, starting well before the filing of the initial complaints.   In connection with its investigation, Lead Plaintiffs' Counsel analyzed the evidence adduced from, *inter alia*: (i) reviewing and analyzing publicly available information concerning Defendants, including documents filed publicly by Barrick with the SEC and Ontario Securities Commission, press releases, news articles, and other public statements issued by or concerning Defendants; (ii) research reports issued by financial analysts concerning Barrick; (iii) identifying more than 100 former Barrick employees and other persons with relevant knowledge, contacting 86 and interviewing 22 of them, and including the accounts of four witnesses in the Complaint as well as obtaining a number of internal Barrick documents that allegedly supported the Complaint's allegations, including monthly progress reports and documents detailing the "Basis for Re-Forecast" for Pascua-Lama; and (iv) consulting with experts in the areas of loss causation and damages, market efficiency, internal controls, accounting, and the mining industry.   As a result of these efforts, Lead Plaintiffs' Counsel was able to expand the proposed class period from that alleged in the three initial complaints (May 7, 2009, through May 23, 2013, inclusive) to May 7, 2009 through November 1, 2013, inclusive.

25.     Defendants filed their motion to dismiss the Complaint on February 11, 2014. *See* ECF Nos. 54-57.  Defendants argued, *inter alia*, that:  (i) Lead Plaintiffs' allegations did not demonstrate the requisite scienter; (ii) Defendants' statements regarding the cost and scheduling estimates were forward-looking and protected by the PSLRA safe harbor; (iii) Lead Plaintiffs failed to plead that Defendants misstated or omitted material facts relating to compliance with applicable environmental regulations or those facts were immaterial as a matter of law; and (iv) Lead Plaintiffs failed to establish loss causation because none of the stock price declines were caused by a  corrective disclosure or the materialization of a concealed risk.

26.     On March 25, 2014, Lead Plaintiffs filed their opposition to Defendants' motion to dismiss, arguing, among other things, that Defendants issued materially false and misleading statements that were not protected as forward-looking statements; Defendants acted with the requisite scienter in making their false and misleading statements; and that the Complaint adequately alleged loss causation.  *See* ECF No. 58.

27.     On April 22, 2014, Defendants filed their reply brief in further support of their motion to dismiss.  *See* ECF Nos. 59-60.

28.     On September 5, 2014, the Court heard oral argument on Defendants' motion to dismiss the Complaint.  On April 1, 2015, the Court entered an Opinion and Order granting in part and denying in part Defendants' motion to dismiss.  *See* ECF No. 76.  The Court dismissed Lead Plaintiffs' allegations that Pascua-Lama would be a "low-cost project" on the basis that these statements referred to the anticipated costs of mining gold rather than the cost of developing Pascua-Lama into an operating mine.  The Court also dismissed Lead Plaintiffs' allegations concerning the cost and scheduling estimates, holding that they were forward-looking statements protected by the PSLRA's safe harbor and that Lead Plaintiffs had failed to show

Defendants' knowledge that these statements were false and misleading when made.  The Court denied the motion to dismiss with respect to Lead Plaintiffs' allegations concerning compliance with environmental regulations and statements regarding internal controls and accounting for capital costs.  The Court also denied the motion to dismiss with respect to Lead Plaintiffs' control person liability claims.

29.     On May 15, 2015, Defendants answered the Complaint.  ECF No. 90.

**C.     Defendants' Motion For Reconsideration And Veenman's Motion For Interlocutory Appeal**

30.     On April 15, 2015, Defendants filed a Motion for Reconsideration of the Court's ruling on their motion to dismiss, arguing primarily that with respect to Barrick's statements regarding environmental approvals, the Court found that one instance of the primary statement on which Lead Plaintiffs relied related only to compliance with a new Argentinian federal law and not to compliance with the Chilean requirements at issue in this case.  Defendants also argued alleged statements attributed to Defendants Kinver, Gonzales, and Potter were made in 2009 and were therefore prior to the what Defendants argue was the effective putative class period and/or were on topics that the Court found inactionable.  ECF No. 79.  Lead Plaintiffs filed their Memorandum of Law in Opposition to Defendants' Motion for Reconsideration on May 1, 2015.  ECF No. 82.  Defendants filed a reply in support of their motion on May 8, 2015.  ECF No. 86.

31.     Also on April 15, 2015, Defendant Veenman filed a Motion to Certify the April 1, 2015 Order for Appeal Pursuant to 28 U.S.C. § 1292(b), arguing primarily the pleading of "culpable participation" on a control person claim under Section 20(a) of the Exchange Act is subject to the heightened pleading standards of the PSLRA and Rule 9(b).  ECF No. 80.  Lead

Plaintiffs filed a memorandum of law in opposition on May 1, 2015.  ECF No. 83.  Defendant Veenman filed a reply in support of her motion on May 8, 2015.  ECF No. 87.

32.     On June 2, 2015, the Court issued a Memorandum Opinion and Order denying Defendants' motion for reconsideration and Defendant Veenman's Motion to Certify.  ECF No. 93.

### D.     Fact Discovery

33.     Following the lifting of the PSLRA automatic discovery stay, Lead Plaintiffs promptly propounded detailed discovery requests and ultimately reviewed and analyzed hundreds of thousands of documents (totaling more than 2.2 million pages) produced by Defendants and a third party; took two depositions of Rule 30(b)(6) witnesses; participated in the deposition of one of their confidential witnesses referenced in the Complaint; defended two Rule 30(b)(6) depositions of Lead Plaintiffs; negotiated and resolved numerous discovery disputes; and took the deposition of Defendants' economic expert and defended the deposition of Lead Plaintiffs' economic expert.  As described *infra*, Class Respresentatives also served non-party subpoenas on Bechtel Corporation ("Bechtel"), Ernst & Young LLP ("E&Y"), Fluor Corporation ("Fluor"), and PricewaterhouseCoopers LLP ("PwC").

34.     Lead Plaintiffs served their first set of document requests on Defendants on June 10, 2015, followed by a second on February 19, 2016.  Lead Plaintiffs served their first set of requests for admission on September 18, 2015, and their first set of interrogatories on February 18, 2016.

35.     The Parties' objections, responses, and answers to one another's discovery requests prompted numerous meet and confer sessions as to the scope and manner of each Party's responses, objections, and document production.  Through these efforts and over the course of many weeks of extensive meet and confer sessions and protracted letter-writing on

various discovery matters (*see* Section III.G below), the Parties successfully came to agreement on many issues, including search terms, custodians, appropriate deponents, and the identification of confidential witnesses.  The Parties' extensive negotiations around the scope of document discovery resulted in numerous compromises that alleviated the need to raise disputes with the Court.  While continuing to meet and confer on the scope of document production, on July 22, 2015, Defendants began their rolling production of documents.

36.     As a result of Lead Plaintiffs' Counsel's efforts, Defendants produced 231,470 documents, numbering approximately 2.2 million pages, of which over 1.4 million pages were in Spanish and required translation.  Lead Plaintiffs' Counsel dedicated extensive resources and technology to review, organize, and analyze the information produced by Defendants.

37.     To facilitate the cost and time-efficient nature of the document review process, all of the documents were placed in an electronic database, known as Relativity, which was created and maintained at Motley Rice.  The database allowed Lead Plaintiffs' Counsel to search for documents through Boolean-type searches as well as by multiple categories, such as by author and/or recipient, type of document, date, Bates number, etc.  The database also enabled the streamlined ability to cull and organize witness-specific documents in folders for review.

38.     To review the document production, a team of attorneys from Motley Rice, Labaton Sucharow, and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") (counsel for lead plaintiff movant Central States, Southeast and Southwest Areas Pension Fund) was assembled.  These attorneys worked full-time on this project to complete the document review and analysis, which required frequent translation, as quickly and efficiently as possible.  The attorneys utilized review guidelines and protocols that were put in place and monitored to ensure

efficient and accurate review of the documents.  The review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys.

39.     All aspects of the attorney document review were carefully supervised to eliminate inefficiencies and to ensure a high quality work-product.  This supervision included in-person training sessions, the creation of a set of relevant materials and information, presentations regarding the key legal and factual issues in the case, and in-person instruction from more senior attorneys.  The team of attorneys assigned to review discovery was overseen by a Project Attorney, who had responsibility for constant, daily supervision, and quality assurance.  In addition, the more senior attorneys on the litigation team had daily and weekly interactions and oversight of the Project Attorney and review team.  There were also frequent conferences with the senior litigation attorneys to discuss important and/or "hot" documents, discovery preparation efforts, and case strategy.  The "hot" and highly relevant documents were all subject to further analysis and assessment by senior attorneys on an on-going basis.

40.     As reflected in the lodestar schedules submitted herewith by Motley Rice, Labaton Sucharow, and Robbins Geller, *see* Exs. 4-A, 5-A & 6-A, the team of core attorneys that litigated this case was concentrated and dedicated to this litigation.  Despite the duration of the case, seven attorneys billed more than 1,000 hours toward the prosecution of the case since its inception.  These attorneys became expert in the evidence produced and the strategic value and direction of their work.  This concentration of staffing, which spanned from the inception of the Litigation in 2013 to the commencement of Defendants' document production in July 2015, through resolution in April 2016, inured to the efficient prosecution of the case, minimizing duplication and maximizing the use of expertise developed during the litigation.

41.     Throughout the discovery process, Lead Plaintiffs' Counsel analyzed not only what was produced, but also tracked discovery that potentially was still outstanding.  Lead Plaintiffs' Counsel held numerous meet and confer sessions with Defendants' Counsel and exchanged correspondence with them to ensure the production of all agreed-upon materials, including documents located in South America.

42.     Additionally, and as discussed in more detail below, Defendants took the depositions of representatives of Lead Plaintiffs, Lead Plaintiffs' economic expert, and one of Lead Plaintiffs' confidential witnesses.

43.     Lead Plaintiffs took two Rule 30(b)(6) depositions of Barrick (Jeffrey Hay, Senior Director of Risk Management and Financial Governance, and Jason Thrasher, Manager of Service Delivery for Canada) and the deposition of Defendants' economic expert.

44.     In preparing for these depositions, Lead Plaintiffs' Counsel undertook extensive efforts to analyze the complex factual and legal issues that were integral to Lead Plaintiffs' claims and Defendants' potential defenses, as well as the issues related to proving loss causation and damages.  The depositions, and the documents discussed therein, provided Lead Plaintiffs' Counsel with a solid foundation from which to understand the risks and strengths of the case.

**E.     Discovery Propounded On Lead Plaintiffs**

45.     On June 10, 2015, Defendants served Lead Plaintiffs with document requests and interrogatories.  Defendants' discovery requests were broad and encompassed 36 separate requests for documents and three interrogatories.  In response to Defendants' discovery requests, Lead Plaintiffs produced responsive documents, many of which were in German and required translation.  In total, Lead Plaintiffs produced 12,212 pages of responsive documents (and reviewed many more for responsiveness), including evidence of Lead Plaintiffs' funds' trades in

Barrick securities during the Class Period, e-mails from fund managers, and various investment-related documents such as investment management and outsourcing agreements.

46.     Defendants' interrogatories requested that Lead Plaintiffs identify the confidential witnesses referenced in the Complaint.  These interrogatories were the subject of considerable dispute between the Parties as to whether Lead Plaintiffs were required to disclose these identities during discovery.

47.     Defendants also served deposition notices and subpoenas on Lead Plaintiffs. Defendants deposed two Rule 30(b)(6) representatives of Lead Plaintiffs, both of whom travelled from Germany to New York, New York, to attend the depositions.  Lead Counsel defended each of these depositions.

### F.     Non-Party Discovery

48.     Lead Plaintiffs served non-party discovery on Bechtel (regarding cost and scheduling estimates for the construction of Pascua-Lama), E&Y (regarding audits of Barrick's financial statements), Fluor (regarding forecasts for the cost of completing construction of Pascua-Lama), and PwC (regarding audits of Barrick's financial statements), seeking documents relevant to Lead Plaintiffs' claims.  These discovery requests were subject of numerous meet and confers, which included whether discovery targeted to Bechtel was permissible under the Court's ruling on the motion to dismiss the Complaint that dismissed claims related to cost and scheduling allegations, and whether E&Y and PwC had an obligation to produce documents from their Toronto offices absent the issuance of letters rogatory.   After several meet and confers, Fluor produced, and Lead Plaintiffs' Counsel reviewed, 3,556 pages of responsive documents.

49.     After meet and confers regarding whether Lead Plaintiffs were required to answer Defendants' interrogatory requesting the names of the confidential witnesses cited in the

Complaint, Defendants deposed one of Class Representative's confidential witnesses in Houston, Texas, in December 2015.

### G.   Discovery Disputes

50.   As noted above, the Parties held numerous meet and confer sessions throughout the discovery process, and for the most part were able to resolve disputes cooperatively without Court intervention.  On a few occasions, however, the Parties sought the Court's assistance.  On October 21, 2015, Defendants submitted a letter to the Court seeking a pre-motion conference regarding the issuance of a protective order striking various topics from Lead Plaintiffs' Rule 30(b)(6) deposition notice.  On October 26, 2015, Lead Plaintiffs submitted their response and a cross motion to compel Defendants to designate witnesses competent and fully prepared to testify on the topics noticed in the Rule 30(b)(6) notice.   On November 9, 2015, Judge Scheindlin ordered that Defendants produce witnesses competent to testify on certain noticed topics and that Lead Plaintiffs should renotice other topics and propound written questions concerning certain topics rather than noticing them for deposition.  On November 11, 2015, Lead Plaintiffs served a revised Rule 30(b)(6) deposition notice.

51.   Additionally, on October 26, 2015, Lead Plaintiffs requested a pre-motion conference regarding their request that the Court compel Defendants to respond to discovery requests under Lead Plaintiffs' defined relevant time periods and that Defendants produce documents regarding their cost and scheduling estimates as they related to Lead Plaintiffs' internal controls and accounting for capital costs allegations.  ECF No. 100.  Defendants opposed this motion on October 29, 2015.  ECF No. 101.  On November 9, 2015, Judge Scheindlin ordered that Defendants produce documents related to cost and scheduling at Pascua-Lama as they related to Lead Plaintiffs' internal controls and accounting for capital costs allegations.  The Court also held that the applicable discovery period was January 1, 2009, through June 2014.

52.     At a status conference on February 9, 2016, Defendants requested that Lead Plaintiffs be compelled to produce notes from all interviews between one of their investigators and the confidential witnesses identified in the Complaint.  On February 18, 2016, Defendants filed a letter motion with the Court requesting that the Court order Lead Plaintiffs to produce copies of all interview notes and memoranda summarizing communications between Lead Plaintiffs' investigator and the confidential witnesses.  ECF No. 134.  Lead Plaintiffs filed their opposition to Defendants' request on February 23, 2016.  ECF No. 136.  On March 7, 2016, the Court ordered Lead Plaintiffs to provide the Court with all of their investigator's notes from his interviews with the Project Manager, Project Controls Manager, and Field Operations Manager (including all notes from in-person and telephone conversations) for an *in camera* review.  ECF No. 146.  On April 8, 2016, the Court denied Defendants' motion, holding that the Complaint's attributions to the Project Manager, Project Controls Manager, and Field Operations Manager accurately reflected the contents of the investigator's notes.  ECF No. 153.

### H.     International Discovery Efforts

53.     Lead Plaintiffs' discovery efforts were complicated by the fact that all of the Parties to the litigation, the overwhelming majority of potential witnesses, and nearly all potentially responsive documents were located outside of the United States.

54.     Accordingly, Lead Plaintiffs were required to utilize the letters rogatory process to depose witnesses and secure documents from non-parties that were not subject to the Court's jurisdiction.  In total, Lead Plaintiffs, in collaboration with local counsel in Canada and Chile that were retained specifically for this purpose, applied for letters rogatory for six individuals in Canada and three individuals in Chile.  In addition, Lead Plaintiffs sought letters rogatory directed to E&Y and PwC in Canada.

### I.      Expert Discovery

55.    Considerable expert discovery was taken in connection with the motion for class certification and the Parties each submitted expert reports in support of their respective positions.

56.    Lead Plaintiffs designated and served an expert report by Chad Coffman, CFA, who was retained to provide an expert opinion on market efficiency, causation, and damages. Mr. Coffman's report on market efficiency was based on detailed event studies concerning the movement of Barrick's stock prices in response to new information.

57.    On September 15, 2015, Lead Plaintiffs served Mr. Coffman's 34-page report (plus exhibits), in which he opined that the market for Barrick common stock was efficient during the Class Period.

58.    Lead Plaintiffs' Counsel also retained Canadian and Chilean counsel to assist with the issuance of letters rogatory and experts on mining.

59.    Defendants designated and served an expert report by Allen Ferrell on November 13, 2015.  Mr. Ferrell prepared a 7-page report, plus exhibits.  Mr. Ferrell was retained by Defendants to opine on whether Barrick's stock price decline on May 24, 2013, could be used to measure damages.

60.    Following the submission of their respective expert reports, Defendants deposed Mr. Coffman on October 23, 2015, and Lead Counsel deposed Mr. Ferrell on November 23, 2015.

61.    The Parties' expert reports and expert depositions demonstrated a significant disagreement between the Parties as to damages, causation, and whether the May 24, 2013 price decline was statistically significant.  The Parties continued to work with their experts throughout the mediation process in response to one another's arguments and as their theories were refined.

**J.      Lead Plaintiffs' Motion To Certify The Class**

62.      On November 30, 2015, Lead Plaintiffs moved for certification of a class that included all persons and entities who purchased Barrick publicly traded common stock listed on the New York Stock Exchange (NYSE: ABX) from May 7, 2009, through November 1, 2013, inclusive, and who were damaged thereby.  ECF No. 105.  Defendants opposed the motion arguing, among other things, that Lead Plaintiffs had failed to offer a damages theory that allowed for certification and that Lead Plaintiffs could not demonstrate consequential damages on a class-wide basis based on their materialization of the risk theory of liability.  ECF No. 112. Lead Plaintiffs submitted their reply memorandum in further support of class certification on January 15, 2016.  ECF No. 119.  Defendants filed a sur-reply on January 22, 2016.  ECF No. 123.

63.      On March 23, 2016, the Court entered an Opinion and Order granting class certification, appointing LRI and Union as Class Representatives, and appointing Motley Rice as Class Counsel and Labaton Sucharow as Liaison Counsel.  ECF No. 152.

**IV.  SETTLEMENT NEGOTIATIONS**

64.      Beginning in or about May 2015, while simultaneously litigating expert and fact discovery, the Parties began to discuss the possibility of a settlement.  From that point until April 2016, the Parties engaged in various efforts to settle the Litigation, including face-to-face meetings and numerous other communications among counsel.  In May 2015, the Parties engaged Judge Phillips to assist them in exploring a potential negotiated resolution of the claims against Defendants.  The first mediation occurred on July 31, 2015, in New York, New York, and was attended by Lead Plaintiffs' Counsel and Defendants' Counsel.  In advance of that mediation, the Parties prepared extensive and detailed mediation statements that set forth each side's positions with respect to liability and damages.  The Parties provided their materials to

Judge Phillips and to opposing counsel.  The mediation session did not result in a settlement of the Litigation, and litigation continued.

65.     On September 22, 2015, the Parties met outside of the presence of Judge Phillips to discuss their respective views of the damages in the Litigation.  Defendants made a presentation explaining their damages analysis, to which Plaintiffs submitted a response on September 29, 2015.  While the meeting enabled the Parties to understand one another's positions better, they were unable to agree on a settlement.

66.     The Parties continued with arm's-length mediated settlement discussions with the assistance of Judge Phillips and attended a second mediation with Judge Phillips on November 3, 2015.  Again, the Parties' views of the claims and defenses were far apart and the mediation did not result in a settlement of the Litigation, and the Parties continued with their litigation efforts.

67.     The Parties attended a third mediation session with Judge Phillips in New York, New York, on April 16, 2016.  While significant progress was made at this mediation, the Parties were still unable to agree on a settlement.  Following this mediation session, Judge Phillips made a mediator's recommendation to both Parties to settle the Litigation for $140 million.  Both Parties ultimately accepted the recommendation on April 21, 2016, which resulted in an agreement-in-principle between Lead Plaintiffs and Defendants to settle the Litigation.

## V.     RISKS OF CONTINUED LITIGATION

68.     Based on publicly available documents, information, and internal documents obtained through Lead Plaintiffs' Counsel's own investigation and the extensive fact and expert discovery conducted in the Litigation, Lead Plaintiffs' Counsel believe that they have adduced substantial evidence to support Lead Plaintiffs' and the Class's claims and were prepared to proceed to trial.  Lead Plaintiffs' Counsel also realize, however, that this is not a case that has many of the hallmarks of a successful securities fraud action.  For example, Barrick did not issue

a restatement of its financial results.  There were no U.S. or Canadian government enforcement investigations, let alone criminal indictments, which could have aided Lead Plaintiffs' burden to establish liability.  Instead, this was a proprietary action developed by Lead Plaintiffs' Counsel.[4]  Accordingly, Lead Plaintiffs' Counsel and Lead Plaintiffs faced considerable challenges and defenses on each and every element of their claims if the Litigation were to continue through trial, as well as the inevitable appeals that would follow even if Lead Plaintiffs obtained a favorable verdict against Defendants.

69.     The Court's dismissal of Lead Plaintiffs' primary claims, namely those concerning the "low cost" of Pascua-Lama and cost and scheduling allegations, demonstrates the difficulties Lead Plaintiffs faced in establishing their claims.  While Lead Plaintiffs maintained that the dismissal of these claims did not affect their alleged damages, which they allege were tied to the internal control and accounting for capital cost allegations, proving such damages would have been much more difficult without the "low cost" and cost and scheduling allegations.

70.     In agreeing to settle, Lead Plaintiffs and Lead Counsel weighed, among other things, the substantial cash benefit to Class Members under the terms of the Settlement against the hurdles facing the Class, including:  (i) the uncertainties associated with trying complex securities cases; (ii) the difficulties and challenges involved in proving (a) falsity/materiality, (b) scienter, (c) loss causation, and (d) damages; (iii) the fact that, even if Lead Plaintiffs

---

[4]     Labaton Sucharow was one of three law firms to file an initial complaint before consolidation and the appointment of lead plaintiffs.  *See City of Brockton Ret. Sys. v. Barrick Gold Corp.*, 13 Civ. 5437 (S.D.N.Y.).  This 60-page complaint was significantly more detailed than the other two initial complaints filed and included, among other things, detailed accounts from confidential witnesses that were developed as part of Liaison Counsel's independent investigation.  This investigation was integral to the allegations in the Complaint that were upheld by the Court.

prevailed at trial, any monetary recovery could potentially have been less than the Settlement Amount; and (iv) the delays inherent in such litigation, including appeals.

71.     Lead Plaintiffs and Lead Counsel also considered that their allegations concerning violations of environmental regulations, improper accounting for Pascua-Lama's capital costs (including compliance with complicated GAAP requirements), and the inadequate nature of Barrick's internal controls, at both Pascua-Lama and at the Company-level, might not have been understood or credited by a jury.  These allegations were vigorously disputed by Defendants, who were represented by sophisticated trial counsel, and who offered credible alternate explanations and defenses supported by experts and fact witnesses.

**A.     Risks Concerning Establishing Liability Of Defendants**

72.     The claims against Defendants presented significant liability risks given, among other things, the highly fact-intensive and intricate nature of the alleged fraud at issue and the vigorous opposition Defendants were advancing.   All elements of liability were vigorously disputed by Defendants.[5]

**1.     Risks Concerning Falsity of Alleged Misstatements**

73.     Defendants would undoubtedly argue, as they did at the motion to dismiss stage, that all of the alleged false statements are inactionable.  Among other things, Defendants would argue that Lead Plaintiffs could not establish that the Pascua-Lama Project was not undertaken pursuant to existing environmental approvals or that Barrick did not have measures in place to protect the environment.  For example, Defendants would argue that the July 2011 monthly

---

[5]     While courts have always recognized that securities class actions carry significant risks, post-PSLRA rulings make it clear that the risk of no recovery (and also no fee) has increased exponentially.  *See, e.g., In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[S]ecurities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA.").

progress report, which Lead Plaintiffs allege showed that the Pascua-Lama Project was not in compliance with applicable regulations, concluded that "to date there are no non-compliance commitments which hinder the development of the project."

74.    Defendants would also argue that their statements that Pascua-Lama was "undertaken pursuant to existing environmental approvals" and that Barrick had a "comprehensive range of measures in place to protect [sensitive environmental] areas and resources" did not concern compliance with the Chilean Environmental Impact Assessment, but were made in response to Argentina's passage in 2010 of a federal law restricting mining near glaciers and addressed only the Company's activities in Argentina. Defendants would argue the Complaint did not include allegations of non-compliance with the Argentine Environmental Impact Assessment or Argentine law. In addition, Defendants would argue that Barrick reported in January 2013 that Argentina's environmental authority concluded an audit, pursuant to the new federal glacier protection law, and determined that Pascua-Lama had not impacted the surrounding glaciers.

75.    With respect to Lead Plaintiffs' internal control allegations, Defendants would argue that Barrick routinely disclosed control issues at Pascua-Lama to investors, along with the steps being taken to address them. For example, in July 2011, Barrick stated that it was "in the process of assessing the impact on, and, as required, redesigning, the internal control over financial reporting and disclosure frameworks to reflect" organizational changes at Pascua-Lama. A few months later, Barrick reported that "work continues to enhance and standardize the project controls, finance and supply chain business processes and systems." In July 2012, Barrick disclosed that, as part of its comprehensive review and changes to the management team, it was assessing "the impact on internal control over financial reporting and disclosure."

76.     Defendants would also have challenged Lead Plaintiffs' allegations regarding accounting for capital costs.   Defendants would argue that Lead Plaintiffs failed to allege particularized facts suggesting that the asset impairment analyses concerning Pascua-Lama reported to investors on July 27, 2012, March 28, 2013, June 28, 2013, and August 1, 2013, were performed inadequately or were based upon incomplete or inaccurate information.

77.     Lead Plaintiffs would also need to prove that each alleged misstatement was false or misleading *at the time each statement was made*, a complex undertaking given the four-and-a-half-year Class Period and the variety of alleged wrongdoing, as well as the fact that many potential witnesses are located outside the jurisdiction of the Court.   These individuals would have been difficult, if not impossible, to compel to provide testimony.

78.     Even if Lead Plaintiffs could compel their preferred witnesses to testify, Defendants would have likely tried to develop a theme at trial that corporate optimism that is shown to have been unwarranted only after the fact does not establish falsity and support a claim for securities fraud.

79.     For example, Defendants would likely argue that Lead Plaintiffs' evidence of problems at the Pascua-Lama mine towards the end of the Class Period could not establish the falsity of statements earlier in the Class Period about the Company's internal controls or accounting for capital costs at that stage.    For example, Defendants would argue that the impairment charge was caused by the declining price of gold throughout the Class Period – the price of gold declined 23% in the second quarter of 2013 – combined with high capital costs. Indeed, Barrick disclosed that a "decrease of about 7% in long-term gold prices, a decrease of about 12% in silver prices, an increase of about 10% in operating costs or an increase of about 15% in the total [life-of-mine] capital expenditures, would in isolation, cause the estimated

recoverable amount to be equal to the carrying value" – which would require an impairment charge. Write-downs by other large gold mining companies at this time included, for example: Newcrest Mining, $5.7 billion; AngloGold Ashanti, $2.4 billion; GoldCorp, $2.0 billion; and Newmont Mining, $1.8 billion.

80. Lead Plaintiffs would proffer evidence that Defendants, among other things, consistently received information through monthly progress reports where they, senior management, and plan managers discussed the operational issues at Pascua-Lama. However, as described above/below, Defendants would argue that there is insufficient evidence that the Individual Defendants received or reviewed these monthly progress reports.

81. The foregoing are just a few examples of counterarguments Defendants would raise at summary judgment and trial concerning falsity.

## 2. Risks Concerning Materiality

82. Defendants will undoubtedly argue that Lead Plaintiffs cannot marshal evidence to prove that a number of Defendants' alleged misstatements or omissions were anything more than inactionable statements of corporate optimism or puffery.

83. Although Lead Plaintiffs defeated Defendants' motion to dismiss regarding the materiality of Defendants' statements regarding environmental compliance, there is no guarantee that materiality would be found at summary judgment or trial.

## 3. Risks Concerning Scienter

84. Even if falsity and materiality were established, Lead Plaintiffs faced the risk that a jury would conclude that Defendants did not act with the requisite scienter – that Defendants knew or recklessly disregarded (1) Barrick's non-compliance with applicable environmental regulations at Pascua-Lama; (2) that the Company's internal controls were deficient; and (3) that they had no basis for their capital cost and accounting estimates. In particular, Defendants would

argue that Lead Plaintiffs' allegations amount to assertions that Barrick purposefully pursued a massive, multi-billion dollar mining project at Pascua-Lama despite knowing – from the outset – that the Project was not economically or environmentally feasible, which would make no sense.

85.     With respect to Lead Plaintiffs' allegations that Defendants knew the Pascua-Lama Project was not in compliance with applicable environmental regulations, Defendants would argue that the internal documents relied on by Lead Plaintiffs showed that Barrick was working with regulators to address environmental concerns.  Moreover, Defendants would also likely focus on the absence of evidence that any of the Individual Defendants reviewed the monthly progress reports or attended the meeting in La Serena, Chile, on March 6 and 7, 2012, where environmental issues at Pascua-Lama were discussed.

86.     With respect to alleged failings in the Company's internal controls and accounting for capital costs at Pascua-Lama, Defendants would also likely assert, if such evidence were allowed, that they were at all times acting in good faith reliance on Barrick's independent auditors, PwC and E&Y.

87.     Regarding Defendants' likely auditor defense, Lead Plaintiffs would assert that relying on auditors for assessment of internal controls is impermissible under the securities laws and accounting standards.  Lead Plaintiffs would also show that Barrick had access to more information and possessed more knowledge about its processes than its auditors.

88.     The risks concerning scienter are compounded in this case more so than in other cases due to the vintage of the events at issue.  The Class Period began more than seven years ago and ended nearly three years ago.  Not only would Lead Plaintiffs struggle to secure deposition testimony from many relevant witnesses because they are located outside of the jurisdiction of the Court, but it would be difficult, if not impossible, to secure their testimonies at

trial.  Even if such witnesses testified, their memories would likely have faded as a result of the long lapse of time between the events themselves and trial.

### B.    Risks Concerning Loss Causation And Damages

89.    Lead Plaintiffs also recognized the risk of proving loss causation and damages. To establish loss causation, Lead Plaintiffs would have to prove "a causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Here, Lead Plaintiffs faced barriers to establishing loss causation and resulting damages with respect to each of the claims asserted against Defendants.  If a jury were to find that any of the alleged corrective disclosures identified in the Complaint were not true corrective disclosures or did not accept Lead Plaintiffs' materialization of the risk theories, the potential recovery for the Class would be significantly diminished.

90.    Defendants would almost certainly argue that the decline in Barrick's stock price during the Class Period was caused by factors other than Lead Plaintiffs' alleged corrective disclosures and materialization of the risk allegations.  In particular, Defendants argued, and would continue to argue, that the steep decline in the price of gold that occurred during the second half of the Class Period was responsible for much of the losses alleged by Lead Plaintiffs. For example, the bulk of the losses that Lead Plaintiffs attribute to fraud occurred in the second quarter of 2013, during which the price of gold fell by approximately 23% – its steepest quarterly decline since modern trading began in the mid-1970s.

91.    In particular, Defendants would argue that although Barrick's stock price fell by 8.4% on April 10, 2013, the Company's stock price had already fallen nearly 24% so far that year, and that it declined 20% between April 10, 2013, and May 24, 2013, during which time Lead Plaintiffs did not allege any disclosures related to Pascua-Lama.  *See In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 602 (S.D.N.Y. 2010) (finding loss causation

allegations implausible when plaintiffs "leave wide periods unaccounted for," suggesting they "may be cherrypicking dates that suit their argument").  While the Court upheld these allegations at the pleading stage, it did note that "Defendants . . . allege that these disclosures do not relate to dust mitigation, and therefore plaintiffs have failed to plead loss causation for the related misstatements.  Whether the Chilean litigation addressed the dust mitigation issue is a question of fact that can only be answered with a full record."  Op. & Order at 41 n.165, ECF No. 76.

92.      In addition, Defendants would undoubtedly challenge Mr. Coffman's likely testimony at trial by presenting their own expert's opinion that Mr. Coffman's event study did not properly disaggregate the impact of confounding news and that he incorrectly assumed that the market reacted proportionately to each news item.  For example:

- On June 6, 2012, Barrick announced the termination of then-CEO Regent. Defendants would likely argue that this announcement had no link to any alleged misrepresentation.

- On July 26, 2012, Barrick provided a weaker than expected outlook for 2012, raising its cost of gold production from $460-$500 per ounce to $550-$575 per ounce, and reducing its growth target from 9 million ounces per year to 8 million ounces per year.

- On November 1, 2012, Barrick reported a 55% drop in third quarter profit, substantially below analysts' expectations, and again raised its cost of gold production to $575-$585 per ounce.

- On April 10, 2013, news reports surfaced that the Appeals Court of Copiapo, Chile, had issued an order suspending work on the Pascua-Lama Project. Defendants would argue that they previously disclosed, at least to some degree,

the pending Chilean litigation and that the plaintiffs in that action sought suspension of the Pascua-Lama Project.

- On May 24, 2013, Chile's Environmental Superintendent had issued an order stopping work at Pascua-Lama pending compliance with an environmental permit and issued a $16 million fine. Lead Plaintiffs' expert acknowledged that this was not a statistically significant price decline.

- On July 1, 2013, news reports stated that production at Pascua-Lama was expected to be further delayed and that Barrick would take a $5.5 billion impairment charge. Defendants would argue that Barrick's disclosures indicating that rising development costs and plunging gold prices led to the impairment – factors that caused numerous other gold mining companies to announce comparable impairments at the same time.

- On October 31, 2013, Barrick reported a 74% drop in third quarter profit, reflecting lower gold prices. Defendants would argue that this price decline was not significantly significant when controlling for the S&P Total Return, the Gold Spot Price, and an Industry Index.

- On November 1, 2013, Barrick announced that it would be issuing $3 billion public equity offering and planned to use the "balance of the net proceeds" to pay down debt and "to further strengthen its balance sheet, which could include further debt reductions and for general corporate purposes including ongoing operating and capital expenditures relating to Barrick's existing portfolio of mines."

93.     Relying on their expert, Defendants would try to persuade the jury that the inactionable information disclosed above caused the stock price declines.  Defendants would also contend that even if Mr. Coffman's methodology was appropriate, he failed to demonstrate that the impact of allegedly corrective information is statistically significant on the alleged disclosure and materialization of the risk dates.[6]

94.     Lead Plaintiffs' expert estimated aggregate damages ranging from approximately $1.557 billion to $3.987 billion, under a best-case scenario where the Class Period begins on May 7, 2009, and all alleged corrective disclosures and materialization of the risk dates are credited by a jury.  However, based on the Court's order on the motion to dismiss, which provided that "Plaintiffs have alleged numerous internal reports beginning in July 2011 that discussed the weakness of internal controls at Pascua-Lama," Op. & Order at 45, ECF No. 76, Defendants have argued, and would be expected to continue to argue, that the Class Period should start no earlier than July 2011.  If this argument prevailed, the maximum damages with no disaggregation applied would be $2.518 billion, which would amount to a recovery of approximately 5.56%.  Further, Defendants would undoubtedly argue that Plaintiffs would have to disaggregate the confounding, non-fraud-related information revealed contemporaneously with the corrective disclosures, and rely on Judge Scheindlin's holding that "[s]everal of the identified disclosures relate, at least in part, to statements regarding cost and schedule estimates that are no longer [t]he basis of any claims in this case."  Op. & Order at 2 n.6, ECF No. 152.

---

[6]     Again, in ruling on Defendants' motion to dismiss, the Court noted that "defendants argue that plaintiffs have failed to disaggregate losses due to misstatements as opposed to other industry-wide factors or company-specific news."  Op. & Order at 41 n.165, ECF No. 76.  While the Court found that "[f]or the two disclosure dates at issue here [April 10, 2013 and May 24, 2013], this argument fails[,]" it noted that "plaintiffs need not, at this stage, provide detailed evidence attributing an exact portion of the fall in the stock price to the misstatements."  *Id.* There is of course no guarantee that Lead Plaintiffs' arguments would again be successful at summary judgment or trial.

Lead Plaintiffs' damages expert, in connection with the mediations, concluded that disaggregating confounding non-fraud related information would reduce damages to $1.496 billion for the as-pleaded Class Period and to $1.040 billion for the potential shortened class period. The recovery here is therefore approximately 9.36% and 13.46%, respectfully, when non-fraud information is eliminated from Lead Plaintiffs' expert's damages analysis.

95.    The Parties' respective damages experts strongly disagreed with each other's assumptions and their respective methodologies, including whether the May 24, 2013 stock price decline was statistically significant. Therefore, the risk that the jury would credit Defendants' damages position over that of Lead Plaintiffs had considerable consequences in terms of the amount of recovery for the Class, even assuming liability was proven. *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014) ("Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky 'battle of the experts' and the 'jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable.'"). Indeed, when, as here, plaintiffs' damage theories rest primarily on the testimony and reports of experts, the plaintiffs face a serious risk of having their damage theories rejected by the court on a *Daubert* motion or by the jury when it must balance the credibility of battling experts.

### C.    Risks Concerning Delineation Of The Class Period

96.    Lead Plaintiffs also faced barriers to establishing the start date of the Class Period. As mentioned above, the Court dismissed Lead Plaintiffs' allegations that Defendants engaged in securities fraud by claiming that Pascua-Lama would be a "low-cost project," as well as Lead Plaintiffs' cost and scheduling arguments. The length of the Class Period was, and would be, vigorously litigated by the Parties. Defendants maintained that the Court's ruling on the motion

to dismiss held that Lead Plaintiffs had only established scienter on their internal controls and accounting for capital costs allegations as of July 2011, essentially cutting the Class Period in half.

97.     In addition, Lead Plaintiffs accept that Defendants only knew that Barrick was violating its environmental commitments in April 2010, acknowledging this as the earliest date for which scienter could be established for these claims.  If the Class Period were to start in April 2010, the maximum damages would be reduced accordingly.   The risk that the jury would shorten the Class Period had considerable consequences in terms of significantly reducing the amount of recovery for the Class, even assuming liability was proven.

### D.     Jury And Trial Risk

98.     At the time the agreement to settle the Litigation was reached, the Parties were less than six months away from submitting summary judgment motions and less than seven months away from the pre-trial conference.  While Lead Plaintiffs and Lead Plaintiffs' Counsel believe that the claims asserted against Defendants have substantial merit, we also recognize that there are considerable risks involved in pursuing the claims to a verdict.

99.     For example, given the complex nature of the claims, Lead Plaintiffs intended to rely heavily on expert opinion concerning accounting, internal controls over financial reporting, loss causation, and damages, with the concomitant risk that:  (i) the experts could be subject to a successful *Daubert* motion prior to trial, permitting little or no expert testimony on these key issues; or (ii) if allowed to testify, the jury would evaluate the "battle of the experts" and decide to credit Defendants' experts over Lead Plaintiffs' experts.

100.    The Class also faced additional trial-related risks, including, among other things, presenting a factually intricate and complex case to a jury through adverse witnesses controlled by Defendants.  Moreover, many of the potential witnesses who were involved in the Pascua-

Lama Project and whose testimony would likely be helpful to Lead Plaintiffs' claims are located outside of the United States and could not be compelled to testify. Lead Plaintiffs would have to rely on deposition testimony, if it were even obtained.

101.    Given all these challenges of continuing to pursue the claims against Defendants, versus the guaranteed recovery the Settlement provides for the Class, Lead Counsel and Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and should be approved.

## VI.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND CLASS REACTION TO DATE

102.    Pursuant to the Preliminary Approval Order, the Court appointed The Garden City Group, LLC ("GCG") as Claims Administrator in the Litigation and instructed GCG to disseminate copies of the Notice, the Summary Notice and Proof of Claim form (collectively "Notice Packet") by mail and to publish the Notice in *The Wall Street Journal* and over the *PR Newswire*. ECF No. 169.

103.    The Summary Notice, attached as Ex. A to the Declaration of Jennifer M. Veitengruber Regarding Notice Dissemination and Publication (ECF No. 174-1), provides potential Class Members with information about the terms of the Settlement and, among other things: their right to exclude themselves from the Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the fee and expense application; and the manner and deadline for submitting a Proof of Claim form in order to be eligible for a payment from the Net Settlement Fund. The Summary Notice also informs Class Members of Lead Counsel's intention to apply for an award of attorneys' fees up to 25% of the Settlement Fund and for payment of litigation expenses in an amount up to $1.2 million.

104.     As detailed in the Declaration of Stephen J. Cirami in Support of Lead Plaintiffs'

Motion for Final Approval of Settlement and Plan of Allocation (attached as Ex. 7 hereto), GCG

obtained the names and addresses of potential Class Members from listings provided by Barrick

and its transfer agent and from banks, brokers and other nominees.  Ex. 7 ¶ 2.  In total, as of

September 4, 2016, GCG has mailed 1,072,843 Claim Packets to potential nominees and Class

Members by first-class mail, postage prepaid.  *See id.* ¶ 10.

105.     On June 27, 2016, GCG caused the Notice to be published in *The Wall Street*

*Journal* and to be transmitted over *PR Newswire*.  *See id.* ¶ 3.

106.     GCG also maintains and posts information regarding the Settlement on a

dedicated website established for the Litigation, www.barrickgoldsecuritieslitigation.com, to

provide Class Members with information concerning the Settlement, as well as downloadable

copies of the Claim Packet and the Stipulation.  *Id.* ¶ 4.  In addition, Lead Counsel has made

relevant documents concerning the Settlement available on its firm website.

107.     Pursuant to the terms of the Preliminary Approval Order, ECF No. 169, the

postmark deadline for Class Members to submit objections to the Settlement, the Plan of

Allocation, or the Fee and Expense Application, or to request exclusion from the Class is

September 21, 2016.  To date, Lead Counsel has received one objection and one purported

objection, which are also exclusion requests, and the Claims Administrator has received only

seventy requests for exclusion from potential Settlement Class Members, many of which do not

provide the information required in the Notice.  Copies of these requests, with personal

information redacted, are annexed hereto as Exhibits 7A-D.

108.     Lead Counsel acknowledges that one objection was filed validly.  This objection

objects to the requested attorneys' fees.  The objection is primarily based on that individual's

"belief" that the fees requested include administrative, as opposed to legal, fees.  This objection asserts that the objector is entitled to a payment of $40 under the settlement.  The objector, however, acknowledges that she made an unrealized gain on her transactions in Barrick Gold securities.  Her recovery under the Plan of Allocation would therefore be zero.  Ex. 7-D.  The second (purported) objection on behalf of an individual, his wife, and Jesus Christ's Army Church, is invalid because it did not comply with the terms of the Summary Notice, namely it fails to identify the date(s), price(s), and number of shares of all purchases and sales of Barrick common stock on the New York Stock Exchange during the Class Period.  *Id.*  This purported objection objects to the liability allegations in the Complaint, the amount of the requested attorneys' fees, and the procedural requirements associated with the settlement.  *Id.*

109.    Should any additional objections or requests for exclusion be received, Lead Plaintiffs will address them in their reply papers, which are due on September 30, 2016.

VII.    PLAN OF ALLOCATION

110.    Pursuant to the Preliminary Approval Order, and as set forth in the Summary Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim and all required information postmarked or submitted online no later than September 29, 2016.  As provided in the Summary Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and applicable taxes, the Net Settlement Fund will be distributed according to the Plan of Allocation.

111.    The Plan of Allocation proposed by Lead Plaintiffs, which was prepared with the assistance of Mr. Coffman and is set forth in full in the Summary Notice, ECF No. 174-1 at 4-6, is designed to achieve an equitable and rational distribution of the Net Settlement Fund to eligible claimants, and is consistent with Lead Plaintiffs' damages theory.  Lead Counsel

believes that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

112.    The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages.  In developing the Plan of Allocation, Mr. Coffman considered the amount of artificial inflation present in Barrick's common stock throughout the Class Period that was purportedly caused by the alleged fraud.  This analysis entailed, among other things, studying the price declines associated with Barrick's allegedly corrective disclosures, adjusted to eliminate the effects attributable to general market or industry conditions and inactionable news.  In this respect, an inflation table was created as part of the Summary Notice.  The table will be utilized in calculating Recognized Loss Amounts for Authorized Claimants.

113.    GCG, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants, as calculated in accordance with the Plan of Allocation.  The calculation will depend upon several factors, including when the Authorized Claimant's common stock was purchased and whether the stock was sold during the Class Period and, if so, when.

114.    To date, there have been no objections filed to the Plan of Allocation and Lead Plaintiffs and Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable, and should be approved.

## VIII.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

115.    In addition to seeking final approval of the Settlement and the Plan of Allocation, Lead Counsel is making an application for a fee award of 25% of the Settlement Fund (which includes accrued interest) on behalf of all Lead Plaintiffs' Counsel that contributed to the

prosecution of the Litigation.  This request is fully supported by Lead Plaintiffs.  *See* Exs. 2 & 3. Lead Counsel also requests payment of expenses incurred in connection with the prosecution of the Litigation from the Settlement Fund in the amount of $981,296.48, plus accrued interest. This amount is below the $1,200,000 maximum expense amount that the Class was advised could be requested.

116.    Lead Counsel's request for an award of 25% of the Settlement is based, in significant part, on the graduated fee schedule applied by Judge Gleeson in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014).  Judge Gleeson's declining fee scale would provide the following award of attorneys' fees in a settlement of $140 million:  33% for the 0-$10 million bracket; 30% for the $10-$50 million bracket; 25% for the $50-$100 million bracket; and 20% for the $100-140 million bracket.  *See id.* at 445.  Under such a graduated scale, the effective percentage award here would be 25.57%. Analysis of Judge Gleeson's fee scale and the legal authorities supporting the requested fees and expenses are set forth in Lead Counsel's separate memorandum of law in support of the Fee and Expense Application ("Fee Memorandum").  Below is a summary of the primary factual bases for Lead Counsel's request.

### A.    Lead Plaintiffs Support The Fee And Expense Application

117.    Lead Plaintiffs are two sophisticated institutional investors.   LRI is an independent investment service company based in Luxembourg.  Established in 1998, LRI launches and manages investment funds for banks, insurance companies, and asset managers. LRI provides administrative services for around 200 funds with assets under management of approximately € 8 billion.  *See* Ex. 2 at 1.  Union is the holding company of the Union Investment Group.  Founded in 1956 and headquartered in Frankfurt, Germany, Union, through

its subsidiaries and affiliates, is an institutional investor that, as of December 31, 2015, managed more than € 261 billion in assets.  *See* Ex. 3 at 1.

118.    Lead Plaintiffs believe the fee and expense request is fair, reasonable, and warrants approval by the Court.  *See* Exs. 2 & 3.  In coming to this conclusion, Lead Plaintiffs considered the work conducted, the size of the recovery obtained, and the considerable risks of litigation.  *See id*.  Lead Plaintiffs take their roles in this representative action seriously to ensure that Lead Counsel's fee request is fair in light of the work performed and result achieved for the Class.  *See id*.

**B.     The Risks And Unique Complexities Of The Litigation**

119.    Although Lead Plaintiffs consistently maintained that the evidence evaluated during discovery supported findings of securities fraud, this Litigation still presented substantial challenges.  The allegations would culminate in a trial of factually intricate and complex accounting issues involving Barrick's South American operations over more than four years.  The specific risks Lead Plaintiffs faced in proving Defendants' liability, scienter, and loss causation, along with the challenges and risks of proceeding to trial, are detailed in Section V above.  These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Litigation was undertaken on a contingent-fee basis.

120.    From the outset, Lead Plaintiffs' Counsel understood that they were embarking on a complex, expensive, risky, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking this responsibility, Lead Plaintiffs' Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Litigation, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With several outside experts

and consultants and fast-approaching summary judgment and potential trial dates, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

121.   Lead Plaintiffs' Counsel also bore the risk that no recovery would be achieved. Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  *See, e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 730 (11th Cir. 2012) (affirming judgment as a matter of law on basis of loss causation following jury verdict in plaintiffs' favor); *Ward v. Succession of Freeman*, 854 F.2d 780, 795 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).   The road to recovery can be very long and arduous.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010), *cert. denied*, *Apollo Grp., Inc. v. Policemen's Annuity & Benefit Fund of Chi.*, 562 U.S. 1270 (2011) (trial court overturned unanimous verdict for plaintiffs, verdict later reinstated by the Ninth Circuit Court of Appeals, and judgment finally re-entered after denial of *certiorari* by the United States Supreme Court).

122.   A good example of the risks and delays inherent in securities litigation, even after a jury verdict in favor of the class, is *Jaffe v. Household International, Inc.*, No. 1:02-CV-05893 (N.D. Ill.).  In *Household*, a securities class action case filed in 2002, plaintiffs obtained a jury verdict in their favor on May 7, 2009, after a month-long trial and seven years of costly and contentious litigation.  Because of post-verdict challenges, a judgment was not entered until October 17, 2013, which was then appealed.  After thirteen years of litigation, and six years after

a favorable jury verdict, the Seventh Circuit ruled on May 21, 2015, that the defendants were entitled to a new trial primarily on the issue of loss causation.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 433 (7th Cir. 2015).  The case finally settled in June of 2016 – fourteen years after the litigation commenced.

123.    It takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

124.    Here, there were no government investigations or accusations, or a restatement of earnings – factors that would have aided Lead Plaintiffs' prosecution of the Litigation.  Instead, the Litigation was a proprietary one developed independently by Lead Plaintiffs' Counsel.  Lead Plaintiffs' Counsel's persistent efforts in the face of substantial risks and uncertainties is what resulted in a favorable recovery for the benefit of the Class.  In circumstances such as these, and in consideration of Lead Plaintiffs' Counsel's hard work and the very favorable result achieved, the requested fee of 25% of the Settlement Fund and payment of $981,296.48 in expenses is reasonable and should be approved.

### C.    The Significant Time And Labor Devoted To The Litigation

125.    The work undertaken by Lead Plaintiffs' Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles has been time-consuming and challenging.  As more fully set forth above, the Litigation was prosecuted for

almost three years and settled only after Lead Plaintiffs' Counsel overcame multiple legal challenges and devoted substantial resources, including reviewing over 2.2 million pages of documents, the majority of which were in Spanish.   Among other efforts, Lead Plaintiffs' Counsel conducted an exhaustive investigation into the Class's claims; researched and prepared a detailed consolidated amended complaint; briefed an extensive opposition to Defendants' motion to dismiss; successfully opposed Defendants motion for reconsideration and Defendant Veenman's motion to certify the motion to dismiss order for appeal pursuant to 28 U.S.C. § 1292(b); undertook fact and expert discovery; and successfully obtained class certification.

126.    At all times throughout the pendency of the Litigation, Lead Plaintiffs' Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Class, whether through settlement or trial, by the most efficient means necessary.

127.    Attached hereto as Exhibits 2-4 are declarations from Lead Plaintiffs' Counsel to support Lead Counsel's request for an award of attorneys' fees and payment of litigation expenses.  *See* Decl. of Christopher F. Moriarty on behalf of Motley Rice LLC, dated September 7, 2016 (Ex. 4); Decl. of Jonathan Gardner on behalf of Labaton Sucharow LLP, dated September 6, 2016 (Ex. 5); Decl. of David Rosenfeld on behalf of Robbins Geller Rudman & Dowd LLP, dated September 7, 2016 (Ex. 6).

128.    Included with these declarations are schedules (Exhibits 4-A, 5-A & 6-A to each declaration) that summarize the number of hours worked by each attorney and each professional support staff employed by the firms and the value of that time at current billing rates, i.e., the

"lodestar" of the respective firms, as well as the expenses incurred by category.[7]  As set forth in each declaration, these schedules were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms.   Before submitting these time schedules, all entries were carefully reviewed and any potential duplicative time was removed.

129.    As discussed above, the prosecution of this case was undertaken with a focus on efficiency and the avoidance of duplication.   Only seven attorneys dedicated more than 1,000 hours to the matter (of the hours submitted).[8]  Despite the almost three-year duration of the case, the knowledge and experience of the personnel who worked the most on the matter was utilized to optimize the outcome for the Class.   Additionally, a number of attorneys contributed to the successful prosecution of the case in many significant ways.   For instance, several senior attorneys at Lead Plaintiffs' Counsel were intimately involved in mediating and reaching an ultimate resolution of the case.

130.    Under Lead Counsel's direction, the work undertaken by the attorneys was closely supervised and allocated in the most efficient manner possible.  For instance, during the discovery process, certain attorneys were nearly solely dedicated to this matter, preparing the case for summary judgment and, if necessary, trial.  These attorneys, some of whom dedicated more than 1,000 hours each to the case, were exclusively focused on building the documentary and testimonial record that the Court would have considered at summary judgment and trial. They were ably assisted by additional attorneys and staff who supplemented these efforts when

---

[7]      Attached hereto as Exhibit 8 is a summary table reporting the lodestars and expenses of Lead Plaintiffs' Counsel.

[8]      Lead Plaintiffs' Counsel have not submitted any time or expenses incurred after July 15, 2016, even though significant time has been, and will continue to be, spent finalizing the settlement and responding to queries from Class Members.

required.  The ability to maintain continuous, dedicated attention to this litigation from inception, and more particularly during discovery, allowed for greater efficiency.

131.    The hourly billing rates of Lead Plaintiffs' Counsel here range from $695 to $995 for partners/members, $490 to $750 for of-counsel, and $350 to $800 for other attorneys.  *See* Exs. 4-A, 5-A & 6-A.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary.  Exhibit 10, attached hereto, is a table of billing rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms in bankruptcy proceedings nationwide in 2015.  The analysis shows that across all types of attorneys, Lead Plaintiffs' Counsel's rates here are consistent with, or lower than, the firms surveyed.

132.    Lead Plaintiffs' Counsel have collectively expended more than 40,000 hours in the prosecution and investigation of the Litigation.  *See* Ex. 8.  The resulting collective lodestar is $20,132,916.25.  *Id*.  Pursuant to a lodestar "cross-check," the requested fee of 25% of the $140 million Settlement Fund ($35,000,000) results in a slight "multiplier"[9] of approximately 1.74 on Lead Plaintiffs' Counsel's lodestar (or 173.84%), which does not include any time from July 15, 2016 onwards that has been and will necessarily be spent from this date forward administering the Settlement.

D.      **The Quality Of Lead Plaintiffs' Counsel's Representation And Their Standing And Expertise**

133.    Lead Plaintiffs' Counsel are highly experienced in prosecuting securities class actions and worked diligently and efficiently in prosecuting the Litigation.  Motley Rice, as demonstrated by the firm resume attached to its declaration, is among the most experienced and

---

[9]      The multiplier is calculated by dividing the $35 million fee request by the $20,132,916.25 lodestar of Lead Plaintiffs' Counsel.

skilled firms in the securities litigation field, and has a long and successful track record in such cases. *See* Ex. 4-F. Motley Rice has served as lead counsel in a number of high profile matters, including *Bennett v. Sprint Nextel Corp.*, No. 2:09-cv-02122-EFM-KMH (D. Kan.) (representing PACE Industry Union-Management Pension Fund, Skandia Life Insurance Company, and West Virginia Investment Management Board, reaching settlement of $131 million) and *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, No. 08-6324 (PAM/AJB) (D. Minn.) (representing Oklahoma Teachers' Retirement System, Oklahoma Firefighters Pension Fund, Union Asset Management Holding AG, Danske Invest Management A/S, and Westmoreland County Employees Retirement System, reaching settlement of $85 million).

134. Labaton Sucharow, as demonstrated by the firm resume attached to its declaration, is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases. *See* Ex. 5-G. Labaton Sucharow has served as lead counsel in a number of high profile matters, including *In re American International Group, Inc. Securities Litigation*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund, reaching settlements of $1 billion) and *In re HealthSouth Corp. Securities Litigation*, No. 03-1501 (N.D. Ala.) (representing State of Michigan Retirement System, New Mexico State Investment Council, and New Mexico Educational Retirement Board, securing settlements of more than $600 million).

135. Robbins Geller, as demonstrated by the firm resume attached to its declaration, is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases. *See* Ex. 6-F. Robbins Geller has served as lead counsel in a number of high profile matters, including *Jaffe v. Household International, Inc.*, No. 1:02-CV-

05893 (N.D. Ill.) (representing International Union of Operating Engineers, Local 132 Pension Plan, PACE Industry Union-Management Pension Fund, and Glickenhaus & Company, securing settlement of $1.575 billion).

### E.   Standing And Caliber Of Defense Counsel

136.   The quality of the work performed by Lead Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Defendants are represented by Debevoise & Plimpton LLP, a well-known and respected law firm with attorneys who vigorously represented the interests of their clients.   In the face of this experienced, formidable, and well-financed opposition, Lead Plaintiffs' Counsel was nonetheless able to achieve a settlement very favorable to the Class.

## IX.   REQUEST FOR PAYMENT OF LITIGATION EXPENSES

137.   Lead Counsel seek, on behalf of Lead Plaintiffs' Counsel, payment from the Settlement Fund of $981,296.48 in litigation expenses reasonably and necessarily incurred by Lead Plaintiffs' Counsel in connection with prosecuting the claims against Defendants.  *See* Exs. 4, 5, 6 & 8.

138.   From the beginning of the case, Lead Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Litigation was successfully resolved.  Thus, Lead Plaintiffs' Counsel were motivated to take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.  Lead Counsel maintained strict control over the litigation expenses. Indeed, many of the litigation expenses were paid out of a litigation fund created and maintained by Liaison Counsel.  *See* Ex. 5-F.

139.   As set forth in their declarations, Lead Plaintiffs' Counsel have incurred a total of $981,296.48 in litigation expenses in connection with the prosecution of the Litigation.  *See*

Exs. 4, 5 & 6.  As attested to, these expenses are reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  Expenses are set forth in detail in each firm's declaration, which identifies the specific category of expense, e.g., online/computer research, experts' fees, travel costs, duplicating, telephone, fax and postage expenses, and other costs incurred for which counsel seek payment.  These expense items are billed separately by each firm and such charges are not duplicated in the respective firms' billing rates.

140.    Of the total amount of expenses, $521,826.35, or approximately 53%, was expended on experts and consultants.  As detailed above, Lead Plaintiffs' Counsel retained an expert to offer his opinions concerning the efficiency of the market for Barrick common stock as well as causation and the amount of damages suffered by the Class, and to rebut the arguments Defendants' expert advanced against loss causation and damages.  This same expert also helped Lead Counsel develop a fair and reasonable Plan of Allocation.  Lead Plaintiffs' Counsel also retained an accounting and internal control violations expert to respond to Defendants' defenses, and to help prosecute this Litigation through trial.  Lead Plaintiffs' Counsel also retained consultants with expertise in mining.  Accordingly, these professionals were essential to the overall prosecution of the Litigation.

141.    Another large component of the expenses, $65,873.44, related to travel, business transportation, and working meals.  For instance, in connection with the extensive discovery taken and defended by Lead Plaintiffs' Counsel in the Litigation, among other matters, Lead Plaintiffs' Counsel was required to travel throughout the country and seeks payment for the costs of this travel.  Representatives of Lead Plaintiffs were also required to travel from Europe to

attend depositions.  (Any first class airfare has been reduced to economy rates for purposes of this application.)  Also, any travel time that did not include working on the case at the same time has been reduced by half in all instances.

142.    Additionally, mediation fees totaled $66,770.84 and costs related to the extensive investigation of the claims, such as the fees charged by outside investigators, counsel needed for letters rogatory in Canada and Chile, and counsel for the confidential witnesses, amounted to $39,967.56.

143.    The other expenses for which Lead Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include court fees, online legal and factual research, transcription costs, costs related to the document productions, copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

144.    All of the litigation expenses incurred, which total $981,296.48, were necessary to the successful prosecution and resolution of the claims against Defendants.

## X.    THE REACTION OF THE CLASS TO THE FEE AND EXPENSE APPLICATION

145.    As mentioned above, consistent with the Preliminary Approval Order, to date, 1,072,843 Claim Packets have been mailed to potential Class Members advising them that Lead Counsel would seek an award of attorneys' fees that would not exceed 25% of the Settlement Fund, and payment of expenses in an amount not to exceed $1,200,000.  *See* Ex. 7 ¶ 10. Additionally, the Summary Notice was published in *The Wall Street Journal* and was transmitted over *PR Newswire*.  *See id.* at ¶ 3.  The Notice and the Stipulation have also been available on the settlement website maintained by GCG.  *Id.* ¶ 4.  While the deadline set by the Court for Class Members to object to the Fee and Expense Application has not yet passed, to date only two

purported objections have been received.  Lead Counsel will respond to any additional objections in our reply papers, which are due September 30, 2016.

## XI.  MISCELLANEOUS EXHIBITS

146.    Attached hereto as Exhibit 9 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Memorandum.

147.    Attached hereto as Exhibit 10 is a list of defense-firm billing rates analyzed and gathered by Liaison Counsel Labaton Sucharow from bankruptcy-court filings in 2010.

## XII.  CONCLUSION

148.    In view of the significant recovery to the Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law in support of approval of the Settlement, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be approved as fair and reasonable and that the proposed Plan of Allocation should likewise be approved as fair and reasonable.  In view of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Plaintiffs' Counsel, as described above and in the accompanying memorandum of law in support of the fee and expense request, Lead Counsel respectfully request that the Fee and Expense Application be approved in full.

I declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on September 7, 2016                          /s/ James M. Hughes
                                                      James M. Hughes

**CERTIFICATE OF SERVICE**

I, James M. Hughes, hereby certify that on September 7, 2016, I caused a true and correct copy of the attached Declaration of James M. Hughes in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and Lead Counsel's Motion for Attorneys' Fees, Reimbursement of Litigation Expenses to be served electronically on all counsel registered for electronic service for this case.

*/s/ James M. Hughes*
James M. Hughes